NC4sWAD1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          21 CR 472 (KPF)

5    NADINE JAZMINE WADE,

6                 Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        December 4, 2023
9                                       9:00 a.m.

10
     Before:
11
                      HON. KATHERINE POLK FAILLA,
12
                                        District Judge
13

14                       APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW J. KING
17        DINA McLEOD
          MICAH FERGENSON
18        Assistant United States Attorneys

19   ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
          Attorneys for Defendant
20   BY:  ROBERT A. SOLOWAY
          DAVID M. STERN
21

22   ALSO PRESENT:
     JAYDA FOOTE, AUSA Paralegal Specialist
     MAYERLIN ULERIO, Defense Paralegal
23

24

25

NC4sWAD1

```
1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record beginning with the government.

4              MR. KING:  Good morning, your Honor.

5              Matthew King for the government, joined at counsel's

6    table by my colleagues Micah Fergenson, Dina McLeod, and Jayda

7    Foote, a paralegal from our office.

8              THE COURT:  Good morning to each of you.  Thank you.

9              Good morning, Mr. Soloway.

10             MR. SOLOWAY:  Good morning, your Honor.

11             Robert Soloway for Nadine Wade, joined at counsel

12   table by David Stern and by our paralegal, Mayerlin Ulerio.

13             THE COURT:  Good morning to each of you.

14             Mr. Soloway, I'll note I'm having a little difficulty

15   hearing your microphone.

16             MR. SOLOWAY:  I just turned it on, Judge.  Sorry.  I

17   thought I pressed it.

18             THE COURT:  You may have pressed it off.  That's fine.

19             All right.  So I received some filings yesterday.  We

20   should talk about them.

21             From the government, who is going to be speaking to

22   this issue?

23             MR. KING:  I assume the adjournment question, your

24   Honor?

25             THE COURT:  That one, sir.
```

NC4sWAD1

1          MR. KING:  Mr. Fergenson will.

2          THE COURT:  I'm sure he appreciates it.

3          Mr. Fergenson, my question to you is this:  in your

4   response, what you talk about -- I just want to be sure I have

5   the pages, the page correctly, I believe it's on the first

6   page -- there is apparently 15,000 pages of discovery produced

7   in the recent past.  What it says is -- I'm looking about five

8   lines from the bottom -- the government has marked only a very

9   small subset for use in its case in chief, three exhibits in

10  total.

11         What I'm trying to figure out, sir, whether that is an

12  indication of what you have marked from the 7,000 pages that

13  relate to different portion of the investigation or whether

14  that's what you've marked out of the totality of materials that

15  are cited in the defense letter of yesterday.

16         MS. FERGENSON:  The former, your Honor, the 7,000

17  pages.

18         THE COURT:  OK.  How many exhibits have you marked out

19  of the totality of these materials, sir?

20         MS. FERGENSON:  Of the 15,000, your Honor?

21         THE COURT:  Yes, sir.

22         MS. FERGENSON:  I'm not certain of that number.

23  Certainly more than the three.

24         THE COURT:  Well, thanks.  OK.

25         MS. FERGENSON:  Just to give your Honor some sense of

NC4sWAD1

1    it, things that we have obtained, paper records we have

2    obtained from primarily banks, your Honor, there is maybe eight

3    banks involved.  Those consist of, perhaps, we got an

4    additional monthly statement that was missing from our

5    production, perhaps we got some additional withdrawal slips or

6    deposit slips and check images.  Those would be either, you

7    know, tacked on to exhibits that had been marked already and

8    incorporated or just added as a new paper exhibit for that

9    particular bank account.  For the bank records, that is the

10   sort of thing we have received.

11          We have also received some exhibits from other

12   witnesses we have been speaking with, like some of the romance

13   scam victims where they found, you know, from years prior they

14   found some photographs that they sent to the online alias or

15   that the online alias sent to them.  You know, we've gotten

16   some -- just to give your Honor a sense of the categories, we

17   have gotten some from other sort of businesses.  We've got some

18   additional FedEx records, for example.  Nothing terribly

19   voluminous, involving, you know, one is three records for a

20   Florida address, another is, you know, about 50 FedEx records

21   for an address in New Jersey.

22          Those things we have received and we have marked.

23          THE COURT:  Let me direct your attention, then, sir,

24   to something on the second page of the defense request, and

25   that is there is something PNC Bank call audio, TD Bank call

NC4sWAD1

 1    audio, and transcriptions of earlier audio calls.

 2            Now on the transcriptions front, I'm sure you'll tell

 3    me the Capital One materials were produced earlier.  I guess

 4    what I'm trying to figure out is, I don't know what these are

 5    and I don't know whether these are coming in or the government

 6    is seeking to bring them in at trial.

 7            MS. FERGENSON:  Yes, your Honor.

 8            So in speaking with the bank witnesses, one of the

 9    things we learned after following up with them about it was

10    that they could have recorded calls.  They checked again and

11    they did have, in some instances, many recorded calls.

12            TD Bank had 100 recorded calls.  They produced those

13    to us.  We reviewed them, we have produced them promptly to the

14    defense, we reviewed them, we have marked --

15            THE COURT:  May I imagine that Ms. Wade shows up

16    nowhere anywhere on these calls.

17            MS. FERGENSON:  No, your Honor.  They are calls with

18    Ms. Wade.

19            THE COURT:  Thank you.  I see.

20            MS. FERGENSON:  Now, but a couple things to note

21    about, just taking the TD Bank example.

22            THE COURT:  Please.

23            MS. FERGENSON:  There are 100 calls.  We reviewed them

24    very quickly, produced them immediately, and reviewed them very

25    quickly.  And we have marked maybe a subset of nine or ten that

NC4sWAD1

1    just fall in the time period from May 28, 2020, through about

2    June 10, 2020.

3              And just, again, the number 100 obviously is a lot and

4    the hours of audio is a lot, but many of these calls are

5    extremely anodyne.  Many of the length of the calls is just

6    because she is on hold with a bank customer service rep waiting

7    to, you know, while they are looking into her account or

8    verifying her account.  That's a lot of the time spent on these

9    audio recordings.

10             And so at the end of the day, what the government is

11   seeking to use is a very small portion of the 100.

12             THE COURT:  I believe the defense would respond that

13   it, nonetheless, has to listen to all 100 to determine, if

14   you're using them, are you using them in the totality or using

15   excerpts from them, sir?

16             MS. FERGENSON:  I think we will offer the totality of

17   the calls we're using, your Honor, for the sake of the jury.

18   And, your Honor, we will probably try to skip ahead to the most

19   significant portions.

20             THE COURT:  All right.  There won't be from your --

21   you will argue there isn't a Rule 106 issue, a completeness

22   issue, although they may argue that there are additional calls

23   that are necessary to place those in context.

24             MS. FERGENSON:  I think that's fair, your Honor.

25             THE COURT:  OK.  All right.  So this call audio, this

NC4sWAD1

```
 1    is, I did not appreciate that this was of Ms. Wade herself.
 2              All right.  Are there other category of materials that
 3    you would like to speak to, sir?
 4              MS. FERGENSON:  No, your Honor, unless the court has
 5    additional questions.
 6              THE COURT:  I have asked the questions I have.
 7              Thank you.
 8              Mr. Soloway, am I turning to you or someone else on
 9    your team to discuss this?
10              MR. SOLOWAY:  That would be me, your Honor.
11              THE COURT:  Sir, thank you very much.
12              Mr. Soloway, I was in this weekend, obviously
13    preparing for trial, and I did not hear -- earlier in the week
14    of last week I received a request from your team for the
15    appointment of a third person to the trial team, so I granted
16    that immediately upon its receipt.  And one of the proffered
17    reasons, sir, was because you were addressing discovery that
18    was being produced by the government before trial.
19              So, please, I was surprised to now see this
20    adjournment request.  I'm more surprised because I received it
21    three o'clock yesterday, a motion in limine.  There was no hint
22    until 11 o'clock last night, and even then I wasn't given a
23    courtesy copy of the document.  There was nothing to suggest
24    that there was adjournment request coming.  So I got ready for
25    bed thinking I was ready for this trial.
```

NC4sWAD1

1         What happened between three o'clock yesterday and 11

2    o'clock yesterday to change your mind?

3         MR. SOLOWAY:  Your Honor, I would say that the

4    application that we made, first of all, was made reluctantly

5    except this, to say that it was made reluctantly doesn't mean

6    that we didn't feel that we had to make it.  We resisted making

7    it.

8         The government identified conversations that we had

9    with them.

10        THE COURT:  Yes, and concessions you extracted from

11   them in exchange for not making the motion.  That's why, sir,

12   please recall, no, you never even hinted to me that you were

13   making adjournment request.

14        Did you?

15        MR. SOLOWAY:  No.

16        THE COURT:  Right.  So I'm allowed to be surprised,

17   and very surprised that you did so at literally the eleventh

18   hour.

19        MR. SOLOWAY:  Yes.  We think, Judge, of course that

20   the eleventh-hour nature of the motion is driven by the way

21   that things progressed from November 15 until the very present,

22   and the representations and the reliance on representations

23   that things would be coming, especially in the initial

24   conversations with the government when we did say we would not

25   be making a motion for a continuance and that you should turn

NC4sWAD1

1     over the 3500 material based on that representation.

2          Then on the Monday following that weekend, the

3     government did that.  But it's not going to surprise you to

4     hear me say that our position is that the discovery kept on

5     coming.  And not only did it keep on coming, but it increased

6     in volume, and it increased in volume in ways that made it

7     impossible toward the very end, when on November 29 and

8     November 30 respectively we received the TD Bank calls and the

9     PNC call audios.

10          And we, as the government has indicated to you, the

11     calls are all with our client.  The fact that the government is

12     presenting some of them doesn't mean that there isn't much on

13     those calls that is going to be helpful to us if we know about

14     it.

15          For the government to give us things and say whatever

16     they say about it in the nature of either it's tangential or

17     it's not central to our case, when they give us things, we have

18     to look at them.  We have to -- and that includes the 7,000

19     that they characterize as tangential.

20          And it's also noteworthy, Judge, that the government

21     really hasn't identified a reason for requesting all of these

22     records late.  I mean, they also don't even mention in their

23     response to this court the fact of these audio calls, which

24     they have selected groups of from the four banks, and we are

25     not in a position to know their content.

NC4sWAD1

| | |
|---|---|
| 1 | We are trying and at the last -- so the eleventh hour |
| 2 | is when our motion was made, but that's because things never |
| 3 | changed and didn't for the good, but continued to worsen in |
| 4 | terms of our ability to keep up during the period of time when |
| 5 | it's our role and our expectation that the bulk of the Rule 16 |
| 6 | material that we have to deal with, we have.  And that our job |
| 7 | during the runup to the trial is to read the 3500 material and |
| 8 | prepare our in-court presentations, not to incorporate new |
| 9 | materials into the Rule 16 universe of things we have, because |
| 10 | it's complicated to do that. |

Even when you receive additional bank records that are just bank records, when you have, for example, a universe of TD Bank records and then one of the things that happened is that we received, you know, another bunch of TD Bank records, and we had to figure out where they went and how they fit in and what was new in them.

And, you know, it's really not something that we felt at the eleventh hour, but not because of us at the eleventh hour, that could be ignored responsibly as defense lawyers representing someone on trial because we want to walk in here knowing that we have command of the material that is pertinent. And that applies to the material that the government is representing is tangential.  Because to us, we want to look at it.  We think we know what they are talking about, but we are reading it and, you know, they gave it to us.

NC4sWAD1

1          So really that's it, Judge.  I'm not going -- unless

2     you have other questions for me, our view really is that we, in

3     this last two weeks, have been robbed of the ability to do what

4     we have to do, which is to prepare our in-court presentations

5     by these things that the government -- and this is what they

6     did.  I'm not --

7          THE COURT:  You're not suggesting that they produced

8     them to you any later than upon receipt, correct?

9          MR. SOLOWAY:  100 percent correct.

10          THE COURT:  All right.  You just feel they started too

11     late getting these materials.

12          MR. SOLOWAY:  That is correct, and for us to

13     meaningfully review them.  If we meaningfully review them, then

14     we can't -- we can't be ready to come into court and start

15     dealing with the witnesses in a meaningful way, having to make

16     that kind of choice because of the way that the government did

17     what they did.  Again, without, you know, these materials

18     are -- they might say some thousands of them are not material,

19     but they are material.  Things that were given to us in the

20     last two to three weeks are extraordinarily material, and that

21     is particularly true of the calls, which are the most difficult

22     things for us to manage and are very, very important.

23          I could give examples of why they are important, but I

24     don't think -- and the government knows why they are important.

25          THE COURT:  They are.

NC4sWAD1

1          OK.  I'll accept that.  I presume your colleague is

2     back at the office listening to them now?

3          MR. SOLOWAY:  You're referring to Mr. Anderson?

4          THE COURT:  I am.

5          MR. SOLOWAY:  No.  He's been asked to work on the

6     writing projects that -- we had the motion and the motion, of

7     course, for the state of mind that he wrote over the weekend.

8          But he's not reviewing discovery.  That's not what we

9     brought him on to do, your Honor.

10          (Counsel confer)

11          Yes.  I mean, you know, Mr. Anderson, he's a very,

12     very good lawyer, but we were scrambling to try to find

13     somebody.  He's got a lot of things that he's also doing right

14     now.  This is, for everybody, the eleventh hour and we weren't

15     really -- we weren't able to find somebody to join as a third

16     attorney, the trial team, such as, you know, in an equal sort

17     of way.

18          But he was able to devote the time we asked for a

19     limited number of hours.  He was able to devote a certain

20     amount of time, but not to become involved in the way that, you

21     know, a third attorney on the case would ordinarily be part of

22     the trial team and here in court with us every day.  He wasn't

23     able to do that.  That's what I can say about that.

24          THE COURT:  All right.  Thank you.

25          Mr. Fergenson.

NC4sWAD1

1          MS. FERGENSON:  Yes, your Honor.  Just not to belabor

2     the points.

3          THE COURT:  No, I want you to belabor the points.

4     This is very important.

5          MS. FERGENSON:  The discovery was produced on a

6     rolling basis over a several-week period and the defense has

7     had that discovery well in advance, to understate the point of

8     their adjournment request last night.

9          THE COURT:  They've said to me, sir, that they

10     received a significant amount of call audio on the 29th of

11     November and the 1st of December.

12          MS. FERGENSON:  Yes, your Honor.  That's correct.

13          THE COURT:  OK.  And is it approximately 16 hours from

14     TD Bank and four and a half hours from PNC?

15          MS. FERGENSON:  I actually don't know.  I have not

16     measured it that way, your Honor.  I know it is about 100 calls

17     from TD Bank and around 40 from PNC.

18          THE COURT:  All right.  I mean, what I want --

19          Sir, don't sit down just yet.  Thank you.

20          MS. FERGENSON:  Yes.

21          THE COURT:  Mr. Fergenson, what I want you to address

22     is Mr. Soloway's point that, irrespective of the good faith of

23     the government's production, irrespective of the work that you

24     did and the quickness with which you turned it over, they have

25     an obligation to review it.  Of course they cannot take your

NC4sWAD1

```
1    word that it would be -- that it is exculpatory inculpatory.

2    However, the government is describing it as tangential, and

3    that that is the problem that they are having.

4         Now I'm aware, as we're all aware, that there will be

5    two days this week where we're not sitting.  All we have to get

6    through today is jury selection.  That there are two days of

7    witnesses that you have already identified for the defense and,

8    perhaps, for which these calls might not be necessary.  But I

9    want to understand, because if what you're going to tell me is

10   that, fear not, Failla, because Thursday and Friday we're free

11   and they can work on it then.  Then that may be part of an

12   answer, but I just want to hear from you.

13        When do you expect them to listen to these materials?

14        MS. FERGENSON:  Well, your Honor, I guess we expected

15   them to listen to them the same time we were listening to them,

16   which is right after we produced them.

17        And in terms of the witness order that we provided,

18   yeah, I mean, to give you -- just to give you who we were

19   planning to call on Tuesday and Wednesday.

20        THE COURT:  I believe I have your exhibit, sir, yes.

21        MS. FERGENSON:  So we are planning to call Citibank

22   and Capital One, whose calls were produced earlier and

23   transcriptions for those calls have also been produced, for the

24   ones that are marked as exhibits.  And we were also planning to

25   call TD Bank in the first two days.
```

NC4sWAD1

1          Now, TD Bank's exhibits were also marked and the

2     transcripts for those exhibits were also produced already.

3          THE COURT:  I'm asking the question.  Is there a

4     witness that you could sub into the TD Bank witness this week?

5          MS. FERGENSON:  Yes, your Honor.  I think we could

6     confer about that, just to confirm, but I think we could move

7     TD Bank to the following week.

8          THE COURT:  OK.  What else do you want me to know,

9     sir?

10          MS. FERGENSON:  Just one moment, your Honor.

11          THE COURT:  Of course.

12          (Counsel confer)

13          MS. FERGENSON:  And just to complete the picture for

14     your Honor, the PNC, we are planning to call PNC witness that

15     would be the following week.  So both TD and PNC and their

16     calls would be addressed in the second week.

17          THE COURT:  I hesitate to ask this question, sir, and

18     this is the product of my own concerns about my trip later in

19     the week.

20          Mr. Felix is going to be called; yes?

21          MS. FERGENSON:  Yes, your Honor.

22          THE COURT:  The second week.

23          MS. FERGENSON:  Yes, your Honor.

24          THE COURT:  I assume he's a day or a two-day witness;

25     no?

NC4sWAD1

1          MS. FERGENSON:  Not for us, your Honor.

2          THE COURT:  Fair enough.  OK.  Fair enough.

3          I would just think the sting drawing is pretty

4    significant, but maybe I misperceive him.

5          All right.  Thank you.

6          (Pause)

7          Thank you very much for your patience.  I am not

8    adjourning the trial.  I am not precluding the use of this

9    material.  I have considered the parties' submissions, I have

10   considered the volume of materials, and I have considered the

11   type of materials that were produced.  I recognize that the

12   materials were produced promptly upon their receipt, and I

13   understand, therefore, that the defense had the materials this

14   weekend and had all weekend to review them.

15         I also understand the prior history of adjournment

16   request discussions between the parties and the concessions

17   that were given to the defense as a result of them.  It is

18   noteworthy, although not dispositive, there was no notice to me

19   at any time before last night.  I also note that the defense

20   has three members on the team.  They can allocate the work

21   among the three of them.  They do not all need to be in the

22   court at the same time, and if it is something that they need,

23   we can try and work to get them a breakout room or something

24   here in this courthouse during the trial day.  If they ask me

25   for one, I'll do what I can.  I can give them my own jury room

NC4sWAD1

1    at 618, and we can give them that.

2              But, more importantly, there are only three trial days

3    of this week, and none of them are going to implicate all of

4    these materials.  Today is all jury selection, nothing else,

5    and two later days in the week that can be used for preparing

6    for trial and considering these materials.  And the government

7    is going to move the TD Bank witness to next week so that they

8    have four days, effectively, to consider how, if at all, these

9    materials affect their questioning of the TD Bank and PNC Bank

10   witnesses.

11             With that, I am denying the request.  So we're today

12   picking a jury and going forward with trial.

13             There was a second issue, which was the motion in

14   limine.  Did the government wish to be heard on that, Mr. King?

15             MR. KING:  Yes, your Honor.

16             THE COURT:  All right.  There is not a written

17   response, sir?

18             MR. KING:  There is not yet a written response, your

19   Honor.  We wanted to address that issue with you now before

20   putting in a submission, in part, because it's the government's

21   view that we're not in a position to respond in writing, nor is

22   the court from our view in a position to rule on the motion as

23   it is.

24             That is because the defense has moved to admit in mass

25   500 pages worth of text messages and e-mails between their

NC4sWAD1

1    client and Mr. Felix, which probably conservatively amount to

2    3,000 or so statements of the defendant.

3            And in their motion, they proffer two bases for that,

4    but don't with any specificity identify the statements in that

5    whole group that they wish to admit, nor do they proffer any

6    specific argument for the admissibility of those statements.

7            Absent the defense providing a specific basis for the

8    statements they seek to admit, the government feels that it

9    can't respond to the motion, nor can the court rule on it

10   effectively.  The defense has flipped the burden of

11   admissibility of saying to the government, go through these

12   3,000 statements and identify which one of them do you believe

13   are not admissible.  That is, of course, not how the process

14   should go.

15           It's the burden of the proponent of the evidence,

16   which is here the defense, to lay out and convince your Honor

17   why they are admissible.  So what the government would suggest

18   is that your Honor tell the defense to submit a supplemental

19   motion laying out further proffers of the admissibility of

20   whatever specific statements within that large group of

21   material they, in fact, wish to offer so that the government

22   can respond and tee up for your Honor, in a specific a fashion

23   as possible, what the disputes about admissibility are.

24   Because there may not be.

25           The government may not dispute admissibility of

NC4sWAD1

1    certain statements within this larger group, but as it's been

2    presented to the government and the court, that work cannot be

3    done by the government.  And so we would suggest that your

4    Honor ask the defense to submit a supplemental motion by the

5    end of the day tomorrow so that the government can then present

6    a written response addressing the proffers of admissibility on

7    particular statements.

8            THE COURT:  All right.  Mr. Soloway, am I hearing from

9    you, or Mr. Stern?

10           MR. SOLOWAY:  From me, your Honor.

11           THE COURT:  All right.  Sir, my concern is that, as I

12   understood, you were seeking to admit wholesale these text

13   messages and they cover many, many different topics.  Some

14   personal, some more business-related.  But it's hard for me.  I

15   have not had a situation, sir, where as a lawyer or as a judge,

16   where someone has sought to admit the totality, sort of the

17   totality of communications, e-mail or text, with a party and

18   said, here, discern state of mind from this.

19           I have certainly had instances in which someone has

20   sought to admit a particular message, particular communication

21   saying that irrespective of its truth or falsity, it's being

22   admitted for the state of mind for the effect on the listener.

23   But I don't understand that that is what you have.

24           So may I please have a better understanding of why

25   months of communications come in, in a single foul swoop?

NC4sWAD1

1         MR. SOLOWAY:  We believe, your Honor, that the

2    entirety of the communications that exist -- and there were

3    others that no longer do exist -- but what does exist, we made

4    available to the government, and they made available to us in

5    discovery a set of direct messages or chats between Mr. Felix

6    and our client.

7         Our position is that the entirety of those materials

8    are relevant, and they are relevant on the issues that we have

9    identified in the motion.  I really don't think that -- and our

10   client, just so your Honor knows and the government knows, our

11   intention is to put or to propose to put, of course, the

12   entirety, the entire universe of these materials in, but to

13   create excerpts that we want the jury to specifically or

14   particularly hear.

15        We think the jury should be able to hear or listen to

16   or read -- read, actually -- the entirety of them in their

17   entirety.  They are the story of the state of mind that we

18   expect or hope to elicit that explains the -- well, you know,

19   to put it in the way that it is, that our client was in love

20   with Abuchi Felix.

21        I know we have said this in the papers, because it's

22   our position that being in love with someone is related to

23   trusting them.  And the government, of course -- and I know

24   this was mentioned in the papers, but I'll just hit on it or

25   refer to it again.  it is incredibly directly relevant to the

NC4sWAD1

1    issue of conscious avoidance to have the jury understand what

2    was going on here and the specific granular exchanges that

3    existed that pertain to what Ms. Wade's state of mind was.

4            If you look at the entirety of these materials --

5            THE COURT:  I have.

6            MR. SOLOWAY:  Thank you, Judge.

7            -- there is never going to be a part of it that isn't

8    relevant to what our defense is here.

9            THE COURT:  OK.  I understand that.  I'm not yet

10   disputing the relevant --

11           No, let me finish, sir.  Thank you.

12           I'm not ready to dispute the relevance of the

13   materials, although I'm not sure each text message can itself

14   be relevant.  You're saying all of them as a group are

15   relevant.  But relevant doesn't equate to admissibility.  And

16   for many of these messages, it seems to me that what matters is

17   their truthfulness.

18           So this idea that they can be admitted for state of

19   mind is difficult because, for example, the November 16, 2017,

20   text about money laundering, that only matters to her state of

21   mind if you believe what she is saying.

22           So I'm not sure this idea -- that's the problem I'm

23   having.  When I think of state of mind, what you're telling me,

24   irrespective of the truth or falsity, it is the effect on the

25   listener.  It is what the listener or the listener is saying in

NC4sWAD1

1    response to hearing something or doing and saying where truth

2    or falsity doesn't matter.

3        But here, from many of the texts, I think the truth

4    does matter, and it's indicative or you would be relying on it

5    for its truthfulness.  I'll tell you right now, they are not

6    coming in as a whole group.  So if there are some excerpts that

7    you think should come in either because they are indicative of

8    sort of impeachment for Mr. Felix when one day he testifies,

9    I'll listen to you on that.

10        And if your client is testifying, I may have to

11    revisit the whole issue.  But even then I don't think I would

12    let them all in.  I just don't see -- I've never had someone

13    say, in order to understand my client, you have to just admit

14    all of her text messages with someone.  I just don't see that

15    here.

16        MR. SOLOWAY:  Well, I think, you know, the way we

17    would propose, for example, having the jury -- the jury's

18    relationship with these materials, in our view, would be

19    partially limited by our intention to create excerpts --

20        THE COURT:  No, but you're --

21        MR. SOLOWAY:  -- as exhibits.

22        THE COURT:  Stop.

23        You are asking me to admit all of them.  I'm not going

24    to admit all of them.  Full stop.

25        So if there are excerpts that you wish to admit, we

NC4sWAD1

```
 1    can talk about that.  But I'm not admitting months and months
 2    of text messages as a single exhibit, even if you're then going
 3    to excerpt further from them.  You're not saying to me the jury
 4    will only be pointed to some of them, doesn't help me if you're
 5    seeking to admit them all.  I have figured that out in my years
 6    on this planet, sir.  So let's try again.
 7             MR. SOLOWAY:  I think we will --
 8             I hear your Honor.
 9             THE COURT:  OK.
10             MR. SOLOWAY:  And we will go back and respond
11    appropriately to what I've heard from your Honor just now.
12             THE COURT:  OK.
13             MR. SOLOWAY:  So, thank you, your Honor.
14             THE COURT:  All right.  Then that's where we are.
15             All right.  I guess we're waiting for a jury.  Let me
16    just check in with my deputy.
17             I don't think they are ready.  They are not ready yet.
18    You have a few moments to gather your thoughts together and, I
19    don't know, work on things.  If defense counsel wants a room,
20    we'll try and find you a room.
21             Do you want me to start looking?
22             MR. SOLOWAY:  I think we're going to 100 percent take
23    you up on that and have somebody in there, yes, working away.
24             THE COURT:  We'll do that right now.
25             Thank you.  Be back when we can.
```

NC4sWAD1

1                    MR. SOLOWAY:  Thank you, your Honor.

2                    (Jury selection followed)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25