NC5Gwad1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                         21 CR 472 (KPF)

NADINE JAZMINE WADE,

          Defendant.
                                  Trial

------------------------------x

                              New York, N.Y.
                              December 5, 2023
                              8:45 a.m.

Before:

               HON. KATHERINE POLK FAILLA,

                              District Judge

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW J. KING
     DINA McLEOD
     MICAH FERGENSON
     Assistant United States Attorneys

ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
     Attorneys for Defendant
BY:  ROBERT A. SOLOWAY
     DAVID M. STERN

ALSO PRESENT:
JAYDA FOOTE, AUSA Paralegal Specialist
MAYERLIN ULERIO, Defense Paralegal

NC5Gwad1

1          (Trial resumed)

2          THE COURT:  Counsel, good morning.  I understand from

3    my deputy that the parties wish to speak with me this morning.

4          I have a jury who has been waiting very patiently, and

5    I would like the parties' consent to have my deputy tell them

6    that a legal issue has arisen, that we are addressing it as

7    efficiently as we can, as promptly as we can and we'll get back

8    to them.  Because I don't want them annoyed at us on the first

9    day because I made such a big deal about them showing up on

10   time and they did.

11         Is there anyone who objects to having my deputy just

12   give that summary to the jury?

13         MR. STERN:  No.  We think that's a wise thing to do.

14         MR. KING:  That's fine with the government, your

15   Honor.

16         THE COURT:  Ms. Noriega, please do that.

17         From whom will I be hearing?  Mr. Stern.

18         MR. STERN:  Ms. Wade has things she wants to tell the

19   Court.  We have advised her in the strongest terms that we can

20   that she should not do that.  She insists on doing it.

21         We would like you to hear what she has to say, at

22   least initially, ex parte.  Then if you think it should be

23   shared with the government, of course, you can do that.

24         THE COURT:  May I have a sense -- or is the answer not

25   until the ex parte -- of the general topic matter.  Is it about

NC5Gwad1

1    this trial, is it about something else?

2          MR. STERN:  It is about this trial.  And beyond that,

3    I'm not sure I can give you a sense of it.  It's Ms. Wade's own

4    thoughts that I don't entirely, I guess I would say,

5    understand.

6          THE COURT:  Okay.  And do I understand you advised her

7    not to have this conversation with me, and she still wishes to?

8          MR. STERN:  Correct.  We have advised her not to have

9    this conversation at all, but she thinks it's very important

10   that she have this conversation.

11         THE COURT:  With me?

12         MR. STERN:  With you, yes.

13         THE COURT:  One moment, please.

14         Does the government wish to be heard on this?  I'm

15   capable of hearing things, I kind of do it for a living, but I

16   want to hear if you have an objection to this.

17         MR. KING:  Can we have one moment, your Honor.

18         THE COURT:  Yes, sir.

19         (Conferring)

20         MR. KING:  Your Honor, if I may.

21         THE COURT:  You may, sir.

22         MR. KING:  The government objects to the proposed

23   ex parte nature of Ms. Wade's comments to the Court.  The

24   government sees no reason why, and there's been no reason

25   proffered why it should proceed in ex parte fashion.

NC5Gwad1

1  Defendants often speak directly to the Court even against the

2  wishes of their lawyers, that happens on the record in open

3  court, so the government would object to this happening

4  ex parte.

5              THE COURT:  I appreciate that, sir.

6              I think what I'll do is I will hear it in the first

7  instance ex parte.  If I determine it was inappropriately made

8  ex parte, I will let you know.  I also am conscious of the fact

9  that we should be impaneling this jury and starting this trial.

10             I would like the defense team, including Ms. Wade, in

11 the robing room in just a moment.

12             (Pages 29 through 46 SEALED)

13

14

15

16

17

18

19

20

21

22

23

24

25

NC5Gwad1

1          (In open court)

2          THE COURT:  To those of you who have been in the

3     courtroom the past few minutes, I appreciate your patience.

4          Let me tell you what I can tell you.  And that is that

5     Ms. Wade had several questions for me about this process, and I

6     answered those questions to the best of my ability.

7          There was a request for a copy of the indictment.  I

8     gave her my copy of the current indictment.

9          There was a request for information about the

10    participants in the case, which would include you and me and

11    our certifications or authorizations to perform the roles that

12    we perform.  I advised Ms. Wade that she can file a FOIA

13    request if she wants, for example, my commissioning certificate

14    or yours.  And that's what I'm going to tell you.

15         Those questions have been asked and answered.  And I'm

16    advised by her counsel that we are ready to go forward.

17         Counsel, are we ready?

18         MR. SOLOWAY:  We are ready.

19         Ms. Wade has asked me to raise the fact that we object

20    to the placement of this particular podium here, which

21    obstructs the view of the jury by Ms. Wade.

22         THE COURT:  Ms. Wade is certainly -- if you are

23    comfortable with this -- she can sit on the table that is

24    perpendicular to yours during, for example, questioning of

25    witnesses so she can better see the jury.

NC5Gwad1

1          MR. SOLOWAY:  Thank you.

2          THE COURT:  That may impair your ability to consult

3    with her.

4          MR. SOLOWAY:  Indeed.

5          THE COURT:  But I will let you all figure that out.

6          MR. STERN:  Judge, with your permission, I'll sit with

7    here over there.

8          THE COURT:  All right.  If, for some reason, it

9    doesn't work out, I will let you know.  I have no reason to

10   believe it won't.

11         Government has no objection; correct?

12         MR. KING:  No, your Honor.

13         THE COURT:  Thank you.

14         So friends, it's my intention to impanel this jury and

15   give them the preliminary instructions.

16         Mr. King, is it you who is giving the opening, sir?

17         MR. KING:  Yes, it is, your Honor.

18         THE COURT:  Are there demonstratives today?

19         MR. KING:  Not for the opening.

20         THE COURT:  Mr. Soloway, are you opening, sir?

21         MR. SOLOWAY:  No, your Honor.

22         THE COURT:  I'm sorry.

23         MR. SOLOWAY:  I thought you were asking me are there

24   demonstratives.

25         THE COURT:  No, sir.  I asked the preliminary

NC5Gwad1

1  question, are you opening.

2          MR. SOLOWAY:  I'm sorry, I didn't hear that.

3          THE COURT:  I will take the no to the second question

4  I was about to ask you.

5          MR. SOLOWAY:  Correct.

6          THE COURT:  My deputy is lining up our jurors who

7  arrived on time, which is always a good thing.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NC5Gwad1

1          (In open court; jury present)

2          THE COURT:  Ladies and gentlemen of the jury, thank

3   you very much.  I was quite adamant that you be here on time,

4   and I'm glad that you were.

5          Sometimes it happens that legal issues arise during

6   the trial.  It was important that this one be resolved before

7   we saw you, before we began, so that is now happening.

8          Ms. Noriega, would you please swear in the jury.

9          (A jury of 12 and 4 alternates was impaneled and

10  sworn)

11         THE COURT:  Good morning, everyone.  This case is now

12  officially on trial.  Just to remind you, this trial is

13  expected to last about eight trials days.  It should end at the

14  end of next week.  I will mention again, my trial day is a

15  little different from other judges.  I think the custom here is

16  to start at 9:30 and end at 5 or 5:30 and have an hour and a

17  half in the middle for lunch.  I begin my day a little earlier,

18  at 9, I have a shorter lunch break and shorter breaks in the

19  morning and afternoon.  The trade-off is that we end somewhere

20  between 3 and 3:30, that will be governed by where we are with

21  witnesses.

22         If, for example, a witness is about to conclude, we

23  might go over a little bit.  If a witness ends and there's five

24  minutes left in the day, I'll send you home.  But we will be

25  playing it a little bit by ear, because one can never tell how

NC5Gwad1

1    long a particular witness will take.

2              I discussed with you yesterday the roles that you and

3    I perform during this trial.  In order to do my job -- and this

4    morning is a perfect example of it -- I sometimes have to

5    interrupt the proceedings and talk to the parties about the

6    rules of law that will apply during this trial.  We'll

7    sometimes talk here in the courtroom, we'll sometimes talk in

8    your presence, we'll sometimes talk at the sidebar where you

9    won't with able to hear us, we'll sometimes talk in the robing

10   room outside of your hearing.  To the extent that these

11   conferences take more than a minute or two, I would excuse you

12   from the courtroom if they were taking place here.  I will try

13   to avoid these interruptions as much as I can.  But I am going

14   to ask you to be patient as I address them because I need them

15   to ensure the fairness of the trial.  I'll also let you know,

16   as a practical matter, they often have the effect of

17   streamlining the trial so the trial proceeds a little more

18   efficiently.

19             Let me talk to you now about the burden of proof here.

20   And the burden is on the prosecution to prove Ms. Wade's guilt

21   beyond a reasonable doubt of each count in the indictment.  And

22   I will instruct you on more detail on this issue at the

23   conclusion of the trial.  Let me say, for now, that reasonable

24   doubt is defined or can be defined as doubt based upon reason

25   and common sense.  It is the doubt that a reasonable person has

1    after carefully weighing all of the evidence.

2            The burden of proof never shifts to Ms. Wade for the

3    simple reason that the law never imposes on a defendant in a

4    criminal case the burden or duty of calling any witnesses or

5    producing any evidence.  The law presumes Ms. Wade to be

6    innocent on all of the charges against her.  If, after careful

7    consideration of all of the evidence presented during this

8    trial and following the rules of law that I will explain to you

9    at the conclusion of the trial, you have a reasonable doubt as

10   to Ms. Wade's guilt of a particular charge in the indictment,

11   you must acquit her of that charge.  You must find her not

12   guilty.  If, however, after careful consideration of the

13   evidence presented during the trial and following the rules of

14   law that I will explain to you at the conclusion of the trial

15   you have no reasonable doubt as to Ms. Wade's guilt of a

16   particular charge, then you must convict her of that charge,

17   you must find her guilty.

18           It is a fundamental principle of law that a defendant

19   has the right not to testify.  If Ms. Wade elects not to

20   testify, you may not draw any inference against her based on

21   that decision.  And that fact may not enter into your

22   deliberations in any way.

23           I'll explain to you now the order that this trial will

24   proceed in.  First, the government and then counsel for

25   Ms. Wade will present their opening statements.  An opening

NC5Gwad1

statement is not evidence, it's not argument, it's an outline of what each side believes the evidence presented at trial will show.  It is offered to help you follow that evidence as it is presented.

You will then hear from witnesses, the testimony of witnesses.  The government will call its witnesses.  The witnesses will first give direct testimony, and then each witness may be cross-examined by defense counsel.  There may be redirect testimony by the government.  There may be recross-examination by defense counsel.  And there may be, during the witness' testimony, the introduction of exhibits.  There may also be stipulations or agreements that are received into evidence.

After the government's case, Ms. Wade may, but need not, call witnesses.  If she does call witnesses, those witnesses will be examined and cross-examined, just as the government's witnesses were examined and cross-examined.  And if she presents evidence, it is possible the government may present evidence in rebuttal.

After all of the evidence has been presented, the attorneys for the government and for Ms. Wade will make closing arguments.  They may review the evidence in these arguments, they may make arguments to you about what conclusions they think you should or should not draw from the evidence presented at trial.  These arguments, just like the opening statements,

NC5Gwad1

1    are not themselves evidence.  You may find them helpful to you

2    in your deliberations.

3             After closing arguments, I will instruct you on the

4    law.  Then you will retire to deliberate on your verdict.  That

5    verdict must be unanimous, and it must be based solely on the

6    evidence or the look of evidence presented at the trial.

7             What is evidence?  Evidence consists of the testimony

8    of witnesses, documents and other items admitted into evidence

9    and stipulations agreed by the parties.

10            There are certain things that are not evidence, that

11   may not be considered by you as evidence, so let me give you a

12   list of what is not evidence.  First, statements and questions

13   by lawyers are not evidence, nor are any statements that I

14   make, including ones I'm making right now, or any questions I

15   ask of a witness.  The answers to the questions presented to

16   witnesses are what is evidence.  And arguments by attorneys,

17   they are not evidence.

18            Second, objections to questions are not evidence.

19   Lawyers have an obligation to their clients to make an

20   objection when they believe that evidence being offered is

21   improper under the rules of evidence.  You should not be

22   influenced by any objections or by my rulings on them.  If I

23   sustain an objection, then please ignore the question.  And to

24   the extent any answer was given, please disregard that answer.

25   If I overrule an objection, then please treat the answer given

NC5Gwad1

1    to that question as you would any other.

2              If you are instructed that a piece of evidence is

3    received for a limited purpose only, I'll explain to you the

4    purposes for which it can be considered, and I'll ask you and

5    instruct you only to consider it only for those purposes.

6              Third, any testimony that I directed you to disregard

7    or have excluded is not evidence.  It may not be considered by

8    you.

9              And fourth, anything you have seen or heard outside

10   the courtroom is not evidence and must be disregarded.  As I

11   said yesterday and I will keep saying throughout this trial,

12   you are to decide this case solely on the evidence presented

13   here in the courtroom.

14             As you decide the facts of this case, one of the

15   things you will have to determine is the credibility of the

16   witnesses.  When I use that term, credibility, what I mean is

17   how truthful or believable they are.  There is no formula to

18   evaluate this evidence.  For now, suffice it to say that you

19   bring into this courtroom all of the experience and background

20   of your lives.  It is often said -- you may hear the parties

21   say this -- you don't leave the common sense outside the

22   courtroom door.  And that's because the same types of tests

23   that you apply in your everyday dealings are the tests that you

24   apply in deciding how much weight, if any, to give to a

25   particular piece of evidence in the case.

1           The law does not require you to accept all of the

2       evidence admitted at trial.  And in determining what evidence

3       you do accept, you must make your own evaluation of the

4       testimony from each of the witnesses and you must make your own

5       evaluation of each exhibit received in evidence.  It is

6       essential, however -- and you will see me say this repeatedly

7       to you -- you must keep an open mind until all the evidence is

8       received.  And that is because the case may only be presented

9       step by step and witness by witness.  You may have had an

10      experience where someone told you a story with a version of

11      events and you found it compelling, but upon hearing another

12      person's version of the same events or upon questioning the

13      original person about their version of the events, things may

14      seem to you very different.  There may be another side to every

15      story.  And you should use your common sense and your good

16      judgment to evaluate each witness' testimony based on all of

17      the circumstances.

18          I cannot emphasize too strongly, you must keep an open

19      mind until the trial is over.  Do not reach any conclusions

20      until you have all of the evidence before you.

21          Do not decide this case based on what we call implicit

22      biases.  Everyone -- myself included -- has feelings or

23      assumptions or perceptions, fears, maybe even stereotypes, and

24      there are implicit biases that we may not even be aware of.

25      And these can impact how we see or hear and how we remember

NC5Gwad1

what we see or hear and how we make important decisions.  You
are making very important decisions in this case.  And for this
reason, I encourage you strongly to evaluate the evidence and
to resist jumping to conclusions based on personal likes or
dislikes or generalizations, gut feelings, prejudices,
sympathies, stereotypes or biases.

          Finally, let me caution you about certain rules or
principles governing you as jurors in this case.  First, you
must not talk to each other about this case or with anyone you
who has anything to do with this case until the end of the case
when you go into the jury room to decide on the verdict.  The
reason for this requirement is that you must not reach any
conclusion on any charge until all of the evidence is in.  As I
said -- I'll say again -- keep an open mind until you start
your deliberations in this case.

          Second, do not communicate with anyone else about this
case or anyone who has anything to do with this case until the
trial has ended and you have been discharged as jurors.  Anyone
else includes members of your family, any friends you may have.
And no communicating about the case means no communicating on
any social media site.  You may tell your family and friends
you are a juror on a criminal case, but please do not tell them
anything else about the case until you have been discharged by
me.

          Third, do not let anyone talk to you about the case or

NC5Gwad1

anyone who has anything to do with the case.  If anyone should

attempt to communicate with you about this case at any time

throughout the trial, either in or out of the courthouse,

immediately report that to my deputy, Ms. Noriega, and to no

one else.  And by no one else, I mean no one else, including

your fellow jurors.  To minimize the possibility of any

improper communication, I would ask you please to go straight

to the jury room when you come to the courthouse in the morning

and to remain in the courtroom or the jury room for as much of

the trial day as possible.

          Fourth, do not do any research or any investigation on

your own about this case or anyone who has anything to do with

the case.  Don't go visiting any place involved in the trial,

don't read or listen to any news reports about this case, if

there are news reports about this case.  Do not research the

case using the internet or anything else.  That's because your

decision in this trial must be based solely on the evidence or

look of evidence that is presented here in the courtroom.  All

that you need to know will be presented in open court by the

very capable attorneys who represent the parties.  And inform

me immediately through Ms. Noriega if you become aware of

another juror's violation of these instructions.

          Finally, it appears that each of you have been given a

notebook and a pen, that is because I permit jurors to take

notes.  Please understand that you are not obligated to take

NC5Gwad1

notes.  The notes are an aid to your recollection.  The court

reporters in this case record everything that is said in the

courtroom.  Any portion of the testimony can be read back to

you during your deliberations.  If you do take notes, please

remember that note taking may distract you from something

important that is happening on the witness stand.  If you do

take notes, make sure you have the correct juror number on the

front page of your notebook and make sure that you keep that

covered when you are not using it so that only you will be

making or seeing the notes that are written in that pad.  Let

me emphasize, please, that your notes are not to be shared with

the other jurors.  The fact that a juror has taken notes does

not entitle him or her to any greater voice in the

deliberations.  And a transcript will be available to jurors if

there's any difficulty in remembering the testimony.  Whatever

you do with that notebook, please leave it in the jury room at

the end of each trial day, and we'll make sure it's kept

secure.

　　　　　From this point to the time that you deliberate, it is

your duty not to discuss this case and not to remain in the

presence of other persons who may be discussing this case.  As

I instructed you yesterday, I have instructed the parties and

counsel in this case not to have any contact with you.  So if

you see them in this court complex and they don't acknowledge

you, they don't make small talk, if you find yourself in an

NC5Gwad1

1    elevator with them, please do not take offense.  They are not

2    being rude.  They are following the instructions that I gave

3    them yesterday.

4            This concludes my preliminary instructions to you.

5    And we begin with the initial stage of the case, which are

6    opening statements.  We begin, as I mentioned a moment ago,

7    with the government's opening statement.  I'll ask you to

8    please give your attention to the attorneys as they make their

9    opening statements.

10           Mr. King, when you are ready, sir.

11           MR. KING:  Thank you.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. KING:  This is a case about greed and lies.  Lies

2     told to the victims of a cruel internet scam who believed that

3     they had met the man of their dreams.  Lies told to the banks

4     where those victims were tricked into sending their

5     lifesavings.

6          The defendant, Nadine Wade, is responsible for lying

7     to those banks.  She is responsible for receiving and hiding

8     and transferring the money that was stolen from the victims of

9     that internet scam.

10          To pull off a scam like that, it takes a team of

11     criminals.  Scammers sitting behind computers in Africa found

12     the victims, convinced the victims to send them money through

13     the defendant and her partners.  Here in the United States, the

14     defendant did her part to collect that money and to send it

15     out, all but her cut, on a journey back to the scammers in

16     Africa.  She did that by lying and by laundering money.

17          For nearly four years, the defendant engaged in

18     textbook money laundering.  She created a fake company and she

19     opened bank accounts in a name of that company.  She picked up

20     envelopes full of victim money, she deposited that money in her

21     bank accounts, and she transferred it to other members of her

22     scheme.  Victim after victim.  FedEx envelope after FedEx

23     envelope.  Year after year.  Until by the end, the defendant

24     had laundered $1.5 million worth of money stolen from those

25     victims.

1          That is why we're here today, because when the

2     defendant collected and concealed and transferred money stolen

3     from those victims, when she lied to banks about where that

4     money came from, she committed multiple federal crimes:  Money

5     laundering, bank fraud, conspiracy.

6          Members of the jury, this is the government's opening

7     statement, an opportunity to preview for you what the evidence

8     will show and how we will prove that the defendant is guilty.

9          So what will the evidence show?

10         You're going to learn that in 2017, people from across

11    the United States started sending money to the defendant.  A

12    lot of money.  And most of that money went into the bank

13    accounts that the defendant opened in the name of a business

14    that she claimed sold women's clothing and cars.  But the

15    people that were sending money to the defendant and her company

16    were not her customers.  The defendant didn't have any

17    customers.  She had no employees.  She had no office.  She had

18    no inventory.  She didn't even have a website.  And that's

19    because her business wasn't real.  It was fake.  It was a

20    front.  It was a front for laundering money stolen from those

21    victims.

22         So why did so many people send so much money to the

23    defendant?

24         Because they were tricked by someone that they met

25    online on a dating website.  Someone who turned out to be just

a scammer.  After making the victims fall for them, those

scammers convinced the victims to send them money through the

defendant and told the victims lies about who the defendant was

and where their money was going.

        The victims, thinking they were helping the people

they had met online, flooded the defendant with money mostly by

sending her cashier's checks through the mail to a FedEx drop

spot at a Walgreens near the defendant's apartment.  One woman

sent $50,000 to the defendant, another $250,000, and another

$480,000 to the defendant.

        So what was the defendant doing?

        Almost every week, and sometimes multiple times a

week, the defendant went to that Walgreens.  She collected

FedEx envelopes stuffed with victim money.  Sometimes those

envelopes had cashier's checks for the defendant.  Sometimes

they had cash or money orders.  And sometimes they had a little

bit of everything, cash or money orders or cashier's checks.

        After collecting the victims' money, the defendant put

it in her bank accounts.  She transferred it on to other

members of the scheme.  Eventually it found its way back to the

scammers in Africa.  But the defendant didn't do that for free.

Of course not.  She used the victims' money to line her own

pockets.  She used it at department stores, at restaurants, and

to travel.  And she withdrew cash, tons and tons of cash.

        Now, over time, the banks started to get suspicious

1    about the activity happening in the defendant's bank accounts.

2    Many of them called the defendant to confront her about what

3    was going on.  Some of them even told the defendant that she

4    was under investigation for fraud.

5              Did the defendant stop her activity?

6              Did she tell the truth to the banks?

7              Not even close.  She lied again and again to the banks

8    to keep that victim money flowing.

9              In the end, the banks shut down every single bank

10    account the defendant had opened, all 17 of them.  Bank after

11    bank.  Account after account.  Year after year.  Until by the

12    end, the defendant couldn't get a bank account open at any

13    bank.

14              That is what the government will prove to you at this

15    trial, that the defendant is guilty beyond a reasonable doubt

16    of laundering victim money and defrauding banks.

17              So how will we prove that the defendant is guilty?

18              You're going to hear from some of the victims

19    themselves.  They will tell you how they were tricked into

20    sending money to the defendant and her company by someone they

21    met on a dating website.

22              You'll see some of the victims' communications with

23    the people they met online.  You'll see the scammers direct

24    those victims to send money to the defendant and her company.

25    And you'll see photographs of the checks made out to the

1    defendant's company and the FedEx labels addressed to the

2    defendant.

3            You'll see bank records for the defendant and her

4    company.  In those records you'll see the same thing over and

5    over and over again.  The defendant deposits large sums of

6    victim money, and then a few days later, the money is gone.

7    She withdraws it.  She transfers it.  She spends it.  Over and

8    over and over again, for nearly four years, to the tune of

9    $1.5 million.

10           You'll also hear from the defendant's ex-husband, who

11   is one of her partners in crime and a leader of this money

12   laundering scheme.  He will tell you how the scheme worked, how

13   the defendant opened bank accounts, how she picked up envelopes

14   full of victim money, and how she dropped off cash to other

15   members of the scheme.

16           He will tell you how he told the defendant that he had

17   a car business and explained that the money she was gathering

18   was for his customers.  He will also tell you that there was no

19   car business, and he will tell you how the defendant had every

20   reason to know that the car business wasn't real.  All the red

21   flags:  The FedEx envelopes sent to a Walgreens, the

22   consistently closing bank accounts, and the shady cash dropoffs

23   the defendant made to men sitting in cars on the side of the

24   road.

25           Now, make no mistake, the defendant's ex-husband has

NC5sWAD2                    Opening - Mr. King

pleaded guilty to federal crimes.  He's entered into an

agreement with the government to cooperate, to provide

information, and to testify, all with the hope of receiving a

less sentence.  So listen carefully when he testifies, and

scrutinize whether it's consistent with the other evidence in

the case.  When you do that, I expect that you'll find that his

testimony is backed up by the other evidence in this case.

        Finally, you're going to hear some of the calls that

the defendant had with her banks.  You'll hear the defendant

lie to those banks about all the people sending her that money.

The victims who the defendant has never seen or spoken to

before.  The defendant will tell the banks they were her

customers.

        You'll also hear some of the banks tell the defendant

that she is under investigation for fraud.  You'll even hear

one bank employee tell the defendant that one of the people who

sent the defendant money, one of those victims, was recalling

that money because of fraud.  You'll hear that.  Even after

that call, the defendant continued participating in this scheme

for years out of sheer greed.  Greed and lies.  That is what

this case is all about.

        At the end of the trial, when all the evidence has

come in, we will have another opportunity to speak to you and

to explain how all of that evidence fits together to prove the

defendant is guilty.

```
 1              But between now and then, I'm going to ask you to do
 2   three things:
 3              First, pay close attention to the evidence;
 4              Second, follow Judge Failla's instructions on the law;
 5   and
 6              Third, use your common sense.  The same common sense
 7   you use every single day.
 8              If you do those three things, you will return the only
 9   verdict that is consistent with the evidence in this case:
10   That the defendant is guilty.
11              THE COURT:  Thank you, sir.
12              Mr. Soloway, when you're ready.
13              MR. SOLOWAY:  Thank you, your Honor.
14              Good morning.
15              THE JURY:  Good morning.
16              MR. SOLOWAY:  As you know, having heard from the
17   government, this case is about a vicious fraudulent scheme
18   which our client, Nadine Wade, is accused of knowingly
19   participating in.  It's a case about a criminal crew which
20   preyed upon and fleeced the lonely and vulnerable.  It's a crew
21   which didn't reach out to people randomly.  Instead, they
22   deliberately targeted, as the government mentioned to you,
23   people on dating sites, to troll like sharks for victims among
24   people whom they knew to be seeking love and companionship or
25   one or the other.
```

1          In that space on those dating sites, there were wolves

2     in the henhouse.  And who are these predators?  They were

3     focused, experienced criminals.  The evidence will show you the

4     fruits of their cruelty.  It will show you how practiced they

5     are in the art of fraud and deceit.  It will show you what they

6     are made of, how they steal money from strangers by pretending

7     to have human feelings for them, and then exploit the human

8     feelings that are sent back to them by stealing from those

9     people they've misled.

10         You'll hear from one of those crooks at this trial.

11    His name is Abuchi Felix.  You'll learn from the evidence how

12    he lived and the values, goals, and activities that made up his

13    days.  You'll learn of his knowing and intentional

14    participation in the crimes that fleeced many unsuspecting

15    people looking for online companionship, not just of their

16    hard-earned savings, but perhaps, more importantly, of their

17    dignity and their sense of safety in the world.

18         And as the government has told you, you will also hear

19    from some of the victims, and the stories of what happened to

20    them will make you mad and will make you sad and will make you

21    feel sorry for them.

22         You're also going to learn from the evidence that one

23    day, in 2016, the life of the just-turned twenty two years old

24    Nadine Wade intersected with that of Abuchi Felix, when she was

25    introduced to him at a gathering at the home of one of his

1    family members.

2         You'll learn they began a relationship and that the

3    two of them were married.  The evidence will show that Felix

4    told her he made his living in the car business, that he bought

5    cars at auctions, and sold them overseas.  To her, he appeared

6    to be a financially stable person.  A hard worker.  He was of

7    Nigerian decent and a member of a large close-knit family made

8    up of what seemed, to Nadine Wade, like working people who

9    valued family and children, who spent time together, and seemed

10   to help one another in hard times, and celebrate together when

11   life was good.

12        That picture of family life powerfully appealed to

13   Ms. Wade and represented a kind of life that had been absent

14   from her growing up and during her young adulthood.  More

15   important, it represented the kind of life for which she

16   yearned, and Felix quickly became the man she hoped she could

17   join together with to build the life of her dreams.

18        You'll learn, however, that what happened next is not

19   that she lived happily ever after.  That is why we're here.

20   What happened next, instead, is that Ms. Wade became one of

21   Mr. Felix's victims.  The evidence will show that she was

22   someone who was asked to participate by her husband in his

23   business activities in many ways.  She was tasked with bringing

24   payment to auction lots which cars which were successfully

25   purchased at auction were stored.  She picked up money at

NC5sWAD2                    Opening - Mr. King

 1    Western Union and other money transfer stores, which he told

 2    her was related to his car business.

 3            As time passed, at her husband's request, she opened

 4    bank accounts to accept payments which she believed were part

 5    of the proceeds of his car business.  It turns out that these

 6    activities aided and facilitated her husband's crimes.  The

 7    evidence will show, however, her lack of awareness of her

 8    participation in an illegal enterprise and her innocent state

 9    of mind as she went about her labors and her life.  These are

10    the matters that you will be called upon to consider.

11            As of now, you haven't heard any evidence.  I tell you

12    now at the outset of this trial that much of what the

13    government will present and argue to you is true.  It's true

14    that Abuchi Felix worked with others to steal a lot of money

15    and that Nadine Wade was married to him and helped him with his

16    business, including doing banking for him.

17            In the coming days, you will hear the evidence and it

18    will be your job to decide whether it proves Nadine Wade's

19    guilt of any, all, or none of the criminal charges lodged

20    against her.  We ask you, and the judge has charged you, to

21    keep an open mind until you've heard all of the evidence in

22    this case.  When you have heard all of the evidence in this

23    case, you will understand what happened, and you will see that

24    the many things Ms. Wade did, she did without knowledge of the

25    underlying criminal activity that was afoot.

NC5sWAD2                          Birch - Direct

1          And after you've heard what there is to hear, we will

2     have the opportunity to return and talk to you again, and will

3     at that time ask you to find our client not guilty of the

4     crimes charged against you.

5          Thank you.

6          THE COURT:  And now we begin with the government's

7     case in chief.

8          Please call your first witness.

9          MR. KING:  The government calls Joy Birch.

10          THE COURT:  Ms. Birch, please come forward.  I'll ask

11     you please to raise your right hand.

12      JOY BIRCH,

13          called as a witness by the Government,

14          having been duly sworn, testified as follows:

15          Could you please state and spell your full name for

16     the record.

17          THE WITNESS:  Joy Birch, J-o-y B-i-r-c-h.

18          THE COURT:  All right.  Is everyone able to hear

19     Ms. Birch.

20          Thank you.

21          Counsel, you may proceed.

22          MR. KING:  Thank you, your Honor.

23     DIRECT EXAMINATION

24     BY MR. KING:

25     Q.  Good morning, Ms. Birch.

NC5sWAD2                          Birch - Direct

```
 1    A.   Good morning.

 2    Q.   How old are you?

 3    A.   I'm 67 years old.

 4    Q.   Where do you live?

 5    A.   Saint George, Utah.

 6    Q.   Do you currently work?

 7    A.   No.

 8    Q.   Are you married?

 9    A.   No.

10    Q.   Have you been married before?

11    A.   Yes.

12    Q.   What happened to your prior marriage?

13    A.   My first husband was killed in an accident, and my second

14    husband -- I remarried, and that one ended in a divorce.

15    Q.   Do you have any children, Ms. Birch?

16    A.   Yes.

17    Q.   Do you have any grandchildren?

18    A.   Yes.

19    Q.   Do you recognize the name Diego Francisco?

20    A.   Yes.

21    Q.   Who is Diego Francisco to you?

22    A.   He was someone that reached out to me on an internet --

23    internet dating, um, website.

24    Q.   Did you ever meet Diego Francisco in person?

25    A.   No.
```

NC5sWAD2                          Birch - Direct

1    Q.  At some point during the relationship you had with Diego,

2    did he ask you to send him money?

3    A.  Yes.

4    Q.  Did you send him money?

5    A.  Yes.

6    Q.  Overall, about how much money did you send to Diego?

7    A.  Around $160,000.

8    Q.  Why did you send him that money?

9    A.  Um, I was feeling that -- trying to be kind, feeling that

10   somebody was in need at the beginning.  And then it just seemed

11   like things -- there was always problems that came up, and it

12   seemed like I was the only one that would be able to help him.

13   Q.  Did he ever pay you back?

14   A.  No.

15   Q.  Ms. Birch, when you gave this money to Diego, did you send

16   the money directly to him?

17   A.  No.

18   Q.  Who did you send it to?

19   A.  I sent it to different companies, but the first one was

20   Nadine Wade is who I addressed them to.

21   Q.  Why did you send money for Diego to Nadine Wade?

22   A.  Diego, he told me that he had blown a valve on his

23   construction site and that he needed money in order to get a

24   new valve.  The company that he was working with, um, he needed

25   to expedite the money so that that could be, the purchase of

1    the valve, could be made and shipped.

2              Um, and so he told me that Nadine Wade was the person

3    to send it to because she could make sure that it was deposited

4    into the bank account to ensure the shipment and payment of

5    this valve that was supposed to be --

6    Q.  Thank you, Ms. Birch.

7              We'll come back to that detail in is few minutes.  I

8    want to direct your attention to August 2020.

9              What was your relationship status at that time?

10   A.  Single.

11   Q.  Around that same time, did you try -- decide to try online

12   dating?

13   A.  Yes.

14   Q.  Why did you decide to try online dating?

15   A.  Because I was lonely.  Um, I wanted somebody to talk to,

16   someone to do things with, someone that maybe would think I was

17   pretty.  Um, someone that could look out for me.

18   Q.  What online dating site did you end up trying, Ms. Birch?

19   A.  LDS Singles.

20   Q.  Why did you choose that dating site in particular?

21   A.  Because I am of the Church of Jesus Latter-Day Saints and

22   they catered to that religion, to try to bring those in the

23   same theology stance together to meet one another.

24   Q.  When you were using that dating site, did there come a time

25   that you met Diego Francisco online?

NC5sWAD2                         Birch - Direct

1   A.  Yes.

2   Q.  How long into your time using the LDS Singles website did

3   you connect with Diego Francisco?

4   A.  I was only on their website for, like, a week, maybe two.

5   Q.  What, if anything, did Diego tell you about where he lived

6   at that time?

7   A.  He said he lived in Salt Lake.

8   Q.  Did he ever provide you with any other specific information

9   about where he lived?

10  A.  Yes.

11          MR. KING:  Ms. Foote, can you please pull up what's

12  been marked for identification as Government Exhibit 501L and

13  show it only to Ms. Birch, the parties, and the court.

14  Q.  Ms. Birch, do you recognize this document?

15  A.  Yes, I do.

16  Q.  And what is it?

17  A.  It is the text that Diego sent to me saying that this was

18  his address.

19  Q.  Is this true and correct copy of that document that Diego

20  Francisco sent to you?

21  A.  Yes.

22          MR. KING:  Your Honor, the government offers

23  Government Exhibit 501L.

24          MR. SOLOWAY:  No objection.

25          THE COURT:  Government Exhibit 501L is admitted into

1   the evidence and it may be published to the jury.

2              (Government's Exhibit GX 501L received in evidence)

3              MR. KING:  Ms. Foote, if you can publish it to the

4   jury.

5              Thank you.

6   BY MR. KING:

7   Q.  Ms. Birch --

8              THE COURT:  One moment, please, sir.

9              OK.  Is it possible you can move over, sir, to the

10  monitor two seats over that does work for now.  Let's have you

11  sit there and work on getting it fixed.

12             Does that one work, sir?

13             JUROR:  Yes.

14             THE COURT:  OK.  Thank you, sir.

15             JUROR:  This one is off as well.

16             THE COURT:  OK.  Let's ...

17             Thank you, as always, Ms. Noriega.

18             Counsel, you may continue.

19             MR. KING:  Thank you, your Honor.

20  BY MR. KING:

21  Q.  Ms. Birch, does this document say where Diego -- where you

22  believed Diego lived?

23  A.  Yes.

24  Q.  And where does it say that he lived?

25  A.  He live -- it says that he lived on 44 Broadway, Apartment

NC5sWAD2                              Birch - Direct

1  2005, in Salt Lake City, Utah.

2  Q.  Did you ever look up that address after you received this?

3  A.  Yes.

4  Q.  And what was there?

5  A.  Apartment building.

6         MR. KING:  Ms. Foote, you can put that exhibit aside

7  for now.

8  Q.  Ms. Birch, what, if anything, did Diego tell you about his

9  marital status when you met online?

10 A.  He said that he had lost his wife a couple of years prior.

11 Q.  What, if anything, did Diego tell you about what he did for

12 a living?

13 A.  He said that he was an underwater deep sea welder and that

14 he was also a model, and that was the images he used to portray

15 himself online --

16 Q.  Did he tell --

17 A.  -- from those model photos.

18 Q.  I'm sorry, Ms. Birch.

19        Did he tell you any more information about his career

20 as a male model?

21 A.  Um, just that he did it kind of on the side and that, I

22 believe it was in Italy, that he was supposedly doing this.

23 Q.  How did you communicate with Diego when you first met him?

24 A.  Um, we started off on just using the e-mails back and forth

25 through the LDS Singles website.

1   Q.  Did the way you communicated change at some point?

2   A.  Yes.

3   Q.  How did you communicate then after it changed?

4   A.  Then we started texting and then we would use phone calls.

5   Q.  How often did you communicate with Diego during this

6   period?

7   A.  About twice a day.

8   Q.  You alluded to this before, but Diego ever send you

9   photographs of himself?

10  A.  Yes.

11  Q.  What did he look like in those photographs?

12  A.  Dreamy.  He was handsome.  My -- my wildest dreams.

13          MR. KING:  Ms. Foote, can you please pull up what's

14  been marked for identification as Government Exhibit 501K, and

15  show it only to Ms. Birch, the parties and the court.

16  Q.  Ms. Birch, can you see that?

17  A.  I can.

18  Q.  Do you recognize that image?

19  A.  Yes.

20  Q.  What is it?

21  A.  It is a copy of a passport that he sent to me.

22  Q.  Is this a true and correct copy of that photo of the

23  passport that Diego Francisco sent to you?

24  A.  Yes.

25          MR. KING:  Your Honor, the government offers

1    Government Exhibit 501K.

2                MR. SOLOWAY:  No objection.

3                THE COURT:  Government Exhibit 501K is admitted into

4    evidence and it may be published to the jury.

5                (Government's Exhibit GX 501K received in evidence)

6                MR. KING:  Ms. Foote, if you can please publish that

7    to the jury.

8    BY MR. KING:

9    Q.  When you received this photograph, Ms. Birch, who did you

10   believe was depicted in this passport photograph?

11   A.  I believed it was Diego.

12   Q.  What is your understanding, if any, of why Diego sent you

13   an image of his passport?

14   A.  He was trying to prove to me that he was a good person and

15   that he would not send this type of information.  He felt that

16   he couldn't trust me.  He was just trying to say that I'm a

17   good person.  You can trust me.  Here is my information.

18               MR. KING:  Ms. Foote, you can put that exhibit aside.

19   Q.  Did Diego send you any other photographs of himself?

20   A.  Yes.

21               MR. KING:  Ms. Foote, if you can please pull up, and

22   just for Ms. Birch, the court, and the parties, and click

23   through these next few exhibits starting with Government

24   Exhibit 501M, and then click to 501N, as in Nancy, 501O, 501P,

25   and 501Q.

NC5sWAD2                          Birch - Direct

 1              THE COURT:  Mr. Soloway, is there an objection to the

 2      introduction of these exhibits?

 3              MR. SOLOWAY:  No objection.

 4              THE COURT:  I assume there is a request for admission.

 5              MR. KING:  Yes, your Honor.

 6              The government offers these exhibits into evidence.

 7              THE COURT:  Thank you.

 8              Government Exhibits 501M, N, O, P, and Q are admitted

 9      into evidence and they may be shown to the jury.

10              (Government's Exhibits GX 501M, N, O, P, and Q

11      received in evidence)

12              MR. KING:  Thank you, your Honor.

13      BY MR. KING:

14      Q.  Ms. Birch, let's start with Government Exhibit 501M.

15              MR. KING:  If you could publish that to the jury,

16      Ms. Foote.

17      Q.  What is this a photograph of?

18      A.  Diego with his dog.

19      Q.  And who sent -- who, if anyone, sent this photograph to

20      you?

21      A.  Diego.

22      Q.  I want to turn now to Government Exhibit 501N.

23              What is this a photograph of?

24      A.  Diego in his office.

25      Q.  And who, if anyone, sent this photograph to you?

NC5sWAD2                          Birch - Direct

1  A.  Diego.

2  Q.  And, finally, I want to show you what's in evidence as

3  Government Exhibit 501Q.

4         What's depicted here, Ms. Birch?

5  A.  Diego says that he liked to cook, so he was showing me what

6  he had made.

7  Q.  What's your understanding, if any, of why Diego sent these

8  photographs to you?

9  A.  Um, just trying to share things that he -- share what he

10  looked like, what he did.

11         MR. KING:  Ms. Foote, you can take that exhibit down.

12  Q.  Ms. Birch, at some point after you met Diego, did you stop

13  using the LDS Singles website?

14  A.  Yes.

15  Q.  And why did you stop using the website?

16  A.  After a couple of days of meeting with or talking with

17  Diego, he said that he felt that he would really like to get to

18  know me and was not going to have his name on the website

19  anymore.

20         Um, he wanted to try to make it more of an exclusive,

21  um, virtual dating and, um, so he took his down, and eventually

22  I took mine down.

23  Q.  At the beginning of your relationship with Diego, what were

24  your conversations with him like?

25  A.  They were just the normal let's get to know each other,

NC5sWAD2                         Birch - Direct

1    tell me about your family, tell me about where you lived, grew

2    up.

3    Q.  You testified earlier that at times you spoke to him over

4    the phone, is that right?

5    A.  Yes.

6    Q.  Did you ever call him?

7    A.  Yes.

8    Q.  And did he pick up when you called him?

9    A.  No.

10   Q.  So how did you two have conversations over the phone?

11   A.  He usually called me.  Whenever I would try to call him, he

12   wouldn't pick up, but within a minute, he would call me back.

13   Q.  Ms. Birch, did there come a time when you a video call with

14   Diego?

15   A.  We tried.

16   Q.  Can you describe what happened?

17   A.  He said that he was in Florida and so it was sunshine and

18   bright.  So he had an umbrella that he held to the side, and

19   then he had some sort of a photo that he had -- I don't know

20   how he had it affixed or anything -- that looked of Diego so

21   that I did see something that looked like Diego.

22          He said -- then he saw my picture and he says, Oh, you

23   look just like what's on the website.  And then everything went

24   fuzzy.  And he says, I'm outside, so I've lost my connection,

25   so we can't do this FaceTime anymore.

1   Q.  Did you have anymore video calls with Diego after that?

2   A.  No.

3   Q.  Ms. Birch, what were your feelings like towards Diego at

4   the beginning of your relationship with him?

5   A.  I was interested.  He was saying things that I liked.

6   Q.  Did your feelings grow over time?

7   A.  Yes.

8   Q.  And how would you characterize your feelings towards him

9   when the relationship was good?

10  A.  Um, I was very interested.  He was telling me all of the

11  right things.  Um, he had answers to questions that I would

12  broach.  He would send me music that said this is how I feel.

13  It's like what every woman wants to hear, feel, and hope that

14  it was true.

15  Q.  Ms. Birch, did there come that time when Diego told you

16  that I was working on an oil rig?

17  A.  Yes.

18  Q.  What did he tell you about why he was on an oil rig?

19  A.  He says that he -- he claimed that he had a company and he

20  had a crew, and they were called to go and do some work on an

21  oil rig that needed some underwater welding.

22  Q.  Did you continue to communicate with Diego when he was on

23  the oil rig?

24  A.  Yes.

25  Q.  How did you communicate with him when he was supposedly on

1    the oil rig?

2    A.   Texting and phone calls.

3    Q.   Did he ever send you any photographs or videos from the oil

4    rig?

5    A.   Yes.

6         MR. KING:   Ms. Foote, can you please bring up what's

7    already in evidence as Government Exhibit 501O.   You can

8    publish it to the jury.   Thank you.

9    Q.   Ms. Birch, what is this a photograph of?

10   A.   Diego with, supposedly, his crew.

11        MR. KING:   And, Ms. Foote, if you can please show

12   Ms. Birch and the jury what's already in evidence as Government

13   Exhibit 501P.

14   Q.   What's depicted here, Ms. Birch?

15   A.   Diego on the oil rig.

16        MR. KING:   You can put those aside, Ms. Foote.

17        Thank you.

18   Q.   Ms. Birch, did there come a time when Diego told you about

19   something that had happened on the oil rig?

20   A.   Yes.

21   Q.   What did he tell you happened?

22   A.   He actually sent me a video of some sort of a blowup or an

23   explosion on the oil rig because of a valve.

24   Q.   Did there come a time after that that he told you or that

25   he asked you for money?

NC5sWAD2                        Birch - Direct

1   A.  Yes.

2   Q.  What did he tell you about why he needed the money?

3   A.  He says that the blowup of the valve was his fault, he was

4   taking responsibility for it, and that he needed to replace

5   that valve.

6   Q.  Did he ask you to get him money in a certain way, like, a

7   cash or a check?

8   A.  He told me to get a cashier's check.

9   Q.  What, if anything, did he tell you to do with that check?

10  A.  He told me who to have that check made out to and who to

11  send that to.

12  Q.  Did you send that check?

13  A.  Yes.

14  Q.  Did he ask you for money only once?

15  A.  No.

16  Q.  Did you send more money after that first check?

17  A.  Yes.

18  Q.  Did Diego ask you to send money a certain way as well these

19  other times, again, like, cash or a check?

20  A.  Yes.

21  Q.  How did he ask you to send it?

22  A.  He asked me to FedEx it overnight.

23  Q.  And was it cash or checks?

24  A.  They were checks.

25  Q.  What, if any, records did you keep of the money you sent in

1  response to Diego's requests?

2  A.  I had took photos of the checks, I took photos of the

3  mailing, um, mailing address on the FedEx, and I took photos of

4  the FedEx receipt.

5           MR. KING:  Ms. Foote, if you can please show just the

6  witness, the court, and the parties what's been marked for

7  identification as Government Exhibit 501A, and we're going to

8  flip through a few of these.

9           Start with 501A.

10          Go on to 501B.

11          Government Exhibit 501C.

12          Government Exhibit 501D.

13          Government Exhibit 501E.

14          Government Exhibit 501F.

15          501G.

16          501H.

17          501I.

18          501J.

19          THE COURT:  Mr. Soloway, is there an objection to any

20  of these?

21          MR. SOLOWAY:  I have no objection, Judge.

22          MR. KING:  The government offers those exhibits into

23  evidence, your Honor.

24          THE COURT:  Government Exhibits 501A, B, C, D, E, F,

25  G, H, I, and J are admitted into evidence.  They may be

NC5sWAD2                          Birch - Direct

1    published to the jury.  Thank you.

2                (Government's Exhibits GX 501A, B, C, D, E, F, G, H,

3    I, and J received in evidence)

4                MR. KING:  Thank you, your Honor.

5    BY MR. KING:

6    Q.  Ms. Birch, have you seen those exhibits that we just

7    clicked through for your testimony today?

8    A.  Yes.

9    Q.  And what are they?

10   A.  They are copies of the checks, mailing labels, and the

11   receipts for payment for FedEx.

12               MR. KING:  Ms. Foote, if you can please bring up

13   what's already in evidence as Government Exhibit 501A and

14   publish that to the jury.

15   Q.  What is that, Ms. Birch?

16   A.  That's the cashier's check that I sent to Royal Treasure

17   Chest.

18   Q.  And how much was this check for?

19   A.  $8,500.

20   Q.  When did you get this check?

21               Is there a date on it?

22   A.  August 6 of 2020.

23   Q.  Why did you make this check out to Royal Treasure Chest,

24   LLC?

25   A.  That's what Diego told me to do.

NC5sWAD2                    Birch - Direct

1    Q.  What, if anything, did Diego tell you about Royal Treasure

2    Chest, LLC?

3    A.  That that was a company that would be able to -- that had a

4    valve that would be needed to fix the situation that he was

5    facing.

6    Q.  What did you do with this check after you obtained it?

7    A.  Then I mailed it to Nadine Wade.

8         MR. KING:  Ms. Foote, can you please bring up what's

9    already in evidence as Government Exhibit 501B.

10   Q.  What is this, Ms. Birch?

11   A.  That's the mailing -- mailing label and the FedEx receipt.

12   Q.  Who obtained this FedEx label?

13   A.  I did.

14   Q.  And when did you use this label for?

15   A.  To mail the check previous.

16   Q.  And who did you send this check to?

17   A.  Nadine Wade, in care of Walgreens.

18        MR. KING:  And, Ms. Foote, if you can just zoom in on

19   the label for a moment.

20   Q.  What was the address that you used to send this to Nadine

21   Wade?

22   A.  It was Walgreens at 244 East 161st Street in the Bronx.

23   Q.  Why did you send this check to that Walgreens?

24   A.  Um, that's what Diego told me to.  I did know that there

25   was some places around that did not have a concierge to accept

NC5sWAD2                     Birch - Direct

```
 1   packages.  So Walgreens was a place that would accept packages
 2   that they could pick up.
 3             THE COURT:  Counsel, may I inquire?
 4             MR. KING:  Yes, ma'am.
 5             THE COURT:  Thank you.
 6             Ms. Birch, you just said that you were aware that some
 7   people didn't have concierges who could accept packages.
 8             Is that something you just knew from your experience,
 9   or was that something that Mr. Francisco told you was the
10   reason why you were sending it to a Walgreens?
11             THE WITNESS:  It's from experience because I had a son
12   that lived in New York for a time.
13             THE COURT:  Thank you.
14             Thank you, counsel.
15             MR. KING:  Thank you, your Honor.
16             Ms. Foote, you can put that aside and bring up what's
17   already in evidence as Government Exhibit 501C and publish that
18   to the jury.
19   Q.  What's this, Ms. Birch?
20   A.  It's a check I sent to Royal Treasure Chest.
21   Q.  And how much was this check for?
22   A.  6,500.
23   Q.  And when did you obtain this check?
24   A.  On the 11th of August of 2020.
25   Q.  And why did you get another check payable to Royal Treasure
```

NC5sWAD2                              Birch - Direct

1    Chest, LLC?

2    A.  Um, I can't remember the exact, that there was another

3    complication.  I can't remember what exact complication there

4    was.

5    Q.  Did somebody tell you to obtain this check?

6    A.  Yes.

7    Q.  And who was that?

8    A.  Diego.

9    Q.  And what did you do with this check after you got it?

10   A.  I mailed it.

11          MR. KING:  Ms. Foote, can you please bring up what's

12   already in evidence as Government Exhibit 501D.

13          If you could rotate that so that the FedEx label is

14   straight.  Is that possible?

15          If not, maybe we can just zoom in on the FedEx label.

16   That's fine.

17   Q.  Ms. Birch, what did you use this label for?

18   A.  To mail the previous check.

19   Q.  And who did you send this check to?

20   A.  To Nadine Wade, again, to a Walgreens at 244 East 161st

21   Street.

22   Q.  Is that the same Walgreens that we looked at before?

23   A.  Yes.

24   Q.  Again, why did you send this check to that Walgreens?

25   A.  Because that's what Diego said needed to happen.

| | |
|---|---|
| 1 | MR. KING:  Ms. Foote, you can pull that exhibit down |
| 2 | and put up what's already in evidence as Government Exhibit |
| 3 | 501E. |
| 4 | Q.  Ms. Birch, what is this? |
| 5 | A.  It's a check I sent to Royal Treasure Chest. |
| 6 | Q.  And when did you send this check? |
| 7 | A.  It was the 14th of August of 2020. |
| 8 | Q.  And how much was this check for? |
| 9 | A.  35,000. |
| 10 | Q.  Why did you get a third check payable to Royal Treasure |
| 11 | Chest, LLC? |
| 12 | A.  Another complication, whether it -- I think it was more for |
| 13 | shipping.  They ran into problems. |
| 14 | Q.  What did you do with this $35,000 check to Royal Treasure |
| 15 | Chest, LLC? |
| 16 | A.  I mailed it. |
| 17 | MR. KING:  Ms. Foote, if you can please bring up |
| 18 | what's already in evidence as Government Exhibit 501F. |
| 19 | If you can zoom in on the FedEx label. |
| 20 | Q.  Ms. Birch, what is this? |
| 21 | A.  This is the label that I sent the check, previous check, |
| 22 | to. |
| 23 | Q.  And who did you send this check to? |
| 24 | A.  It was at Walgreens, again, Nadine Wade, at the same |
| 25 | address. |

1          MR. KING:  Ms. Foote, can you please pull that exhibit
2     down and put up what's in evidence as Government Exhibit 501G.
3     Q.  What is this check, Ms. Birch?
4     A.  It's a check that I send to Honcho Ways.
5     Q.  How much was this check for?
6     A.  $82,800.
7     Q.  And when did you get this check?
8     A.  I sent that one on the 22nd of August of 2020.
9     Q.  Why did you make this check out to Honcho Ways as opposed
10    to Royal Treasure Chest, LLC?
11    A.  If I remember, my memory is that there was another
12    malfunction on the valve, and this was the company that had
13    another valve.
14    Q.  What did you do with this check?
15    A.  I mailed it.
16          MR. KING:  Ms. Foote, can you please bring up what's
17    already in evidence as Government Exhibit 501H.
18          If you can zoom in on the FedEx label.
19    Q.  Who did you mail this check to?
20    A.  Frank Edwards.
21    Q.  At what address did you mail this to?
22    A.  152 Mapes Avenue in Newark.
23    Q.  Why did you send this check to Frank Edwards?
24    A.  Because that's who Diego told me to send it to.
25    Q.  What, if anything, did Diego tell you about Frank Edwards?

NC5sWAD2                          Birch - Direct

1    A.  I don't remember anything other than he was the person that
2    would handle the check.
3              MR. KING:  Ms. Foote, you can put aside 501H, and
4    please bring up what's already in evidence as Government
5    Exhibit 501I.
6    Q.  What is this, Ms. Birch?
7    A.  It's a check that I sent to Zeevaldor, Inc.
8    Q.  And when did you send this check?
9    A.  The 24th of August, 2020.
10   Q.  How much was this check for?
11   A.  28,650.
12   Q.  Why did you make this check out to Zeevaldor, Inc.?
13   A.  I don't remember the reason, but I remember that Diego told
14   me to do that.
15   Q.  And what, if anything, did you do with this check?
16   A.  I mailed it.
17             MR. KING:  Ms. Foote, if you can please bring up
18   what's already in evidence as Government Exhibit 501J.
19             Please zoom in on that label.  Thank you.
20   Q.  What is this, Ms. Birch?
21   A.  That's the shipping label.
22   Q.  And what did you -- the shipping label for what?
23   A.  The previous check.
24   Q.  And what did you send this FedEx to?
25   A.  Frank Edwards, 7 Longworth Street, Newark.

1    Q.  And why did you send this check to that address?

2    A.  That's what I was told needed to happen.

3    Q.  And who told you that?

4    A.  Diego.

5           MR. KING:  Ms. Foote, you can put that exhibit aside.

6    Q.  Ms. Birch, aside from the five checks that we just walked

7    through together, did you send any more money to Diego during

8    your relationship with him?

9    A.  No.

10   Q.  Did he ask you to send him any more money?

11   A.  I think he was going to ask me at one point, but when I

12   answered the phone, I told him that if he wanted -- that I was

13   not going to send him any more money.

14   Q.  And why did you say that to him at that time?

15   A.  Um, I figured that what he was doing was wrong.  I figured

16   that he probably was not going to pay me back like he said he

17   would, and I wasn't going to pay him back -- I wasn't going to

18   give him more money until he paid me what he owed me.

19   Q.  Had he made any promises to you about paying you back?

20   A.  Yes.

21   Q.  What did he say?

22   A.  He says, I will pay you back what I owe you plus a lot

23   more.

24   Q.  Ms. Birch, after you sent this money to Nadine Wade and

25   Frank Edwards, what, if anything, happened to your relationship

1  with Diego?

2  A.  Well, after I told him I wasn't sending him any more money,

3  then he got angry at me and told me I was listening to other

4  people and I shouldn't be listening to other people.  But just,

5  um, this was something between him and I., but I didn't talk to

6  any other people.  He just assumed.

7  Q.  Did there come a point in time when your relationship with

8  Diego ended?

9  A.  Yes.

10 Q.  After it ended, did you ever confront Diego again?

11 A.  A couple of days later, I called him.  Of course he didn't

12 answer, and then he called me right back.  And I told him I

13 wanted my money.  And he says, well, just give me your address

14 and I'll send it to you.

15 Q.  Ms. Birch, how, if at all, has your encounter with Diego

16 Francisco affected you?

17 A.  Um, it was kind of one of the hard things of life.  Um,

18 immediately after I realized that I had been scammed, I was in

19 a panic about how am I going to recoup all this money that I

20 foolishly gave to somebody under false pretenses.

21      It made me not sleep.  It made me depressed.  I was

22 depressed with guilt.  I was depressed with embarrassment.  I

23 kind of turned inward and wouldn't be -- wouldn't go be with

24 people.  I just can't imagine people wanting to be with me.

25      I felt that I was -- I used to be a trusting person,

1   and now I feel that everybody is trying to scam me, whether

2   it's a phone call, media, or just somebody saying something to

3   me.  I have some trust issues with people.  They say -- I'm

4   sorry.

5          If they say something nice to me or about me, I tend

6   to just -- you can't -- you can't be serious.  You've got to be

7   lying to me.  That is especially with men, that they couldn't

8   possibly find something in me worth trying to develop a

9   relationship.

10          I now have trouble thinking that I can make wise

11  choices, and I think my family thinks the same thing.  The

12  hardest thing I had to do was to admit to my family the foolish

13  choice I made to trust somebody and send them money.

14          MR. KING:  Thank you, Ms. Birch.

15          I have no further questions for Ms. Birch, your Honor.

16  Thank you.

17          THE COURT:  Thank you.

18          Cross exam.

19          MR. SOLOWAY:  Thank you, your Honor.

20  CROSS-EXAMINATION

21  BY MR. SOLOWAY:

22  Q.  Good morning, Ms. Birch.

23  A.  Good morning.

24  Q.  My name is Robert Soloway.  I represent Nadine Wade, the

25  person on trial here.

NC5sWAD2                          Birch - Cross

1              If I ask you a question, you don't understand what I'm

2     asking you, please tell me.

3     A.   OK.

4     Q.   You've testified here today about something that happened

5     to you that was very obviously very hurtful to you, right?

6     A.   Yes.

7     Q.   And it happened to you because you said that you trusted

8     this so-called Diego Francisco, right?

9     A.   Correct.

10    Q.   And, in hindsight, you know now that you shouldn't have

11    trusted him?

12    A.   Yes.

13    Q.   But at the time this person was trying to win you over in

14    the ways you've explained when you were answering Mr. King's

15    questions, right?

16    A.   Yes.

17    Q.   And you met him you said at a time in your life when you

18    were lonely, right?

19    A.   Yes.

20    Q.   And you were hoping at that time to meet somebody that you

21    could spend, maybe spend time with, share a bit of your life

22    with?

23    A.   Yes.

24              (Continued on next page)

25

NC5Gwad3                         Birch - Cross

BY MR. SOLOWAY:

Q.  And also someone who shared your own basic values and
interests?

A.  Yes.

Q.  And that is the kind of person that this so-called Diego
presented to you; right?

A.  Yes.

Q.  And as you talked to him, you formed the belief and the
feeling that he might be someone that you could spend some time
with?

A.  Yes.

Q.  And he made you feel that way by appearing to be open with
you; right?

A.  Yes.

Q.  By sending you all these images that were admitted into
evidence that you just looked at; right?  The images of him
cooking?

A.  Yes, those.

Q.  The images of him in his life?

A.  Yes.

Q.  He shared these things with you; right?

A.  Yes.

Q.  And he shared personal information with you about his life,
in terms of his family; right?

A.  In terms of his wife.

NC5Gwad3                        Birch - Cross

1    Q.  He said his wife had died in a car accident five years ago?

2    A.  I thought it was an illness.

3    Q.  He told you, you said, the kind of work he did; right?

4    A.  Yes.

5    Q.  And he shared with you also some of the details of that

6    work, including that he was, at the time he started talking to

7    you, bidding on a job to do some underwater welding on an oil

8    rig; right?

9    A.  Yes.

10   Q.  There was a problem, a leak, and he was bidding and hoping

11   to get a contract to be able to repair that damage on the oil

12   rig?

13   A.  Yes.

14   Q.  Right?

15   A.  Yes.

16   Q.  And there came a time that he shared with you that he was

17   happy that he had won the contract to do the job; right?

18   A.  Yeah.

19   Q.  And you mentioned that he sent you a bunch of photographs

20   and some of them were actually of him that we looked at just

21   now, supposedly on this oil rig and supposedly on the oil

22   rig --

23   A.  Yes.

24   Q.  -- with his crew?

25   A.  Yes.

1    Q.  Did he also send you images of him supposedly actually

2    doing work, repair work in the water on the oil rig, do you

3    remember that?

4    A.  Yeah, I do.  I didn't save any of those photos.  I do

5    remember that one of the things that I do -- those photos, he

6    had a different mask in the water than he did on the shore or

7    on the rig, and I asked him why.  And he didn't say or didn't

8    answer me.

9    Q.  How about images of him fishing off out the oil rig with

10   his crew, do you remember receiving those kinds of images?

11   A.  Yes.

12   Q.  And so because of all of this sharing, you felt like you

13   were really getting to know this person; right?

14   A.  Yes.

15   Q.  And those images that were giving you a sense of who this

16   person was contributed to the feelings you were having toward

17   him in terms of liking him; right?

18   A.  Yes.

19   Q.  And he also made gestures and efforts to make you believe

20   that he was interested in you; right?

21   A.  Yes.

22   Q.  When you sent him a photo of yourself, he said he thought

23   you were beautiful?

24   A.  Yes.

25   Q.  At one point, pretty early in the interactions, he called

NC5Gwad3                        Birch - Cross

1   you sweet?

2   A.  Yes.

3   Q.  On the rig, when he was supposedly on the rig, he told you

4   that, as soon as he was finished with the job, he would leave

5   from New Orleans and come to your town in St. George to meet

6   you personally; right?

7   A.  Yes.

8   Q.  And you were even making hotel reservations for him in your

9   town and letting him know about them; right?

10  A.  Yes.

11  Q.  He also, during the time when he was having you send him

12  money, he sent you bank statements to prove his worth, his

13  value, how much wealth he had; right?

14  A.  Yes.

15  Q.  And it was a lot of money --

16  A.  Yes.

17  Q.  -- reflected in those statements; right?

18  A.  Yes.

19  Q.  And based on all of the things that you were receiving and

20  the things that you seem to be genuinely exchanging, you were

21  hoping that you would meet this man and things might work out

22  between the two of you; right?

23  A.  Yes.

24  Q.  When you sent him the money that you sent him, is it

25  correct that you sent him the money because you believed that

NC5Gwad3                          Birch - Redirect

1   you were sending it to someone that cared for you?

2   A.  Yes.

3   Q.  Again, you wanted and hoped that things would work out

4   between the two of you?

5   A.  Yes.

6   Q.  But then what happened is, in your life, that everything

7   just fell apart; right?

8   A.  Yes.

9           MR. SOLOWAY:  Thank you.  I have nothing further.

10          THE COURT:  Any redirect from the government?

11          MR. KING:  Yes, your Honor.

12          THE COURT:  Briefly?

13          MR. KING:  Yes, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. KING:

16  Q.  Ms. Birch, you testified that you sent around $160,000 to

17  Diego; right?

18  A.  Yes.

19  Q.  Did Diego ever send you money?

20  A.  No.

21  Q.  Did you ever get any money from him to go to department

22  stores?

23  A.  No.

24  Q.  Did you ever get any money from him to go to restaurants?

25  A.  No.

NC5Gwad3                              Birch - Redirect

1   Q.  Did you ever get any money from him to travel?

2   A.  No.

3   Q.  You also testified that, at a certain point, you stopped

4   sending money to Diego; is that right?

5   A.  Yes.

6   Q.  Did you continue sending him money for years?

7   A.  No.

8   Q.  Did you continue sending money for months?

9   A.  No.

10  Q.  Did all the money you sent Diego happen in one month in

11  August of 2020?

12  A.  Yes.

13  Q.  And then did you stop?

14  A.  Yes.

15  Q.  Why did you stop sending him money?

16  A.  Because I figured that he was never going to pay me back or

17  I wasn't going to send him money until he paid me back.

18              MR. KING:  No further questions, your Honor.

19              THE COURT:  Thank you very much.

20              MR. SOLOWAY:  I have a question, Judge.

21              THE COURT:  No, that's okay.

22              You may step down.  Thank you.

23              THE COURT:  Would the government please call its next

24  witness.

25              MR. FERGENSON:  The government calls Julia Gutierrez.

1          THE COURT:  Let me check in with the parties.  Would

2    this be an appropriate time to take our morning five-minute

3    break?  I'm getting nods.

4          If I can ask the government to have the witness ready

5    in five minutes.  We will take our morning break.  And I'll

6    remind you of things you are going to hear from me at every

7    break.  Do not discuss this case with each other or with anyone

8    else.  We'll see you in five minutes.

9          (Recess)

10         (In open court; jury present)

11         THE COURT:  You may proceed.

12         MR. KING:  Your Honor, if I may, before we get to

13   Ms. Gutierrez's testimony, the government would like to enter a

14   stipulation into evidence.

15         THE COURT:  Is this a testimonial or an evidentiary

16   stipulation?

17         MR. KING:  Evidentiary, your Honor.  Thank you.

18         THE COURT:  Is there any objection from the defense?

19         MR. SOLOWAY:  No.

20         THE COURT:  Could you tell me, please, what the

21   exhibit number is of the stipulation.

22         MR. KING:  It is Government Exhibit S1.

23         THE COURT:  It is admitted into evidence and may be

24   published to the jury.

25         (Government Exhibit S1 received in evidence)

NC5Gwad3                      Birch - Redirect

1            THE COURT:  We spoke about stipulations.  What I said

2       to you is a stipulation is an agreement between the parties.

3       Sometimes it's a stipulation that certain facts are to be taken

4       as true.  What you do with those facts is up to you.  Sometimes

5       it's a stipulation about testimony, what someone would say if

6       they were called to testify.

7            Counsel, you may continue.

8            MR. KING:  Ms. Foote, if you would publish that to the

9       jury.

10           It is hereby stipulated and agreed that the following

11      government exhibits are true and accurate copies of records

12      maintained by the below businesses.  And I'll read the

13      businesses that are referenced:

14           Bank of America, Capital One, Citibank, Citizens Bank,

15      TD Bank, Valley National Bank, Wells Fargo, JPMorgan Chase,

16      HSBC, PNC Bank, Block, Inc. or Cash App, Robinhood Markets,

17      Inc., Western Union, Federal Express, Green Property LLC,

18      Copart and IAA.

19           The government exhibits listed above relating to those

20      businesses were made at or near the time by, or from

21      information transmitted by, a person with knowledge or kept in

22      the course of regularly conducted business activity of each

23      business, it being the regular practice of that business

24      activity to make such records.

25           The parties further stipulate and agree that the

NC5Gwad3                         Birch - Redirect

1    stipulation, which is Government Exhibit S1, as well as the

2    other government exhibits described in the stipulation, may be

3    received into evidence as government exhibits at trial.

4             And your Honor, the government offers the stipulation

5    and Government Exhibits 101A through 101B, 111A through 111D,

6    112A through 112E, 113A through 113E, 114A through 114D, 115A

7    through 115S, 121A through 121C, 122A through 122C, 123A

8    through 123C, 124A through 124C, 125A through 125G, 126A

9    through 126M, 131A through 131M, 132A through 132E, 140A

10   through 140K, 141A through 141E, 142A through 142I, 143A

11   through 143E, 144A through 144E, 145A through 145F, 146A

12   through 146H, 147A through 147G, 148A through 148F, 149A

13   through 149E, 151A through 151B, 152A through 152C, 161A

14   through 161H, 162A through 162E, 163A through 163C, 171A

15   through 171B, 172A through 172B, 173A through 173B, 174A

16   through 174B, 181A through 181E, 182A through 182D, 183A

17   through 183D, 919 --

18             THE COURT:  191 is what you meant to say.

19             I'll imagine that is amended, if the defense agrees.

20             MR. SOLOWAY:  Yes.

21             THE COURT:  And I think you had an 11C, but we'll go

22   with 191A through E, and please continue from there.

23             MR. KING:  Thank you, your Honor.

24             201A through 201B and of course the government offers

25   191A through 191E, 202A through 202C, 203A through 203B,

NC5Gwad3                         Birch - Redirect

Government Exhibits 401 through 407, Green Property, 71 through

74, 61A and 62A through 62F.

            THE COURT:  All of those exhibits, as just corrected

for those two, are admitted into evidence.  Thank you very

much.

            (Government Exhibits 101A through 101B, 111A through

111D, 112A through 112E, 113A through 113E, 114A through 114D,

115A through 115S, 121A through 121C, 122A through 122C, 123A

through 123C, 124A through 124C, 125A through 125G, 126A

through 126M, 131A through 131M, 132A through 132E, 140A

through 140K, 141A through 141E, 142A through 142I, 143A

through 143E, 144A through 144E, 145A through 145F, 146A

through 146H, 147A through 147G, 148A through 148F, 149A

through 149E, 151A through 151B, 152A through 152C, 161A

through 161H, 162A through 162E, 163A through 163C, 171A

through 171B, 172A through 172B, 173A through 173B, 174A

through 174B, 181A through 181E, 182A through 182D, 183A

through 183D, 191A through E, 201A through 201B, 202A through

202C, 203A through 203B, 401 through 407, 71 through 74, 61A

and 62A through 62F received in evidence)

            MR. KING:  Thank you, your Honor.

            The government now calls Ms. Gutierrez.

JULIA GUTIERREZ,

      called as a witness by the Government,

      having been duly sworn, testified as follows:

1          THE COURT:  Counsel, you may inquire.

2    DIRECT EXAMINATION

3    BY MR. FERGENSON:

4    Q.  Good morning, Ms. Gutierrez.

5    A.  Good morning.

6    Q.  Where do you work?

7    A.  The US Attorney's Office.

8    Q.  What is your title at the US Attorney's Office?

9    A.  Paralegal.

10   Q.  What are your responsibilities as a paralegal at the US

11   Attorney's Office?

12   A.  I draft legal documents, I'll assist with some trials, I

13   handle evidence and then other tasks that come up.

14   Q.  Perhaps we can repeat the question.

15          Ms. Gutierrez, what are some of your responsibilities

16   as a paralegal at the US Attorney's Office?

17   A.  I'll draft legal documents, I'll assist with trials, like

18   Ms. Foote is doing, handle evidence for the attorneys and other

19   tasks that come up I'll handle.

20   Q.  Now, Ms. Gutierrez, besides your testimony today and

21   preparation for that testimony, did you have any involvement in

22   this case?

23   A.  No.

24   Q.  Were you asked to review certain government exhibits and

25   summarize the information in them?

1    A.  Yes.

2    Q.  Did you help prepare and review for accuracy some summary

3    charts?

4    A.  Yes.

5    Q.  Are the charts all based on voluminous records?

6    A.  Yes.

7    Q.  What type or types of exhibits are the charts based on?

8    A.  Some records from Google as well as some records from

9    FedEx.

10   Q.  Now, Ms. Gutierrez, who decided which exhibits you reviewed

11   and what information to include on the charts?

12   A.  The prosecutors on the case.

13   Q.  And were you provided the opportunity to make additions and

14   revisions to the charts to make sure they were accurate?

15   A.  Yes.

16   Q.  Did you in fact make revisions and additions to the charts?

17   A.  Yes, I did.

18   Q.  And after you edited the charts, are they all now accurate?

19   A.  Yes.

20   Q.  Now, just to be clear, did you review all the evidence

21   gathered in this case or just the charts and the exhibits those

22   charts are based on?

23   A.  Just the exhibits the charts are based on.

24   Q.  Now, Ms. Gutierrez, you mentioned that one type of exhibit

25   you reviewed was from Google?

NC5Gwad3                    Gutierrez – Direct

1    A.  Yes.

2              MR. FERGENSON:  Your Honor, at this time, the

3    government offers a stipulation between the parties marked

4    Government Exhibit S4.

5              THE COURT:  I'm assuming part of the stipulation is

6    the admission of the stipulation itself into evidence.

7              MR. FERGENSON:  Correct.

8              THE COURT:  Is that correct, counsel?

9              MR. STERN:  It is correct, yes.

10             THE COURT:  Thank you.

11             Government Exhibit S4 is admitted into evidence.  It

12   may be published to the jury.  And you may read from it, sir.

13             (Government Exhibit S4 received in evidence)

14             MR. FERGENSON:  Thank you, your Honor.

15             Please publish.

16             This is a stipulation regarding Google records.  It is

17   hereby stipulated and agreed that:  Individuals with a Google

18   account can use the Google products Gmail and Google Voice.

19   Gmail is an email messaging service.  Google Voice is a

20   voice-over-internet-protocol ("VoIP") phone service that offers

21   Google Voice users a phone number.  Google Voice users can then

22   use that phone number to make and receive calls or to send and

23   receive text messages.  Google Voice users can set their

24   preferences such that text messages sent to their Google Voice

25   phone number will also be received as emails to their Gmail

NC5Gwad3                          Gutierrez - Direct

account.

Government Exhibits 1001 to 1018, 1101 to 1109, 1201, 1301 to 1305, 1401 to 1405, 1501, 1502, 1601 to 1647, 1701 to 1731, 1801 to 1831 and 1901 to 1906 are authentic copies of records -- including Gmail and Google Voice records -- that were obtained, pursuant to a court-authorized search warrant from the Google accounts associated with the following email addresses:

Italianrichb@gmail.com (the "Italianrichb Google Account");

Italiantomamo@gmail.com (the "Italiantomamo Google Account"); and

Italiangraylight@gmail.com  (the "Italiangraylight Google Account").

The Italianrichb Google Account was subscribed to in the name D Francisco and its Google Voice phone number was 407-584-7685.  Government Exhibit 1013 is an authentic copy of text messages and call logs for the Google Voice phone number or the Italianrichb Google Account from the period October 6, 2019 to June 10, 2020.  Incoming text messages -- including multimedia message service ("MMS") messages, such as photographs -- were also sent by email to italianrichb@gmail.com.

The Italiantomamo Google Account was subscribed to in the name "Tom E Francisco" and its Google Voice number was

1    321-209-5057 --

2            THE COURT:  5075, perhaps.  I may have heard you

3    incorrectly.

4            MR. FERGENSON:  5075.  Thank you, your Honor.

5            THE COURT:  Of course.

6            MR. FERGENSON:  Government Exhibit 1014 is an

7    authentic copy of text messages and call logs for the Google

8    Voice phone number of the Italiantomamo Google Account from the

9    period June 4, 2019 to November 14, 2019.  Incoming text

10   messages -- including MMS messages, such as photographs -- were

11   also sent by email to italiantomamo@gmail.com.

12           The Italiangraylight Google Account was subscribed to

13   in the name "Diego Francisco" and its Google Voice number was

14   801-332-9439.  Government Exhibit 1015 is an authentic copy of

15   text messages and call logs for the Google Voice phone number

16   of the Italiangraylight Google Account from the period November

17   5, 2019 to August 7, 2020. Incoming text messages -- including

18   MMS messages, such as photographs -- were also sent by email to

19   italiangraylight@gmail.com.

20           Google accountholders can set up recovery email

21   addresses that can be used, for example, to reset passwords.

22   The recovery email address for the Italianrichb Google Account

23   was italiantomamo@gmail.com.  The recovery email address for

24   the Italiangraylight Google Account was italianrichb@gmail.com.

25           The parties further stipulate and agree that this

1   stipulation, which is Government Exhibit S4 and the other

2   government exhibits described in this stipulation may be

3   received into evidence as government exhibits at trial.

4           Pursuant to the stipulation, your Honor, the

5   government offers the government exhibits listed in paragraph

6   two of the stipulation.

7           THE COURT:  All of the exhibits listed in paragraph

8   two, as clarified by our discussions, plus the stipulation, are

9   received into evidence.

10          (Government Exhibits  1001 to 1018, 1101 to 1109,

11  1201, 1301 to 1305, 1401 to 1405, 1501, 1502, 1601 to 1647,

12  1701 to 1731, 1801 to 1831 and 1901 to 1906 received in

13  evidence)

14          THE COURT:  Thank you very much.  You may continue,

15  sir.

16          MR. FERGENSON:  Thank you, your Honor.

17          It's not on my screen, but I have a hard copy.

18          THE COURT:  We can hand you a hard copy if you want.

19          MR. FERGENSON:  I have one of the stipulation, but it

20  may become more problematic soon, your Honor.  We'll see how it

21  goes.

22          THE COURT:  Yes.

23  BY MR. FERGENSON:

24  Q.  Ms. Gutierrez, focusing you on paragraph two of the

25  stipulation, did you review the records described in that

NC5Gwad3                          Gutierrez – Direct

1    paragraph?

2    A.  Yes.

3    Q.  And those included text messages and call logs for three

4    different Google voice numbers, as are described in paragraph

5    three and five?

6    A.  Yes.

7              MR. FERGENSON:  If you can scroll down.

8    Q.  So paragraphs three and five discuss those Google accounts;

9    correct, Ms. Gutierrez?

10   A.  Correct.

11   Q.  Let's just look at one of them.

12             Do you see the stipulation in paragraph five says that

13   Government Exhibit 1015 is an authentic copy of text messages

14   and call logs for the Google voice phone number of the

15   Italiangraylight Google Account.

16             Do you see that?

17   A.  Yes.

18             MR. FERGENSON:  Now, Ms. Foote, could you please pull

19   up what's in evidence as Government Exhibit 1015.

20   Q.  Now, Ms. Gutierrez, we'll look at the chart of text, but

21   let me first focus you on the top left.

22             What's the email address listed there?

23   A.  Italiangraylight@gmail.com.

24   Q.  What's the name?

25   A.  Diego Francisco.

NC5Gwad3                      Gutierrez - Direct

1    Q.  And what is the voice number?

2    A.  It's (801)332-9439.

3           MR. FERGENSON:  Let's zoom out, Ms. Foote, please.

4    Q.  Focusing you on the chart beneath that, what do the columns

5    say?

6    A.  So starting from the left, it's Google Voice number, then

7    phone number, type, date/time, duration in seconds, and text

8    content.

9           MR. FERGENSON:  Ms. Foote, let's zoom out.  And could

10   you scroll for a few pages.

11   Q.  Ms. Gutierrez, is this exhibit over 400 pages?

12   A.  Yes.

13          MR. FERGENSON:  That's fine, Ms. Foote.  Thank you.

14   Q.  If this account received a photo over text message, would

15   that photo appear in this file?

16   A.  No, it wouldn't.

17          MR. FERGENSON:  Ms. Foote, could you please go back to

18   the stipulation, S4 at page two.

19   Q.  Now, again, at paragraph five, the final sentence says,

20   incoming text message, including MMS messages, such as

21   photographs, were also sent by email to

22   italiangraylight@gmail.com.

23          Do you see that that, Ms. Gutierrez?

24   A.  Yes.

25   Q.  Is that consistent with your review of the exhibits?

1    A.   Yes.

2    Q.   Now, Ms. Gutierrez, at a high level, what were the text

3    message summaries you helped review and prepare for accuracy?

4    A.   They were records from Google.

5    Q.   What did you do with those records from Google to make the

6    summary?

7    A.   I basically -- we put the text messages into an Excel

8    format so they were more readable, because the format you just

9    saw was not readable at all.  And then we put in the

10   photographs when they were sent to this email account and

11   matched it up accordingly.

12   Q.   Did you do that for numerous chats and photos?

13   A.   Yes.

14   Q.   Ms. Gutierrez, did you also incorporate Federal Express

15   records into those text message summaries?

16   A.   Yes, I did.

17   Q.   How did you incorporate FedEx records?

18   A.   When there was a picture that included a FedEx tracking

19   number, I matched that tracking number with the records that we

20   received from FedEx, and then I put a snip, like a screenshot,

21   of the FedEx records at the bottom of the text chain so that

22   everything was in one place.

23        MR. FERGENSON:  Ms. Foote, could you please show just

24   Ms. Gutierrez Government Exhibit 404.

25   Q.   Is it up on your screen?

1    A.  I can see it.

2            THE COURT:  What was the exhibit number, 404?  I

3    didn't hear it.

4            MR. FERGENSON:  404.

5            THE COURT:  Thank you so much.

6            MR. FERGENSON:  It's now up on my screen.  Actually,

7    we can publish this to all.  I apologize, Ms. Foote.

8    BY MR. FERGENSON:

9    Q.  Ms. Gutierrez, are these the sorts of FedEx records you

10   incorporated into the summaries?

11   A.  Yes.

12           MR. FERGENSON:  Now, Ms. Foote, let's show just the

13   witness Government Exhibit 900S, please.

14   Q.  Ms. Gutierrez, what is this a chart of?

15   A.  It's a summary chart that lists some of the text summary

16   charts and then their source exhibits.

17   Q.  Is this chart accurate?

18   A.  Yes.

19           MR. FERGENSON:  The government offers Government

20   Exhibit 900S.

21           MR. STERN:  No objection.

22           THE COURT:  Government Exhibit 900S is admitted into

23   evidence and may be shown to the jury, thank you.

24           (Government Exhibit 900S received in evidence)

25   BY MR. FERGENSON:

1    Q.  Ms. Gutierrez, let me focus you first on the second column

2    that starts at the header, summary GX.

3           Do you see that?

4    A.  Yes.

5    Q.  And what's listed in that column?

6    A.  That is the summary Excel sheet of the text messages.

7    Q.  And then to the left of that is a column that says "name."

8    Where does the name column come from?

9    A.  The name comes from the source emails.

10   Q.  In the three columns on the right, each one starts with

11   source GX; right?

12   A.  Yes.

13   Q.  And what's shown in those columns?

14   A.  Those are the source exhibits.  So the leftmost is the

15   Google chat records.  The middle is the email records, which

16   would have those photos and the messages.  And then all the way

17   to the right is the FedEx records.

18   Q.  Ms. Gutierrez, you said earlier, but do the summary

19   exhibits listed in the second column accurately summarize

20   information in the source government exhibit column?

21   A.  Yes.

22           MR. FERGENSON:  The government offers the exhibits

23   listed in the summary GX column, Government Exhibits 911 to

24   915, 921, 931, 941 to 944, 951 to 965, 971 to 979, 981 to 986,

25   991.

NC5Gwad3                    Gutierrez - Direct

1          MR. SOLOWAY:  No objection.

2          THE COURT:  All of these exhibits are admitted into

3     evidence, and they may be shown to the jury.

4          (Government Exhibits 911 to 915, 921, 931, 941 to 944,

5     951 to 965, 971 to 979, 981 to 986, 991 received in evidence)

6     BY MR. FERGENSON:

7     Q.  Ms. Gutierrez, we'll look at all of these, but not

8     necessarily in this exhibit.  Let's start with a Joy Birch text

9     summary as an example.

10         MR. FERGENSON:  Ms. Foote, can you publish Government

11    Exhibit 921.

12    Q.  Now, Ms. Gutierrez, I want to focus you first on the first

13    two rows of this exhibit.

14         What is shown in these first two rows?

15    A.  It's the date of the message, which is July 27th, 2020, and

16    then the second row is a message and some data about the

17    message.

18    Q.  And that message is the same date as the bar above it?

19    A.  Yes.

20    Q.  What does the first message say?

21    A.  Hi, Joy.  This is Diego from LDSPlanet.

22    Q.  Ms. Gutierrez, is that message sent to the Google account

23    or from the Google account?

24    A.  It's sent from the Google account.  It's an outgoing

25    message.

NC5Gwad3                         Gutierrez - Direct

1   Q.  What color are the outgoing messages in all the text

2   summaries?

3   A.  Blue.

4   Q.  What color are all the incoming messages in all the text

5   summaries?

6   A.  White.

7   Q.  What color are phone calls or voice mails?

8   A.  Gray.

9   Q.  Now, let's go to that outgoing text.  What number is that

10  text sent to from the Google account?

11  A.  It's sent to the 317 phone number.

12  Q.  Is there a name listed next to that phone number?

13  A.  Not on this chart.  But in the Google email records, there

14  is.

15  Q.  No?

16  A.  No, not on this chart.

17        MR. FERGENSON:  Ms. Foote, if you zoom out.

18  Q.  There's a name in the top left?

19  A.  Yes.

20  Q.  Where is that name taken from?

21  A.  That's from the Google email records.

22        MR. FERGENSON:  Ms. Foote, could you please add on the

23  right Government Exhibit 1201.  Thank you, Ms. Foote.

24  Q.  Now, focusing you on the header information on the right.

25        Is this an email to italiangraylight@gmail.com?

NC5Gwad3                      Gutierrez – Direct

1    A.  Yes.

2    Q.  Is this one of the emails you reviewed?

3    A.  Yes.

4    Q.  Who is it from?

5    A.  Joy Birch.

6    Q.  Can you read the subject line.

7    A.  New text message from Joy Birch/UT 317-755-9536.

8    Q.  Is that number listed in the subject line the same shown in

9    the summary message chart?

10   A.  Yes.

11   Q.  Is that where the name came from on the text summary?

12   A.  Yes.

13          MR. FERGENSON:  Thank you, Ms. Foote.  Let's just

14   focus on Government Exhibit 921, please.

15   Q.  Now, Ms. Gutierrez, let's go ahead and read the August 6th,

16   2020 messages and I'll read the Italiangraylight messages, the

17   outgoing blue, and you please read Ms. Birch's messages.

18   A.  We have a problem on the rig.  I will text you soon.

19          Are you okay?

20   Q.  Hi sweetie.  Can you talk on Skype?

21   A.  Yes.

22   Q.  Pick my call and talk to me.

23          And then there's a call.

24          Pay too/Royal Treasure Chest LLC, mail to Nadine J

25   Wade, address, 244 East 161st Street, the Bronx, New York

NC5Gwad3                          Gutierrez – Direct

1    10451.  Once your bank issue the cashier's check, you will take

2    a picture of the check and send it to my phone and you will

3    also send me FedEx receipt.  I need to forward both copies to

4    them as proof of payment.  I promise I will pay you back.  You

5    have my word.

6    A.  Okay.

7    Q.  There is a missed call and --

8    A.  The OKC name is legit.  Oops the LLC.

9    Q.  Yes.  Pay too Royal Treasure Chest LLC.

10           And then there is a voice mail and a call.

11           You will send me a copy of the cashier's check and a

12   copy of the receipt.

13           Ms. Gutierrez, there are two incoming photographs?

14   A.  Yes.

15           MR. FERGENSON:  Let's zoom on the check first, please.

16   Q.  Ms. Gutierrez, what kind of check is this?

17   A.  It's a cashier's check.

18   Q.  On what date?

19   A.  August 6th, 2020.

20   Q.  And that's the same date as these messages?

21   A.  Yes.

22   Q.  What was the amount?

23   A.  $8,500.

24   Q.  And Ms. Gutierrez, is there a remitter listed on this

25   check?

1    A.  Yes.

2    Q.  Who is the remitter?

3    A.  Joy Birch.

4    Q.  And who was this $8,500 check from Joy Birch payable to?

5    A.  Royal Treasure Chest LLC.

6          MR. FERGENSON:  Let's zoom back out, Ms. Foote.

7          Let's zoom on the FedEx envelope.

8    Q.  Now, Ms. Gutierrez, who was the addressee of this FedEx

9    envelope?

10   A.  It says to Walgreens, attention Nadine J Wade.

11   Q.  And the address is 244 East 161st Street in the Bronx?

12   A.  Yes.

13   Q.  Now, Ms. Gutierrez, focusing you on the top left of front

14   of the FedEx envelope, is there a name listed there?

15   A.  The top left, yes.

16   Q.  And what's the name?

17   A.  Joy Birch.

18   Q.  And are you able to read the city and the state of the

19   address listed beneath that?

20   A.  It says St. George, Utah, UT.

21   Q.  And that's on the front of this FedEx envelope; right?

22   A.  Yes.

23          MR. FERGENSON:  Let's zoom back out, Ms. Foote,

24   please.

25   Q.  Ms. Gutierrez, we just looked at that FedEx envelope,

NC5Gwad3                    Gutierrez - Direct

1    attention Nadine Wade at 244 East 161st Street; right?

2    A.   Right.

3            MR. FERGENSON:  Your Honor, at this time, the

4    government offers another stipulation between the parties,

5    Government Exhibit S2.

6            THE COURT:  Once again, the parties have stipulated

7    the stipulation be received in evidence.

8            MR. FERGENSON:  I believe so.

9            THE COURT:  Mr. Stern.

10           MR. STERN:  He's correct.

11           THE COURT:  Government Exhibit S2 is admitted into

12   evidence and may be published and read to the jury.  Thank you.

13           (Government Exhibit S2 received in evidence)

14           MR. FERGENSON:  The following government exhibits are

15   true and accurate images of the following addresses:  And I

16   will just read Government Exhibit 11 now, which is 244 East

17   161st Street in the Bronx, New York.

18           The parties further stipulate and agree that this

19   stipulation, which is Government Exhibit S2, as well as the

20   other government exhibits described in this stipulation may be

21   received into evidence.

22           THE COURT:  A little slower for the court reporter and

23   the judge.  Thank you very much.

24           MR. FERGENSON:  Yes.  Thank you, your Honor.

25           The government offers Government Exhibits 11, 12, 13,

NC5Gwad3                        Gutierrez – Direct

1    14 and 15.

2              THE COURT:  All are admitted into evidence and may be

3    published to the jury.

4              (Government Exhibits 11 through 15 received in

5    evidence)

6              MR. FERGENSON:  Ms. Foote, can we please publish

7    Government Exhibit 11, which is the address 244 East 161st

8    Street, the photograph.

9              Ms. Foote, let's go back to Government Exhibit 921 at

10   page two.  Then it continues.

11             I got it.  Thank you.  I will get back to you.  I need

12   to forward the copies.

13             Ms. Foote, can you zoom one last time on that FedEx

14   envelope.

15   BY MR. FERGENSON:

16   Q.  Ms. Gutierrez, could you please read the last four digits

17   of the FedEx tracking number.

18   A.  0643.

19             MR. FERGENSON:  Ms. Foote, let's zoom out and go to

20   the next line.

21   Q.  Ms. Gutierrez, what's the FedEx tracking number, what's the

22   last four?

23   A.  It's the same.  It ends in 0463.

24   Q.  Let's quickly go through the rows shown on this FedEx

25   record, Ms. Gutierrez.

NC5Gwad3                          Gutierrez – Direct

1               So the first record says package details, do you see

2        that?

3        A.   Yes.

4        Q.   And the next row is titled what?

5        A.   Shipper.

6        Q.   And what's the name of the shipper?

7        A.   Joy Birch.

8        Q.   And then the row beneath that, there's recipient.

9               Do you see that?

10       A.   Yes.

11       Q.   And what's under company in recipient?

12       A.   Attention Nadine J Wade.

13       Q.   And then the row beneath that is delivery.  And do you see

14       on the far left, it says timestamp?

15       A.   Yes.

16       Q.   And what was the date and time of delivery?

17       A.   August 7th, 2020 at 1340.

18       Q.   Beneath that, there's a row called signature.

19               Do you see that?

20       A.   Yes.

21       Q.   Who signed for this FedEx envelope from Joy Birch?

22       A.   N Wade.

23       Q.   Thank you.

24               MR. FERGENSON:  Ms. Foote, we can take that down.

25       Q.   Ms. Gutierrez, we have now seen a cashier's check made out

1    to Royal Treasure Chest LLC; correct?

2    A.   Correct.

3         MR. FERGENSON:  Your Honor, the government offers

4    another stipulation, marked as S6 and it is stipulated it is

5    admissible.

6         THE COURT:  Thank you.

7         Given that Government Exhibit S6 is admitted into

8    evidence, it may be published to the jury as it is read to

9    them.  Thank you.

10        (Government Exhibit S6 received in evidence)

11        MR. FERGENSON:  Government Exhibits 51, 52 and 53 are

12   true and correct copies of records maintained by the New York

13   Department of State, that set forth the activities of the New

14   York Department of State.

15        Government Exhibits 54 and 55 are true and correct

16   copies of records, maintained by the New Jersey Department of

17   the Treasury, Division of Revenue and Enterprise Services, that

18   set forth the activities of the New Jersey Department of the

19   Treasury, Division of Revenue and Enterprise Services.

20        The parties further stipulate and agree that this

21   stipulation, which is Government Exhibit S6, as well as the

22   other government exhibits described in this stipulation may be

23   entered into evidence as government exhibits at trial.

24        The government offers Government Exhibits 51 through

25   55.

1       THE COURT:  They are received in evidence and may be

2   shown to the jury.  Thank you.

3       (Government Exhibits 51 through 55 received in

4   evidence)

5       MR. FERGENSON:  Thank you, your Honor.

6       Ms. Foote, please publish to the jury Government

7   Exhibit 51.

8   Q.  Ms. Gutierrez, in the top left, what is the business name

9   on this document?

10  A.  Royal Treasure Chest LLC.

11  Q.  What is the filing period?

12  A.  January 2020.

13  Q.  Beneath that, what is the service of process address?

14  A.  779 Concourse Village E, Apartment 3M in the Bronx, New

15  York  10451.

16  Q.  Beneath that, where it says signer information, who signed

17  this document?

18  A.  Nadine Wade.

19  Q.  And she signed as an authorized person?

20  A.  Yes.

21      MR. FERGENSON:  Let's go to page two, Ms. Foote.

22  Q.  Ms. Gutierrez, which company's articles of organization are

23  these?

24  A.  Royal Treasure Chest LLC.

25  Q.  Directing you to the bottom right of this document, what

NC5Gwad3                     Gutierrez – Direct

1   was the date this document was filed?

2   A.  January 18th, 2018.

3   Q.  And over on the left, who are these articles of

4   incorporation filed by?

5   A.  Nadine J Wade.

6   Q.  Is that the same address as the 779 Concourse Village that

7   was on the service of process?

8   A.  Yes.

9           MR. FERGENSON:  Ms. Foote, let's pull up Government

10  Exhibit S2, and on the right Government Exhibit 15.

11          Now, I'll just read paragraph two of the stipulation.

12          Government Exhibit 15 is a true and accurate map

13  showing 244 East 161st Street, Bronx, New York and

14  779 Concourse Village, Bronx, New York.

15  Q.  Now, Ms. Gutierrez, the 779 Concourse Village, that's the

16  address we just looked at on the Royal Treasure Chest

17  documents?

18  A.  Yes.

19  Q.  The 244 East 161st Street, is that an address for the

20  Walgreens in the Bronx?

21  A.  Yes.

22          MR. FERGENSON:  We can take that down.

23          Let's pull up Government Exhibit 900S.

24  Q.  Now, we looked at, Ms. Gutierrez, the Joy Birch example.

25  Let's go to another example.  Let's go to Clemi Carter Arbaugh.

NC5Gwad3                          Gutierrez – Direct

1              What's the name in the top left, Ms. Gutierrez?

2    A.   Clemi Carter Arbaugh.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NC5sWAD4                      Gutierrez - Direct

1    BY MR. FERGENSON:

2    Q.  What's the name in the top left, Ms. Gutierrez?

3    A.  Clemi Carter Arbaugh.

4    Q.  What's the date?

5    A.  May 13, 2020.

6    Q.  OK.  I'll read the blue and you, please, read the white.

7         Hi, Carter.  This is Diego from LoveAndSeek.

8    A.  Hello.  I've never met anyone named Diego before.  I

9    remember the name from the children's program Dora the

10   Explorer.  I like the name.

11   Q.  Thank you.  Tell me more about you.  How long have you been

12   single and how many kids do you have?

13   A.  My husband has been dead for two years.  I am just starting

14   to think about maybe meeting someone.  I have two sons and a

15   daughter and, of course, I think they are amazing.  You?

16   Q.  Sorry for your loss.  I have a son Alberto, who is 28 years

17   currently studying as a medical doctor at Sapienza University

18   in Rome.  I lost my wife five years in Italy in a ghastly motor

19   accident.  Since then, I have been single.  Also, I lost my dad

20   many years ago, eight years ago, but my mum still lives in

21   Italy and she is 89 years old.  Every Christmas period I travel

22   to Rome to visit my family and spend the season with them.

23        I'll just pause for a moment.

24        Ms. Gutierrez, where there are three asterisks like

25   that, what does that signify.

NC5sWAD4                    Gutierrez – Direct

1    A.   Just a break in the texts.  We didn't include all of them.

2    Q.   OK.  So starting after the break, I will try to find on

3    swipe using your e-mail address.

4    A.   The account is registered under C. Carter Arbaugh, my cell,

5    and my e-mail.

6    Q.   OK.  Ms. Gutierrez --

7            MR. FERGENSON:  Excuse me.  Ms. Foote, let's please go

8    to Government Exhibit 912.

9    Q.   Now, Ms. Gutierrez, same name in the top left here?

10   A.   Yes.

11   Q.   Still Ms. Arbaugh?

12   A.   Yes.

13   Q.   What is the dates of these messages?

14   A.   It's May 23 through 26, 2020.

15   Q.   I'll read the --

16           So that's about ten days later, right?

17   A.   Yes.

18   Q.   OK.  So I'll read the blue, you, please, read the white.

19           You will issue the cashier's check with the name

20   below.  Pay to:  Royal Treasure Chest, LLC.  Then you will

21   drive to FedEx and overnight the check to, name, Nadine J.

22   Wade, address, 244 East 161st Street, the Bronx, New York.

23           Once your bank issue the cashier's check, take a

24   picture of the check and send it to me.  Once you send the

25   check via FedEx, send me a picture of FedEx receipt.  I need to

1  forward both pictures to the company as proof of payment.  It's

2  not always a bed of roses in a relationship.  There comes the

3  ups and downtimes.  I believe that we are facing our hard times

4  and if we stay strong, we will scale through, and the light is

5  just there at the end of the tunnel.  I want you to know that

6  I'm not here to take advantage of you.  All I want is for you

7  to trust me with anything and feel safe and secure, the same

8  way I feel about you.

9            Then there is a break.

10           And I was just reading messages on May 23, right,

11  Ms. Gutierrez?

12  A.  Yes.

13  Q.  And the break comes and now the messages are May 26, right?

14  A.  Yes.

15  Q.  OK.  I am sending the information again.  You will issue

16  the cashier's check with the name below.  Pay to:  Royal

17  Treasure Chest, LLC.  Then you will drive to FedEx and

18  overnight the check to, name, Nadine J. Wade, address: 244 East

19  161st Street, the Bronx, New York.

20  A.  Did not mean to send yet.  My finger slipped.  Yes, I

21  normally eat two meals a day.  If I am somewhere that has

22  amazing breakfast specials, I will eat breakfast.  I have all

23  that.  I will let you know.  I am trusting you and showing you

24  that I believe you.

25  Q.  I don't eat lunch.  Only breakfast and dinner.  Thanks for

NC5sWAD4                    Gutierrez – Direct

1    trusting me, and I promise I will not let you down.  Send me a

2    picture of the cashier's check and FedEx receipt.

3         Thank you.

4    A.  OK.

5    Q.  Then there is a call, Hi, honey.

6         Another call.  And scroll.

7         OK.  And the next message is an incoming message of a

8    paragraph?

9    A.  Yes.

10   Q.  Let's zoom in on that.

11        Now, who is this sent to?

12   A.  Nadine.

13   Q.  This FedEx envelope?

14   A.  Nadine J. Wade.

15   Q.  And that's the same address we have been looking at, the

16   Walgreens?

17   A.  Yes.

18   Q.  And in the top left, are you able to see a name of the

19   sender?

20   A.  Yes.  It's Chris Eldredge, Augusta Cleaners and Formals.

21   Q.  And can you see the city and the state that's listed in the

22   address?

23   A.  It says Waynesboro, Virginia.

24   Q.  That's on the front of this FedEx envelope to Nadine J.

25   Wade, right?

NC5sWAD4                     Gutierrez - Direct

1   A.  Yes.

2              MR. FERGENSON:  All right.  Let's zoom out, please.

3              Thank you, Ms. Foote.  Let's scroll down.

4              OK.  Let's zoom on the next photograph.  .

5   Q.  OK.  Now, Ms. Gutierrez, is this a cashier's check?

6   A.  Yes.

7   Q.  And what's the date?

8   A.  May 26, 2020.

9   Q.  In what amount?

10  A.  It's $15,000.

11  Q.  And now, Ms. Gutierrez, is there a remitter name listed on

12  this check?

13  A.  No.

14  Q.  In the top left, are you able to see which bank or

15  financial institution issued this cashier's check?

16  A.  Yes.  It's DuPont Community Credit Union.

17  Q.  And what's the city and state in the address listed beneath

18  that?

19  A.  Waynesboro, Virginia.

20  Q.  And who is this check, this $15,000 cashier's check from

21  DuPont Community Credit Union, in Waynesboro, Virginia, payable

22  to?

23  A.  Royal Treasure Chest, LLC.

24  Q.  And, Ms. Gutierrez, I want to focus you on the text beneath

25  Royal Treasure Chest, LLC.

NC5sWAD4                          Gutierrez - Direct

1        What does it say after the letters RE colon?

2   A.  Blowout prevent.

3        MS. McLEOD:  Ms. Foote, let's go to -- let's zoom out

4   and if we could briefly scroll back up to the FedEx.

5        Just zoom.

6   Q.  Actually, if you can read it, Ms. Gutierrez, what are the

7   last four of that FedEx tracking number?

8   A.  8022.

9   Q.  Let's scroll to the FedEx record, Ms. Foote, please.

10       What are the last four of this tracking number,

11  Ms. Gutierrez?

12  A.  It's the same, 8022.

13  Q.  Now, I'm not going to go through row by row again, but who

14  signed for this FedEx envelope with the check that says blowout

15  prevent?

16  A.  Nadine Wade.

17       MR. FERGENSON:  Ms. Foote, let's please go to

18  Government Exhibit 913.

19  Q.  Same name in the top left, Ms. Gutierrez?

20  A.  Yes.

21  Q.  And what's the date?

22  A.  May 30, 2020.

23  Q.  So that's just four days after the text we were just

24  looking at?

25  A.  Yes.

NC5sWAD4                          Gutierrez - Direct

1   Q.  OK.  I'll read the blue and you can read the white, if

2   there are any.

3           So there is a call and then the outgoing texts say:

4           I am sorry if I hurt you or upset you.  I apologize.

5           I am sending the information again.  You will issue

6   the cashier's check with the name below.  Pay to: Royal

7   Treasure Chest, LLC.  Then you will drive to FedEx and

8   overnight the check to name:  Nadine J. Wade.  Address: 244

9   East 161st Street, The Bronx, New York.

10          Thank you.

11          And then there is an incoming photo, right,

12  Ms. Gutierrez?

13  A.  Yes.

14  Q.  Let's zoom on that.

15          Now, I won't go over the same detail, but on the front

16  of this FedEx envelope it's addressed to Nadine Wade, correct?

17  A.  Correct.

18  Q.  At that same Walgreens in the Bronx, correct?

19  A.  Correct.

20  Q.  And in the top left, is there a sender information on the

21  front of this FedEx envelope?

22  A.  Yes.

23  Q.  And it says, Chris Eldredge, Augusta Cleaners and Formals,

24  correct?

25  A.  Yes.

NC5sWAD4                        Gutierrez - Direct

1    Q.  And lists an address of Waynesboro, Virginia?

2    A.  Yes.

3    Q.  And, Ms. Gutierrez, what are the last four of the tracking

4    number?

5    A.  8158.

6          MR. FERGENSON:  Let's zoom back out.  Let's go to the

7    next page, please, Ms. Foote.  Let's zoom on this check.

8    Q.  OK.  Ms. Gutierrez, this is another cashier's check, right?

9    A.  Right.

10   Q.  Also from DuPont Community Credit Union in Waynesboro,

11   Virginia?

12   A.  Yes.

13   Q.  And what's the date of this check?

14   A.  May 30, 2020.

15   Q.  How much was this check for?

16   A.  $35,000.

17   Q.  And, again, who was this check made payable to?

18   A.  Royal Treasure Chest, LLC.

19   Q.  Beneath this check, what does it say after the RE colon

20   line?

21   A.  Machinery.

22         MR. FERGENSON:  All right.  Let's zoom back out.

23   Let's scroll down.

24   Q.  And, Ms. Gutierrez, I'm not going to scroll back up, but

25   this FedEx tracking number matches the FedEx envelope we just

NC5sWAD4                          Gutierrez - Direct

1   looked at?

2   A.  Yes.

3   Q.  And I won't go through it again in detail, but who signed

4   for this FedEx envelope from Waynesboro, Virginia, four days

5   later?

6   A.  N. Wade.

7        MR. FERGENSON:  All right.  Ms. Foote, let's go to

8   Government Exhibit 914.

9   Q.  Same name in the top left?

10  A.  Yes.

11  Q.  What's the date?

12  A.  June 8, 2020.

13  Q.  So that's about a week later, right?

14  A.  Right.

15  Q.  OK.  I will read the blue text and you please read the

16  white.

17        Pay to Royal Treasure Chest, LLC.  57K$.  Pay to

18  Honcho Ways, Inc., 68K$.  Mail to, name, Nadine J. Wade,

19  address, 244 East 161st Street, The Bronx, New York 10451.

20  A.  Why two different companies?

21  Q.  Honcho Ways, Inc., is under Royal Treasure.  They own both

22  companies.  They said you should split the payment between

23  their companies so the whole company can clear within 24 hours

24  and they will ship out the machine.  Payment*.

25  A.  I see.  I guess.  Just thought it would go to the same

NC5sWAD4                     Gutierrez - Direct

1    place.

2    Q.  And then there's a call and a second longer call.

3    A.  Can both checks go in the same FedEx envelope?

4    Q.  Yes.

5    A.  Got it.

6    Q.  There's another call.

7              Are you OK?

8              And then there's an incoming message, Ms. Gutierrez?

9    A.  Yes.

10   Q.  All right.  Let's zoom on that photograph.

11             And the same shipper and sender information on the

12   front of this FedEx envelope, Ms. Gutierrez?

13   A.  Yes.

14   Q.  And, actually, do you even see, beneath Bronx, New York,

15   where it says RE colon?

16             What does it say after that?

17   A.  C. Carter Arbaugh.

18   Q.  That's on the front of this FedEx envelope to Nadine J.

19   Wade?

20   A.  Yes.

21             MR. FERGENSON:  Let's zoom back out.  Let's scroll

22   down, please, Ms. Foote.

23   Q.  Now, Ms. Gutierrez, after the FedEx envelope, there's

24   photos of two checks, right?

25   A.  Right.

NC5sWAD4                        Gutierrez - Direct

1    Q.  Let's look at them one by one.  Let's look at the top

2    check.

3              OK.  So this is another cashier's check?

4    A.  Yes.

5    Q.  From the DuPont Community Credit Union?

6    A.  Yes.

7    Q.  And what's the date on this check?

8    A.  June 8, 2020.

9    Q.  And how much was this check?

10   A.  $57,000.

11   Q.  Who was this check made payable to?

12   A.  Royal Treasure Chest, LLC.

13   Q.  And what beneath that, what does it say after RE colon?

14   A.  Machinery.

15   Q.  And, Ms. Gutierrez, this is about a week after the first

16   check that was re machinery, right?

17   A.  Yes.

18             MR. FERGENSON:  Let's zoom back out and let's look at

19   the second check.

20   Q.  OK.  Ms. Gutierrez, same date, right?

21   A.  Yes.

22   Q.  Cashier's check from DuPont Community Credit Union?

23   A.  Yes.

24   Q.  And how much was this check?

25   A.  $68,000.

NC5sWAD4                          Gutierrez – Direct

1   Q.  Now, who is this check made payable to?

2   A.  Honcho Ways, Inc.

3   Q.  And what was the re line underline that?

4   A.  Machinery.

5   Q.  OK.  Let's zoom out and, just before we start reading

6   again, do you recall the text we just read where Ms. Arbaugh

7   asked if both checks could go in one envelope?

8   A.  Yes.

9   Q.  And the answer was yes, right?

10  A.  Yes.

11  Q.  OK.  Let's continue reading and you'll have the first line.

12  A.  I know you called.  Did not want to talk while in FedEx.

13  Q.  I see.  I got the pictures.

14      MR. FERGENSON:  OK.  Let's scroll down, Ms. Foote.

15  Q.  And thanks so much honey.  I appreciate your help.  I

16  program I will not let you down.  I need to forward the

17  pictures and call the company.  I will get back to you.

18  A.  Please don't.  I am sure I cannot handle anything else.

19  Q.  Nothing else will go wrong.  I promise you.

20      Let's keep scrolling down.

21      Now, I won't do it here, but have you previously

22  compared the tracking number here with the tracking number in

23  the photograph?

24  A.  Yes.

25  Q.  And are they the same?

NC5sWAD4                    Gutierrez – Direct

1    A.  Yes.

2    Q.  And, Ms. Gutierrez, who signed for this FedEx envelope that

3    had the two checks inside of it?

4    A.  N. Wade.

5            MR. FERGENSON:  Now, Ms. Foote, let's now go to

6    Government Exhibit 915.

7    Q.  Same name in the top left?

8    A.  Yes.

9    Q.  And what's the date?

10   A.  June 10, 2020.

11   Q.  So that's just two days later than the text we were just

12   looking at?

13   A.  Yes.

14   Q.  OK.  I'll go ahead and read the blue.

15           Pay to Zeevaldor, Inc.  $26,560.

16   A.  Got it.

17   Q.  OK.  And then there's a photo of the FedEx.  Let's zoom on

18   that.

19           I won't spend a ton of time, but the same sender and

20   recipient info we've been looking at, correct?

21   A.  Yes.

22   Q.  And there's still a reference to C. Carter Arbaugh on there

23   as well, right?

24   A.  Right.

25           MR. FERGENSON:  OK.  Let's zoom down.  We can skip

NC5sWAD4                         Gutierrez - Direct

1    over these texts.  Let's just zoom on the check here.

2    Q.  OK.  Now, this is another cashier's check from DuPont

3    Community Credit Union, correct?

4    A.  Correct.

5    Q.  And what's the date?

6    A.  June 10, 2020.

7    Q.  Same date of the text?

8    A.  Yes.

9    Q.  What's the amount on this check?

10   A.  $26,560.

11   Q.  And who was this one payable to?

12   A.  Zeevaldor, Inc.

13   Q.  And who is the re line on this $26,560 check?

14   A.  Machine shipping.

15   Q.  OK.  Let's zoom out.  Let's scroll to the bottom.

16        Ms. Gutierrez, does the FedEx tracking number on this

17   record match the one in the photograph from Ms. Arbaugh?

18   A.  Yes.

19   Q.  And who signed two days later for this FedEx envelope with

20   a check to Zeevaldor, Inc.?

21   A.  Nadine Wade.

22   Q.  Now we can take that down.

23        Ms. Gutierrez, did you search the Google records for

24   additional text messages with Ms. Arbaugh after this date,

25   after the June 10 date?

1    A.  Yes.

2    Q.  And were there any in the three Google accounts described

3    in the stipulation?

4    A.  No.

5    Q.  All right.  Let's transition to another individual.

6            Let's go to Judy Crain.

7            MR. FERGENSON:  Ms. Foote, please pull up Government

8    Exhibit 941.

9    Q.  Now, Ms. Gutierrez, what's the name in the top left here?

10   A.  Judy Crain.

11   Q.  What's the date?

12   A.  April 15, 2020.

13   Q.  And this is just a message from Ms. Crain, correct?

14   A.  Correct.

15   Q.  And what does she say?

16   A.  These two are my favorites.

17           MR. FERGENSON:  And, Ms. Foote, if we can zoom on the

18   photos.

19   Q.  OK.  Let's go to Government Exhibit 942.

20           And, again, this is still Ms. Crain, Ms. Gutierrez?

21   A.  Yes.

22   Q.  What's the date?

23   A.  April 19, 2020.

24   Q.  So just a few days later?

25   A.  Just a few days later.

1    Q.  And what does this message say?

2              You can zoom on it.

3    A.  This is my favorite now.  And then there's a photo.

4    Q.  Let's now go to Government Exhibit 943, please.

5              OK.  Now, this is the next day on April 19 these

6    start, correct?

7    A.  Yes.

8    Q.  OK.  Let's zoom on the messages.  I'll read the blue, you,

9    please, read the white.

10             We got a lot done today, but the blowout preventer was

11   giving us problem.

12   A.  Does that mean a delay in getting the job completed?

13   Q.  Not at all.

14   A.  OK.  That's good.  What is a blowout preventer?  You don't

15   have to answer.  You can tell me when we meet.

16   Q.  A blowout preventer is a specialized valve used to seal,

17   control, and monitor oil and gas wells to prevent blowouts.

18   A.  Oh.

19   Q.  So blowout preventer allows us to weld under the water.

20   A.  Do you have a backup?

21   Q.  I am sure it will work better tomorrow?

22   A.  Hope so.

23   Q.  I guess the machine needs to cool down.  Send me your

24   e-mail.  I want to send you a video of me welding under the

25   water.  I told one of my crew to video me so I can share with

1    you.

2    A.   JudyColleenCrain@gmail.com.

3            MR. FERGENSON:   And let's pull up, Ms. Foote,

4    Government Exhibit 1012.

5            (Video played)

6            Thank you, Ms. Foote.

7            Let's go back to Government Exhibit 943.

8    BY MR. FERGENSON:

9    Q.   Let's start again, Ms. Gutierrez, on April 20.

10           OK.   So this is the following morning.

11           Good morning, sweetie.   We have a problem on the rig.

12   I will text you soon.   I hope you slept well.

13   A.   Oh, no.

14   Q.   Can you talk on Skype?

15   A.   Yes.

16   Q.   Let me know when you are online on Skype.

17   A.   I am on.

18   Q.   Then there is three calls.

19   A.   Where is this Royal Treasure Chest, LLC website?

20   Q.   Check your Skype.   Everything I told you about me is true.

21   I have no reason to lie to you.   I have a reputation to keep so

22   stop thinking I'm here to hurt you.   I will pay you back I

23   promise.

24   A.   OK.

25   Q.   Then there is a call.

NC5sWAD4                          Gutierrez - Direct

1          Hi, honey.

2          Two more calls.

3          Are you OK?

4          There's another call.

5          Is there any reason why you are not picking my calls?

6    I am not here to take advantage of you.  I know right now we

7    are facing the difficulty of building each other's trust.  I

8    understand your fears and worries about the undone project

9    here, and I know you cannot wait to meet me in person.  I also

10   cannot wait, as I have thoughts of us cuddling all night,

11   sleeping and waking to each other's smiling face and doing all

12   the beautiful things we wish to do together.  But, I must tell

13   you, honey, it's not always a bed of roses in a relationship.

14   There comes the ups and downtimes.  I believe that we are

15   facing our hard times, and if we stay strong, we will scale

16   through and the light is just there at the end of the tunnel.

17         You don't have to ignore me.  If you don't want to do

18   this.  Just tell me.

19         Then there's a call.

20         And then the next incoming message says what,

21   Mr. Gutierrez?

22   A.  It is done.

23   Q.  Then there is three photographs sent?

24   A.  Yes.

25         MR. FERGENSON:  And let's look at the check, first,

1    please, Ms. Foote.

2    Q.  OK.  Now, Ms. Gutierrez, is this another cashier's check?

3    A.  Yes.

4    Q.  What's the date of this cashier's check?

5    A.  April 20, 2020.

6    Q.  What's the amount?

7    A.  $15,000.

8    Q.  And is there a remitter listed on this cashier's check?

9    A.  Yes.

10   Q.  Who is the remitter?

11   A.  Judy Colleen Crain.

12   Q.  That's on the face of this cashier's check?

13   A.  Yes.

14   Q.  Who is this $15,000 cashier's check from Judy Colleen Crain

15   made payable to?

16   A.  Royal Treasure Chest, LLC.

17          MR. FERGENSON:  Let's zoom out, please.  Let's look at

18   the FedEx envelope.

19   Q.  OK.  Now, who is this FedEx envelope addressed to?

20   A.  Attention:  Nadine J. Wade, Royal Treasure Chest, LLC.

21   Q.  And, Ms. Gutierrez, in the top left on the face of this

22   FedEx envelope, is the sender's information listed?

23   A.  Yes, it is.

24   Q.  What's the name listed?

25   A.  Judy Crain.

NC5sWAD4                    Gutierrez - Direct

1   Q.  And are you able to read the city and the state?

2   A.  It says New Orleans, Louisiana.

3   Q.  OK.  Let's zoom out.

4           OK.  Let's continue reading.  I'll read the blue.

5           Thank you.

6           I promise I will pay you back.

7           Text me when you get home.

8   A.  OK.  Just know this.  I just gave you everything I have to

9   give you from here.

10  Q.  I will not let you down I promise you sweetie.  Text me

11  when you get back home.

12  A.  OK.  I'm home.

13  Q.  I am glad you got home safely.  Sorry for the stress.  You

14  have nothing to worry about OK.  I will pay.  Have you eating?

15  A.  I just ate for the first time today.  I went to do.

16  Q.  Thank you.  Are you going to lunch now.

17          I'm sorry.

18  A.  That was me.

19          THE COURT:  Let's try that again.  I'll let you read

20  that, please.

21  A.  Are you going to lunch now?

22  Q.  I forward both pictures to the company via e-mail.

23  A.  OK.

24  Q.  And let's scroll down.

25          Now, did you previously compare the tracking number on

NC5sWAD4                         Gutierrez – Direct

1   this FedEx tracker with the one in the photograph?

2   A.  Yes.

3   Q.  Are they the same?

4   A.  Yes.

5   Q.  Who signed for this envelope with a cashier's check from

6   Judy Crain in New Orleans?

7   A.  N. Wade.

8          MR. FERGENSON:  All right.  Ms. Foote, let's go to

9   Government Exhibit 944.

10  Q.  All right.  Now, what's the name in the top left?

11  A.  It's the same, Judy Crain.

12  Q.  And this is just two days later, right?

13  A.  Right.

14  Q.  It's April 22, 2020?

15  A.  Yes.

16  Q.  OK.  I'll read the blue, you can read the white.

17         Hi sweetie.

18  A.  Hi.

19  Q.  Can you talk on Skype?

20  A.  Yes.

21  Q.  OK.  Come online.

22         Then there is a long call.

23         Name, Royal Treasure Chest, LLC.  You will overnight

24  to the address below.  Mail to, name, Nadine J. Wade.  Address,

25  244 East 161st Street, the Bronx, New York, 10451.

NC5sWAD4                    Gutierrez - Direct

1    A.  I can't get it.  So sorry.  All I can get is ten.

2    Q.  OK.  If you can send 10K, I will see if I can talk the

3    company into accept 25K now, and I can send the balance when I

4    get off the rig.

5              Then there's three calls.

6              Honey.

7    A.  At FedEx.

8    Q.  OK.

9              Let's scroll.

10             Then there's three photos sent to the Google account,

11   correct?

12   A.  Correct.

13             MR. FERGENSON:  Let's look at the check first.  Thank

14   you, Ms. Foote.

15   Q.  Now, again, what's the amount of this check?

16   A.  $14,500.

17   Q.  And is the remitter listed on the face of the check?

18   A.  Yes.

19   Q.  What's the remitter as name?

20   A.  Judy Colleen Crain.

21   Q.  And who is this $14,500 cashier's check from Judy Colleen

22   Crain made payable to?

23   A.  Royal Treasure Chest, LLC.

24             MR. FERGENSON:  OK.  Let's zoom out, please.  Let's

25   zoom on the FedEx envelope.

NC5sWAD4                    Gutierrez - Direct

1    Q.   Who is the FedEx envelope addressed to?

2    A.   Royal Treasure Chest, LLC, attention, Nadine J. Wade.

3    Q.   And it's a bit blurry, but are you able to see in the top

4    left the name of the sender?

5    A.   Yeah.  It's Judy Colleen Crain.

6    Q.   Let's zoom back out.

7         OK.  Actually, Ms. Gutierrez, you have the next lines

8    to finish reading.

9    A.   Check will get there at 8:30 a.m. tomorrow.

10   Q.   Got it sweetie.  Thank you.  I will forward the pictures

11   and call the company.  Text me when you get home.  Drive safe.

12   A.   I will drive safe on my bike.  My son's bike.

13   Q.   OK.

14   A.   Home.

15   Q.   Let's keep scrolling down.

16        Now, Ms. Gutierrez, is the tracking number on this

17   FedEx record the same as the one in the photo?

18   A.   Yes.

19   Q.   And who picked up this FedEx envelope from Judy Colleen

20   Crain with a cashier's check from Judy Colleen Crain?

21   A.   It was signed for by N. Wade.

22        MR. FERGENSON:  All right.  Now, Ms. Foote, let's go

23   to another individual.

24        Let's look at Patsy Stanley.

25        THE COURT:  Counsel, may I inquire, just because we're

1    getting near the luncheon time, about how much more direct exam

2    you have.

3         MR. FERGENSON:  Your Honor, I have -- I may be close

4    to halfway.

5         THE COURT:  You're halfway.

6         OK.  Then I think now it makes, if it's all right with

7    you all, and the answer is it will be, let's take the break for

8    lunch right now.  Because you're halfway through and I don't

9    know when else we could break, you know, that wouldn't get

10   close enough to lunch.

11        We'll take our lunch break.  It's going to be 45

12   minutes, and you'll come back to the jury room.  And then when

13   you're all together 45 minutes later, we'll come back in here.

14        I will ask you, as I ask you at each break, not to

15   discuss this case with each other or with anyone else, and to

16   keep an open mind until all of the evidence is in, and to enjoy

17   your lunches.

18        Thank you all very much.

19        (Continued on next page)

20

21

22

23

24

25

NC5sWAD4                          Gutierrez - Direct

1              (Jury not present)

2              THE COURT:  Counsel, I'm just standing for my back.

3         Is there anything for us to discuss at this time?

4              MR. FERGENSON:  Not from the government.

5         No, your Honor.

6              MR. SOLOWAY:  No.

7              THE COURT:  Saying nothing, I'll see you all in

8    45 minutes.

9              Thank you, Ms. Gutierrez, as well.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NC5Gwad5                        Gutierrez - Direct

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 1:30 p.m. |
| 3 | (In open court; jury present) |
| 4 | THE COURT:  Mr. Fergenson, you may continue with your |
| 5 | examination. |
| 6 | MR. FERGENSON:  Thank you, your Honor. |
| 7 | Ms. Foote, could you please publish Government |
| 8 | Exhibit 991. |
| 9 | BY MR. FERGENSON: |
| 10 | Q.  Ms. Gutierrez, what's the name in the top left of this |
| 11 | summary text exhibit? |
| 12 | A.  Patsye Stanley. |
| 13 | Q.  What's the date here? |
| 14 | A.  March 14th, 2020. |
| 15 | Q.  And this isn't an individual we've looked at before, this |
| 16 | is a new one; right? |
| 17 | A.  This is a new person. |
| 18 | Q.  I'll read the first text there is dated March 3rd, 2020. |
| 19 | And so I'll read that, and then I'll continue on with the |
| 20 | March 14th texts. |
| 21 | Hi, Patsye.  This is Diego from OurTime. |
| 22 | Then there's a break.  And we go to March 14th.  Hi, |
| 23 | sweetie.  Good morning.  I have been awake for a while checking |
| 24 | the blowout preventer before we start working today.  Text me |
| 25 | when you are done. |

NC5Gwad5                         Gutierrez - Direct

1   A.  I decided it is a bit cold, my heat was turned down, I

2   still have a jacket on.  How is work today?  The problem

3   better.

4   Q.  Can you talk on Skype?

5   A.  Sure.

6   Q.  Okay.  I left you a message on Skype.

7           There's another call.

8           I'm flying into St. Louis Lambert International

9   Airport; right?  I want to purchase my flight ticket so I can

10  forward my itinerary to you.  But I need to be sure if I'm

11  flying into STL.

12          There's a call.

13          Longer call.

14          What is sent by Ms. Stanley?

15  A.  A picture of a check.

16          MR. FERGENSON:  Let's zoom in on that.

17  Q.  Now, Ms. Gutierrez, how much is this check for?

18  A.  $15,000.

19  Q.  And is there a remitter listed on the face of this check?

20  A.  Yes.

21  Q.  Who is the remitter?

22  A.  Patsye A. Stanley.

23  Q.  And who is this $15,000 check made payable to?

24  A.  Royal Treasure Chest LLC.

25          MR. FERGENSON:  Zoom out, scroll down, please,

1    Ms. Foote.

2            Let's zoom in on the FedEx package, please.

3    Q.   Who it this FedEx package addressed to, Ms. Gutierrez?

4    A.   Nadine J Wade.

5    Q.   And then right above that, focusing you on the top left,

6    what name is listed on the face of this FedEx envelope to

7    Nadine Wade?

8    A.   Patsye Stanley.

9    Q.   And is there an address with a city and state listed?

10   A.   Yes.

11   Q.   What is the city and state?

12   A.   St. Charles, Missouri.

13           MR. FERGENSON:  Let's zoom out and let's scroll down.

14   Q.   And then there's also a picture of a FedEx receipt.

15           Do you see that?

16   A.   Yes.

17           MR. FERGENSON:  Let's scroll down.

18   Q.   Ms. Gutierrez, does this FedEx record's tracking number

19   match the tracking number on the envelope we just looked at?

20   A.   Yes.

21   Q.   Who signed for this package for a cashier's check?

22   A.   N Wade.

23           MR. FERGENSON:  Let's go to another individual.

24   Ms. Foote, let's pull up Government Exhibit 981.

25   Q.   What's the name in the top left of this?

1    A.  Maria Milanya.

2    Q.  What's the date?

3    A.  March 21st, 2020.

4    Q.  I'll read the blue and you read the white.

5            Hi, Maria.  This is Diego from Marriage Minded.

6    A.  Hi, Diego.  You are a fast operator.

7    Q.  Smiley face.  This is much faster.

8    A.  Yes, it is.

9    Q.  Tell me more about you.  How long have you been single and

10   how many kids do you have?

11   A.  My husband was ill for a very long time.  Technically, I

12   alone more and a half year.  We did not have kids.  We want to.

13   I had two surgeries but it never happened.  Do you have kids?

14   Q.  I have a son, Alberto -- I'm not going to continue.

15           You continue.

16   A.  Last 20 years when my husband was still alive, we went

17   every summer for two to three months, we used to have house on

18   a long island in Croatia and we live on Long Island in New

19   York, what a coincidence.  I'm sorry for your loss.  My husband

20   died from cancer.

21   Q.  Sorry for your loss.  I'm family oriented.  I communicate

22   with my mom and my son every day.  They are the love of my

23   life.

24           MR. FERGENSON:  Ms. Foote, let's go to Government

25   Exhibit 982.

1   Q.  What's the name in the top left?

2   A.  It's again Maria Milanya.

3   Q.  What's the date here?

4   A.  March 20th, 2020.

5   Q.  So a little over a week later?

6   A.  Yes.

7   Q.  I'll read the blue and you read the white.

8           Good morning.  I will text you shortly.  The blowout

9   preventer does not seems to be working.  So we are checking

10  out.  Be right back.  Are you there?

11  A.  I'm here.  Everything okay.

12  Q.  No, sweetie.  Can you talk on Skype.

13          Then there's three calls.

14          If you cannot trust me I see no reason why we should

15  continue this.  Thanks for hurting me.  God bless you.

16          There's a call.

17          Are you there?

18          Three more calls.

19          Here is the TD Bank bank address, 1601 West Boynton

20  Beach Boulevard, Boynton Beach, Florida, name Nadine Jazmine

21  Wade, bank name TD Bank, account number 4363680129 checking

22  account address 155 Canal Street, New York, New York  10013.

23          MR. FERGENSON:  Then scroll.

24  Q.  Then there's a call and an MMS -- do you see there's an

25  outgoing message that says MMS sent?

NC5Gwad5                          Gutierrez - Direct

1   A.  Yes.

2   Q.  Now, based on your review of the records, if the Google

3   account sent an attachment to someone, was that attachment

4   located in the Google records you reviewed?

5   A.  No.

6   Q.  So there's the -- I'll continue reading.  There's an MMS

7   sent message.

8           And then, here is the invoice I got from the company.

9   They want the payment to through their agent because he is the

10  one processing me sales at the company.

11          Then there's a call.

12          And then an address 578 East Woolbright Road, 501

13  Boynton Beach, Florida  33435.

14          Three more calls.

15          Just tell them you want to deposit into the account.

16  You don't have to go into details.  That's all.  Send me a copy

17  of the receipt when you are done.

18          Three more calls.

19          And then, what's the next message?

20  A.  I left you a message on Skype.

21          MR. FERGENSON:  Let's zoom in on that.

22  Q.  Ms. Gutierrez, are you able to read from left to right

23  what's on this record?

24  A.  Yes.  It's 11:53 a.m., March 30th, 2020, asterisk 0129 CK

25  DEP, $5,000, number 44.

NC5Gwad5                    Gutierrez – Direct

1    Q.  And those numbers, 0129, are those the same last four

2    numbers of the account number that was sent to Ms. Milanya?

3    A.  Yes.

4    Q.  Ms. Gutierrez, in the bottom left, what does it say on this

5    piece of paper?

6    A.  TD Bank.

7            MR. FERGENSON:  Let's zoom back out.

8    Q.  I'll continue reading in blue.

9            There's three calls.

10           And then, I spoke with the company and they said you

11   could sent the other 5K through money orders.  So you can drive

12   to post office or Western Union to buy a money order for 5K,

13   then you will take pictures of money orders and send it to me,

14   then you will put the money orders inside the envelope and

15   drive to FedEx in 2208 North Congress Avenue, Boynton Beach,

16   Florida 33426 to overnight the money orders to them.

17           Tell FedEx to overnight David Buma, address 32 Holland

18   Street, Newark, New Jersey  07103.

19           MR. FERGENSON:  Let's scroll down.  And then there are

20   receipts that are sent.

21   Q.  Ms. Gutierrez, unlike the other records we have been

22   looking at, was that mailing address addressed to Nadine Wade's

23   attention?

24   A.  No.

25   Q.  So did you incorporate a FedEx record for any shipment in

1  this summary?

2  A.  I did not.

3        MR. FERGENSON:  Let's scroll down.  Ms. Foote, could

4  you zoom in on the money orders.  We can just scroll down some

5  more.  Thank you.

6        Now, let's go to Government Exhibit 984.

7  Q.  What's the name in the top left?

8  A.  Maria Milanya.

9  Q.  Same person?

10 A.  Same person.

11 Q.  And the date?

12 A.  April 10th, 2020.

13 Q.  So about 10 or 11 days later?

14 A.  Right.

15 Q.  I'm going to read the blue.  You read the white.

16       Honey, we have a problem.  There is an explosion on

17 the rig this morning.  Come on Skype.

18       There's a call.

19       Are you there?

20 A.  I'm here, tell me.

21 Q.  Come on Skype.

22       There's two calls.

23       Account name, Nadine Jazmine Wade, bank name, TD Bank,

24 account number ending 0129, checking account address 155 Canal

25 Street.

1          And then there's two calls and a photograph; right,

2    Ms. Gutierrez?

3    A.   Right.

4          MR. FERGENSON:   Ms. Foote, could you zoom on that.

5    Q.   Ms. Gutierrez, do you see the asterisk 0129?

6    A.   Yes.

7          MR. FERGENSON:   Ms. Foote, let's zoom out and scroll

8    down.  And this looks like a bigger photograph, maybe we can

9    zoom on that.

10   Q.   Could you read the amount shown on the right,

11   Ms. Gutierrez?

12   A.   It's $12,014.52.

13         MR. FERGENSON:   Let's zoom back out and continue

14   scrolling down.  We can keep going.

15         Let's go to the next one, Ms. Foote.  Let's go to

16   Government Exhibit 985.

17   Q.   What's the name in the top left?

18   A.   Maria Milanya.

19   Q.   What's the date?

20   A.   April 16th, 2020.

21   Q.   And that's six days later?

22   A.   Right.

23   Q.   You read the white.  I'll read the blue.

24   A.   I call my bank, already left the message.

25   Q.   Honey, your bank is open.  We don't have to wait for your

NC5Gwad5                        Gutierrez - Direct

```
 1    banker.  This is your bank address, right, address 5000 West
 2    Boynton Beach Boulevard, Boynton Beach, Florida 43436.  Just
 3    listen to me this time, okay?
 4    A.  Okay.  He probably will call.  If he don't 9:00 o'clock,
 5    I'm living and wait when bank open 9:30, it be line outside any
 6    way.
 7    Q.  Okay.
 8    A.  I listen to you my kimo sabe.
 9    Q.  Thank you mio amore.  I will tell you what you have to do
10    now.
11    A.  All me that all my life with mio amore.
12              You have details right.
13    Q.  Your bank will issue you a cashiers check of $50,000 with
14    the company name Honcho Ways Inc.  So when you go to the bank
15    this morning you will issue a check of 50k, then you will
16    overnight it to New Jersey.  They want you to send the rest of
17    the 23K through TD Bank.  So once you finish with the first
18    part, I will tell you how to address the other 23k.  But first,
19    you need to issue the 50kcheck and overnight it to New Jersey.
20    Capisci?
21    A.  50k to David Bums.
22    Q.  David Buma, address 32 Holland Street, Newark, New Jersey.
23    You will overnight it to the info above, yes?
24    A.  23k probably in cash.
25    Q.  No.  You will -- once you overnight it to David Buma, then
```

1    let me know and I will tell you how to capisci?

2    A.  I'm not going twice in bank so tell me second part.  I have

3    to pick up car today I have loaner when that call I can let

4    them know, capito.

5    Q.  Here is the second part.  You will issue another cashier's

6    check of 23K with Royal Treasure Chest LLC, then you will drive

7    to TD Bank and deposit the check in the account below.  Account

8    name Royal Treasure Chest LLC, account number 4367711201 at

9    155 Canal Street, New York, New York  10013, business account

10   TD Bank, capisci.

11   A.  So it is check to the TD Bank, capito amore mio.

12   Q.  So when you go to the bank, you will issue two cashier's

13   check, one for 50K and one for 23K.  50 K to Honcho Ways and

14   23K to Royal Treasure Chest LLC.  You will overnight the 50K

15   check to New Jersey and you will deposit the 23K to TD Bank.

16   Tell me if you understand Royal Treasure Chest LLC.

17              And I'll skip over the last one.

18              There's a call.

19              MR. FERGENSON:  Can you scroll down.  So let's zoom

20   first on the check.

21   Q.  So this is a cashier's check, Ms. Gutierrez?

22   A.  Yes.

23   Q.  For how much?

24   A.  $50,000.

25   Q.  And who is it payable to?

NC5Gwad5                    Gutierrez – Direct

1    A.   Honcho Way, Inc.

2              MR. FERGENSON:  Let's zoom back out.

3              And then let's zoom on the first image.

4    Q.   Now, this is one of the pieces of paper, it says TD Bank in

5    the bottom left.  Can you read the text towards the top?

6    A.   10:33 a.m., 4/16/20, asterisk 1201, COMMER DEP $23,000.

7              MR. FERGENSON:  Let's go to Government Exhibit 986,

8    Ms. Foote.

9    Q.   What's the name in the top left?

10   A.   Maria Milanya.

11   Q.   Same person?

12   A.   Right.

13   Q.   What's the date?

14   A.   April 22nd, 2020.

15   Q.   So six days after the messages we were just looking at?

16   A.   Yes.

17   Q.   You go ahead and read the white, and I'll read the blue.

18   A.   Diego, you sure to send the all in check form I prepare

19   paperwork call my credit card, they increase me 300, it help.

20   Q.   That's good.  So now your cash advance limit is 3,800;

21   right?

22   A.   Sorry to broke the mood, but I want to be sure tonight what

23   I doing tomorrow.

24   Q.   Yes.  You can send one cashier's check of 22K.  You will

25   issue the check with Royal Treasure Chest LLC.  Then you will

1   drive to TD Bank and deposit in the account I sent earlier.

2   That's okay.

3   A.  That what I thought, but better double check with you.

4           MR. FERGENSON:  Scroll down.

5           THE WITNESS:  I hope now when you retire you give

6   yourself a break and loosen up and not demand.

7           MR. FERGENSON:  Let's zoom in on the check.

8   BY MR. FERGENSON:

9   Q.  Ms. Gutierrez, how much is this cashier's check for?

10  A.  $22,000.

11  Q.  What is the date?

12  A.  April 22nd, 2020.

13  Q.  What's the remitter name on the face of the check?

14  A.  Maria Milanya.

15  Q.  And who is this $22,000 cashier's check from Maria Milanya

16  payable to?

17  A.  Royal Treasure Chest LLC.

18          MR. FERGENSON:  Zoom out.  And let's just go ahead and

19  scroll down and let's zoom on the photo.

20  Q.  Ms. Gutierrez, do you see this says asterisk 1201 on it?

21  A.  Yes.

22  Q.  And what's the dollar amount on the right?

23  A.  $22,000.

24          MR. FERGENSON:  Let's go to another individual,

25  Ms. Foote.  Can we please pull up Government Exhibit 951.

1    Q.  What's the name in the top left?

2    A.  Patsy Kwitkin.

3    Q.  What's the date on the top?

4    A.  July 19, 2019.

5    Q.  I'll read the blue.

6            Hi, Patsy, is Richard from Marriage Minded.

7    A.  Great.  That is a lot better.  We are told not to share

8    info due to stalkers, but trust is part of establishing

9    relationship.

10   Q.  That's right.  And if we wish to meet someone we have to be

11   able to communicate always because communication is the key to

12   every successful relationship.

13   A.  I lived in Palm Aire for 12 years, but condo living was not

14   for me.  Condocommando were overwhelming to me.

15   Q.  I live in a condo.  How long have you been single and how

16   many kids do you have?

17   A.  Of course, right on the beach?  Single for four and a half

18   years but not be choose.  I have one daughter who is married

19   with a great man and one grandson.  And you?  My grammar is

20   horrible.  I do know better.

21   Q.  I have a son, Alberto, who is 28 years -- and I won't

22   continue to read on.

23            MR. FERGENSON:  Let's pull up Government Exhibit 959.

24   Q.  Same person in the top left?

25   A.  Yes.

1    Q.  Patsy Kwitkin?

2    A.  Yes.

3    Q.  What is the date?

4    A.  October 2nd, 2019.

5    Q.  And I'll go ahead and read the blue.

6           Pay to Royal Treasure Chest LLC, mailing info name

7    Nadine J Wade, address 244 East 161st Street, the Bronx, New

8    York  10451.  You got it.

9    A.  Got it will leave shortly.  Thanks lovie.  You plan on

10   flying out tomorrow, right?

11   Q.  Once they receive the cashier's check tomorrow, they will

12   purchase a money order of 10K each and mail to their howls.

13   Yes, lovie, I'm leaving the rig tomorrow morning.  Mr. Miller

14   will pick me up between 9 and 10:00 a.m.

15   A.  Great.  I have to run some errands this afternoon.

16   Q.  Ms. Gutierrez, how much is this check for?

17   A.  $30,000.

18   Q.  What's the date on the check?

19   A.  October 2nd, 2019.

20   Q.  Is there a remitter listed on this check?

21   A.  No, there's not.

22   Q.  In the top left, what's the financial institution that sent

23   it?

24   A.  Space Coast Credit Union.

25   Q.  How much is this $30,000 check from Space Coast Credit

1    Union -- who is it payable to, excuse me?

2    A.  Royal Treasure Chest LLC.

3    Q.  Thank you.

4         MR. FERGENSON:  Let's scroll to the next page, please.

5    Q.  Now, there is a FedEx receipt?

6    A.  Yes.

7         MR. FERGENSON:  Let's zoom in on that, please.

8    Q.  On the receipt, what's the recipient address?

9    A.  The address or who it is made out to?

10   Q.  Well, let's start with the name.

11   A.  It's addressed to Nadine Wade, Royal Treasure Chest LLC.

12   Q.  And it's the Bronx Walgreens address we have been looking

13   at?

14   A.  Yes.

15   Q.  In the top right, do you see another address?

16   A.  Yes.

17   Q.  What is the city and state that address is from?

18   A.  Coral Springs, Florida.

19   Q.  Let's zoom back out and let's scroll down.

20        Does the tracking number for this FedEx number match

21   the receipt we just looked at?

22   A.  Yes.

23   Q.  Who signed for this check from Patsy Kwitkin?

24   A.  N Wayne.

25        MR. FERGENSON:  Let's go to Government Exhibit 960,

1    please, Ms. Foote.

2    Q.  What's the name in the top left?

3    A.  Patsy Kwitkin.

4    Q.  Same person?

5    A.  Yes.

6    Q.  What is the date?

7    A.  October 9th, 2019.

8    Q.  So that's one week later?

9    A.  Yes.

10   Q.  You go ahead and read the white.

11   A.  Let me check will be right back CL my night was not okay.

12   It is a go.  The money is in.  The amount I need to send is

13   39,100, correct.  Let me check Skype.

14   Q.  39,218.

15   A.  Where did I get the other amount.  Should I just make it

16   39,500 to make sure.

17   Q.  Yes, you can send 39,500.

18   A.  You and I cannot take anymore.  Please let the amount be

19   correct.

20   Q.  The amount is correct.

21   A.  Okay.  Well let me get up, get showered and I will eat,

22   take care of Bennie, and I will be on my way.

23   Q.  Okay, baby.  Love you more.

24   A.  I have info.  Cashier's check to Royal Treasure Chest

25   mailed to Ms. Wade in the Bronx, New York, FedEx a.m. delivery,

1   a.m. next day by 10:30 a.m. if possible.

2   Q.  Pay to Royal Treasure Chest LLC, mailing info, name

3   Nadine J Wade, address 244 East 161st Street, the Bronx, New

4   York, correct?

5   A.  Got it love.

6   Q.  Love you.

7   A.  On my way.  Just finished with bank.  All okay.

8   Q.  Yes.  All okay.  Send me copy of FedEx receipt and

9   cashier's check when you are done.  Drive safe.

10  A.  Of course.  Okay babe.  See if okay.

11          MR. FERGENSON:  Let's zoom on the check.

12  Q.  What's the date on this teller check?

13  A.  October 9th, 2019.

14  Q.  What's the amount?

15  A.  39,500.

16  Q.  And is this from Space Coast Credit Union again?

17  A.  Yes.

18  Q.  And this is a week after the $30,000 check we just looked

19  at earlier?

20  A.  Yes.

21  Q.  Who is this 39,500 check made payable to?

22  A.  Royal Treasure Chest LLC.

23          MR. FERGENSON:  Let's scroll.  You can scroll down,

24  please.  There's a FedEx receipt.  Can we zoom on that.

25  Q.  Again, who is this FedEx addressed to?

NC5Gwad5                        Gutierrez – Direct

1    A.   Nadine J Wade, Royal Treasure Chest LLC.

2    Q.   And that's the same Bronx Walgreens address we have been

3    looking at?

4    A.   Yes.

5    Q.   And in the top right, do you see Coral Springs, Florida?

6    A.   Yes.

7            MR. FERGENSON:   Let's zoom out, and let's scroll down

8    to FedEx record.

9    Q.   Does this FedEx record's tracking number match the tracking

10   number on the photo of the receipt?

11   A.   Yes.

12   Q.   And who signed for this $39,500 check from Patsy Kwitkin?

13   A.   N Wade.

14           MR. FERGENSON:   Now, Ms. Foote, let's go to Government

15   Exhibit 961, please.

16   Q.   Is this also Patsy Kwitkin?

17   A.   Yes.

18   Q.   What is the date?

19   A.   October 17th, 2019.

20   Q.   So this is eight days later?

21   A.   Yes.

22   Q.   I'll read the blue.

23           Are you there?

24   A.   Yes, babe, okay.

25   Q.   They said you will send the check to their branch in

NC5Gwad5                          Gutierrez – Direct

1    Florida, so that's good.

2    A.  And address.

3    Q.  FedEx will deliver faster.

4    A.  Do you think.

5    Q.  Yes, since it is Florida to Florida?

6    A.  Pay to Royal Treasure Chest LLC, mailing address Nadine J

7    Wade, address 8265 Championsgate Boulevard, Championsgate,

8    Florida  33896.

9         Question, are these women related.  I got it, rush

10   deliver.

11   Q.  She is one of the agent working in financial company.

12        And then there's a break.

13        The financial company said, since you are in Florida,

14   you should send it to their branch there because I told them I

15   want their office to deliver the money in London tomorrow.  So

16   they said you should send the check to their branch in Florida

17   so they can deliver faster.

18   A.  I understand.  Know I am pain in ass, but so anxious, need

19   you so.

20   Q.  Everything will be all right.  I assure.

21   A.  I know, will leave by time 10:00 a.m.

22   Q.  Okay.

23   A.  Leaving now.

24   Q.  Okay.

25   A.  Off to FedEx.

NC5Gwad5                         Gutierrez – Direct

1    Q.  And there's a call.

2              And is there an incoming message with a photograph?

3    A.  Yes.

4              MR. FERGENSON:  Ms. Foote, let's zoom on that.

5    Q.  Now, what is the date on this check?

6    A.  October 17th, 2019.

7    Q.  And what is the amount?

8    A.  55,000.

9    Q.  And is this also from Space Coast Credit Union?

10   A.  Yes.

11   Q.  And who is this $55,000 check made payable to?

12   A.  Royal Treasure Chest LLC.

13   Q.  And this is eight days after the 39 and a half thousand

14   dollar check?

15   A.  Yes, I believe so.

16             MR. FERGENSON:  Let's zoom back out and scroll down.

17   Q.  Now, is there a photo of the FedEx receipt?

18   A.  Yes.

19             MR. FERGENSON:  Let's zoom on that.

20   Q.  Now, what is the recipient address of this?

21   A.  Well, it's addressed to Royal Treasure Chest LLC, care of

22   Nadine J Wade.

23   Q.  And is this sent to the Bronx Walgreens?

24   A.  No.

25   Q.  What address is this sent to?

NC5Gwad5                        Gutierrez – Direct

A.  8265 Championsgate Boulevard, Championsgate, Florida

33896.

        MR. FERGENSON:  Let's keep going down.

Q.  And now is this the FedEx record that matches the tracking

number on the photo?

A.  Yes.

Q.  And who signed for this FedEx package sent to Florida?

A.  N Wade.

        MR. FERGENSON:  Now, Ms. Foote, could you please

add --

Q.  Again, this package was to 8265 Championsgate Boulevard;

correct?

A.  Yes.

        MR. FERGENSON:  Could you pull up S2 on the left and

12 on the right.

        I'll just read the stipulation on the left, which

says, Government Exhibit 12 is a true and accurate image of the

following address:  8265 Championsgate Boulevard,

Championsgate, Florida.

Q.  And Ms. Gutierrez, do you see Government Exhibit 12 on the

right?

A.  I do.

        MR. FERGENSON:  Now, Ms. Foote, let's go to Government

Exhibit 962.

Q.  This is Patsy Kwitkin, Ms. Gutierrez?

1   A.  Yes.

2   Q.  And the date?

3   A.  December 11th, 2019.

4   Q.  I'll read the blue.

5           Pay to Honcho Ways Inc.

6   A.  Yes, that put Honcho Wats.  Fixing now, just a few more

7   minutes.

8   Q.  Okay.

9   A.  Off to united parcel.

10  Q.  Honey, send the cashier's check via FedEx.

11  A.  Will do.

12  Q.  Okay.  Send me copy of the cashier's check.

13  A.  Is that okay.

14  Q.  No.  Take a full picture of the cashier's check.  Your

15  camera is too close to the check.

16          MR. FERGENSON:  Scroll down.

17  A.  How is this one.

18  Q.  Perfect.

19          MR. FERGENSON:  And we'll pause and we'll zoom

20  quickly.

21  Q.  How much is this check for?

22  A.  $15,000.

23  Q.  And who is it made payable to?

24  A.  Honcho Ways Inc.

25          MR. FERGENSON:  Let's zoom back out.

NC5Gwad5                          Gutierrez - Direct

1  Q.  And I should have asked, but is the remitter listed on that

2  check?

3  A.  Yes.

4  Q.  Who is the remitter?

5  A.  Patsy Kwitkin.

6          MR. FERGENSON:  Let's scroll down, Ms. Foote.

7  Q.  Is there another FedEx receipt?

8  A.  Yes.

9          MR. FERGENSON:  Let's zoom in on that.

10 Q.  Ms. Gutierrez, what's the recipient address listed on the

11 receipt?

12 A.  Honcho Ways Inc., attention Nadine Wade.

13 Q.  Is this sent to the Bronx Walgreens?

14 A.  No.

15 Q.  What is the address this is sent to?

16 A.  32 Holland Street, Newark, New Jersey  07103.

17         MR. FERGENSON:  Ms. Foote, let's keep scrolling down.

18 Q.  Is this the FedEx record for that receipt?

19 A.  Yes.

20 Q.  And who signed for this package?

21 A.  Nobody.

22 Q.  The signed for line is blank?

23 A.  Yes.

24 Q.  But this package was addressed to Nadine Wade's attention?

25 A.  Yes, it was.

NC5Gwad5                        Gutierrez – Direct

1          MR. FERGENSON:  Ms. Foote, let's pull up on the left

2    Government exhibit S2 and on the right Government Exhibit 13.

3          So the stipulation says that Government Exhibit 13 is

4    a true and accurate image of the address 32 Holland Street,

5    Newark, New Jersey.

6          Ms. Foote, let's go to Government Exhibit 964.

7    Q.  Ms. Gutierrez, still Patsy Kwitkin?

8    A.  Yes.

9    Q.  What's the date?

10   A.  April 23rd, 2020.

11   Q.  I'll read the first page.  You start, please.

12   A.  Okay, love.  If you can give me the info on copter company,

13   will the exact amount they need.

14   Q.  Your bank will issue the cashier's check with the name

15   below, Nadine Jazmine Wade.  Then you will drive to TD Bank and

16   deposit the cashier's check in the account below.  Account

17   name, Nadine Jazmine Wade, account number 4363680129, checking

18   account address, address, 155 Canal Street, New York, New York

19   10013, TD Bank.

20   A.  Why.

21   Q.  Take a picture of the cashier's check and send it to me

22   before you deposit it in TD Bank.  Honey, you will also send me

23   deposit receipt for TD Bank too.  So you are sending me two

24   pictures, cashier's check and receipt from TD Bank.  Do you

25   understand?  They have a branch here in New Orleans, once they

NC5Gwad5                          Gutierrez – Direct

1   confirm the payment in New York, they will call their branch in

2   New Orleans to deliver the money to the copter company.  I

3   prefer going through a financial company to ensure that the

4   copter company gets their money.

5            MR. FERGENSON:  Let's scroll and skip the second page.

6            Can you zoom on the check, please.

7   Q.  Now, Ms. Gutierrez, what is the date on this check?

8   A.  April 23rd, 2020.

9   Q.  This is a cashier's check?

10  A.  Yes.

11  Q.  What is the amount?

12  A.  $43,490.

13  Q.  Was this check issues by Space Coast Credit Union?

14  A.  No.

15  Q.  Is a remitter listed on this check?

16  A.  Yes.

17            (Continued on next page)

18

19

20

21

22

23

24

25

NC5sWAD6                        Gutierrez - Direct

1   BY MR. FERGENSON:

2   Q.  Who is the remitter?

3   A.  Patsky Kwitkin.

4   Q.  And who was this $43,490 cashier's check from Patsky

5   Kwitkin made payable to?

6   A.  155 Canal Street, New York, New York, 10013.

7   Q.  Sorry.  Just focusing you on the second --

8   A.  I'm sorry.  Nadine Jasmine Wade.

9        I was looking at the wrong spot.

10  Q.  No problem.  Thank you, Ms. Gutierrez.

11       And now to focus you on the line you were just looking

12  at, Ms. Gutierrez, the address?

13  A.  Yes.

14  Q.  Now, beneath that, what does it say beneath the address?

15  A.  For Richard Francisco.

16  Q.  Let's zoom out, please.  Let's scroll down and let's zoom

17  on the next photo.

18       Could you please read the text towards the top,

19  Ms. Gutierrez?

20  A.  10:29 a.m., 4/23/20*, 012 -- I think that's another -- 0.

21  CK deposit.  $43,490.

22  Q.  Let's zoom back out.

23       Let's look quickly at Government Exhibit 965.

24       This is Patsy Kwitkin again?

25  A.  Yes.

1  Q.  What's the date?

2  A.  April 29, 2020.

3  Q.  OK.  And we don't even need to read the text.  Let's just

4  scroll down.  Let's zoom on the check.

5        OK.  And, Ms. Gutierrez, if you can read it, how much

6  was this check for?

7  A.  $74,000.

8  Q.  And do you see -- if you were looking at the check

9  properly, in the top left of the check, what's the name printed

10  there?

11  A.  Patsy Kwitkin.

12  Q.  What's the name printed on the check beneath that?

13  A.  Nadine Jasmine Wade.

14  Q.  Let's zoom back out, scroll down, and zoom on this photo

15  quickly.

16        Ms. Gutierrez, I'll just ask you to read the dollar

17  amount on the top right of the check if it were right side up.

18  A.  $74,000.

19  Q.  Let's zoom out.  Let's go to another individual, second to

20  last.

21        Let's pull up Government Exhibit 971.

22        Now, what's the name in the top left of this exhibit,

23  Ms. Gutierrez?

24  A.  Rose Martin.

25  Q.  What's the date?

NC5sWAD6                    Gutierrez - Direct

1    A.  November 25, 2019.

2    Q.  OK.  Now, would you please read the white and I'll read the

3    blue.

4    A.  FedEx:  Your package was received on 11/25/19 at Walgreens

5    09802, 827 Magill Drive, North Huntingdon, PA, 15642.

6    Q.  I'll stop you there.  That's sufficient.

7            Thank you, Ms. Gutierrez.

8            We can zoom back out and let's zoom on the cashier's

9    check.

10           How much is this check for?

11   A.  $8,000.

12   Q.  And who is it made payable to?

13   A.  Honcho Ways, Inc.

14   Q.  And who is the remitter beneath that?

15   A.  Rose Lee Martin.

16   Q.  Let's zoom back out and let's scroll down.  Let's zoom on

17   the FedEx envelope.

18           Who is this FedEx envelope addressed to?

19   A.  Nadine Wade.

20   Q.  And is it Nandine Wad?

21   A.  Yes, yeah.  Nandine.

22   Q.  What's the company?

23   A.  Honcho Ways, Inc.

24   Q.  And the address?

25   A.  32 Holland Street.

1    Q.  OK.  Let's scroll down and let's keep scrolling.

2             Does this FedEx record match that envelope?

3    A.  Yes, it does.

4    Q.  And is there a signature on the FedEx record?

5    A.  No.

6             MR. FERGENSON:  Ms. Foote, let's go to Government

7    Exhibit 973.

8    Q.  This is also Rose Martin?

9    A.  Yes, it is.

10   Q.  What's the date?

11   A.  December 17, 2019.

12   Q.  OK.  You read the white and I'll read the blue.

13   A.  I just want you to get here.

14   Q.  We will be together soon.

15   A.  I know.  The loan is not in the bank yet, but I will keep

16   checking.  Should be today.

17   Q.  OK baby.

18   A.  I just want everything to go good.

19   Q.  Everything will work out.

20   A.  I know and I believe you.

21   Q.  Then there's a break.

22             Pay to:  Royal Treasure Chest, LLC, mailing to name:

23   Nadine J. Wade, address: 244 East 161st Street, The Bronx,

24   New York.

25             That's the information lovey.  That's nice.

NC5sWAD6                        Gutierrez – Direct

1    A.  OK.  I got it.  I will text you before I leave.

2              MR. FERGENSON:  OK.  Let's keep scrolling.  Let's zoom

3    out, Ms. Foote, please.  Let's scroll down and let's zoom on

4    the check.

5    Q.  How much is this check for?

6    A.  $23,000.

7    Q.  Who is it made payable to?

8    A.  Royal Treasure Chest, LLC.

9    Q.  Is the remitter name first listed on the face of the check?

10   A.  Yes.

11   Q.  Who is the remitter name?

12   A.  Rose Lee Martin.

13             MR. FERGENSON:  Zoom out.  Let's scroll down.  We can

14   keep going.  I'm sorry.

15             Actually, I'm sorry, Ms. Foote.  I didn't mean to skip

16   over that.  I apologize.

17             Let's zoom on this check.

18   Q.  Now, Ms. Gutierrez, is this official check from the same

19   bank of the check we just looked at or a different bank?

20   A.  Different bank.

21   Q.  And what's the date?

22   A.  December 17, 2019.

23   Q.  So same date as the messages we're looking at still?

24   A.  Yes.

25   Q.  And what's the amount here?

NC5sWAD6                        Gutierrez - Direct

1  A.  $2,000.

2  Q.  And is there a remitter listed on this check?

3  A.  Yes.

4  Q.  From a different bank?

5  A.  Yes.

6  Q.  What's the remitter's name?

7  A.  Rose Lee Martin.

8  Q.  And who was this $2,000 check from Rose Lee Martin payable

9  to?

10 A.  Royal Treasure Chest, LLC.

11 Q.  Let's zoom back out.  Let's scroll down.  OK.  And then

12 there is a FedEx envelope.  Let's zoom.

13         Who is this FedEx envelope addressed to?

14 A.  Nadine J. Wade.

15 Q.  At that Bronx Walgreens?

16 A.  Yes.

17 Q.  And are you able to see above that in the top left what the

18 sender information is?

19         There's a company.  Could you read the company first?

20 A.  Yes.  It's PA Notary & Tag.

21 Q.  What's the city and state of the address?

22 A.  Irwin, Pennsylvania.

23 Q.  OK.  Let's zoom back out.  Let's scroll down.

24         Does this FedEx record tracking number match the

25 envelope we just looked at?

1    A.  Yes.

2    Q.  Who signed for this FedEx envelope with two checks from two

3    different banks from rose Martin?

4    A.  N. Wade.

5    Q.  All right.  Let's go to Government Exhibit 975.

6           This is still Rose Martin?

7    A.  Yes.

8    Q.  What's the date?

9    A.  December 19, 2019.

10   Q.  OK.  I'll read the blue, you start with the white, please.

11   A.  I checked and nothing in the bank yet hopefully by.

12   Q.  Hopefully.  What have you been doing?

13   A.  Then I could do the check and FedEx it out first.

14   Q.  That's right.  Thank you.

15   A.  Just want you to get off that rig soon.

16   Q.  I want to get off too.  We need to be together.

17          Excuse me.  There's a break.

18          Hi sweetie.  I just spoke with the shipping.

19   A.  Good morning my dear.

20   Q.  And let's go out of this and let's scroll down.  Keep

21   scrolling.  OK.  Now, let's zoom on the photos there.

22          Ms. Gutierrez, are you able to read what it says in

23   the top left corner?

24   A.  The zero numbers.

25   Q.  No above that.  Does it says United States Postal Service?

1    A.  Yes.

2    Q.  And to the right of that, what does it say?

3    A.  Postal money order.

4    Q.  OK.  What's the dollar amount listed on this?

5    A.  1,000.

6    Q.  And is there a different $1,000 postal money order beneath

7    that?

8    A.  Yes.

9            MR. FERGENSON:  OK.  Let's zoom out, Ms. Foote.

10   Scroll down.

11   Q.  And here is another photo of two $1,000 postal money

12   orders?

13   A.  Yes.

14   Q.  And now, Ms. Gutierrez, I'm not going to ask you to do it

15   on the stand.

16           But prior to your testimony, did you compare the

17   serial numbers on these postal money orders in this photo with

18   the two $1,000 postal money orders in the first photo?

19   A.  Yes.

20   Q.  Are they the same or different?

21   A.  They are different.

22   Q.  So this is $4,000 in postal money orders?

23   A.  Yes.

24   Q.  Let's zoom out.  Scroll down.

25           Another photo of two $1,000 postal money orders.

1    Ms. Gutierrez, did you compare the serial numbers on

2 these?

3 A.  Yes.

4 Q.  Are these the same as any that we have looked at or

5 different?

6 A.  They are different.

7 Q.  Let's scroll down.  Let's scroll down one more.

8    OK.  Here's a fourth photo of two $1,000 postal money

9 orders?

10 A.  Yes.

11 Q.  And did you compare the serial numbers on these postal

12 money orders with the ones we have looked at previously?

13 A.  Yes, I did.

14 Q.  And are they the same or different?

15 A.  They are different.

16 Q.  So that is $8,000 in postal money orders total?

17 A.  Yes.

18    MR. FERGENSON:  Ms. Foote, let's scroll back up one

19 page, please.  Let's zoom on the FedEx envelope.

20 Q.  Ms. Gutierrez, where were these $8,000 in postal money

21 orders sent?

22 A.  The Bronx Walgreens, 244 East 161st Street.

23 Q.  And to who is the individual listed on the address?

24 A.  Nadine J. Wade.

25 Q.  OK.  Let's zoom back out and let's scroll down.

1          Does this FedEx record tracking number match the one

2     on the FedEx envelope we just looked at?

3          THE COURT:  Slow down, counsel.  Thank you.

4          MR. FERGENSON:  Sorry, your Honor.

5     Q.  Ms. Gutierrez, who signed for the FedEx package with $8,000

6     in postal money orders in it?

7     A.  N. Wade.

8          MR. FERGENSON:  All right.  Ms. Foote, let's go to

9     Government Exhibit 976, please.

10    Q.  Is this still Rose Martin?

11    A.  Yes.

12    Q.  And what's the date?

13    A.  December 27, 2019.

14    Q.  This is just eight days later after the $8,000 in money

15    orders?

16    A.  Yes.

17    Q.  I'll read the blue.

18         Honey they just called me now.  They said it's should

19    be all post office money order.  So you might have to go to two

20    different location to purchase all the money order.  You could

21    purchase 9,750 at one location then drive to another post

22    office to purchase another 9,750.  They said post office money

23    order is the best.  Because I told them I don't want any delay.

24    A.  All right.

25    Q.  There's a brief call.

NC5sWAD6                          Gutierrez - Direct

1    A.  My dear.  I have 17.

2    Q.  Bad connection.

3    A.  Remember your son was getting 2,500 right.

4    Q.  That's right.

5            Scroll down.

6            I meant you should purchase money order of 8,500 at

7    two different locations.

8    A.  OK.  I think I will go to four different locations.

9    Q.  OK lovey.  Sorry for the stress.

10   A.  I know.  I will leave soon.

11   Q.  OK baby.

12   A.  I will text you before I leave.

13   Q.  OK baby.

14   A.  Hey my dear.  I am leaving now.

15   Q.  OK.  Then there is a break.  Let's keep going.

16           I care about you Rose.  Then there is a symbol emoji.

17           MR. FERGENSON:  OK.  Now, there is an incoming photo.

18   Let's zoom on that.

19   Q.  Now, how many $1,000 postal money orders are shown in this

20   photo?

21   A.  Four.

22   Q.  And are the serial numbers all different on the left?

23   A.  Yes.

24           MR. FERGENSON:  Let's zoom back out.  Scroll down.

25   Yes, please, thank you, Ms. Foote.

NC5sWAD6                    Gutierrez – Direct

1  Q.  How many $1,000 postal money orders are in this photo?

2  A.  Five.

3  Q.  And serial numbers on the left, are they all different?

4  A.  Yes.

5  Q.  Are they different from the first photo of the $1,000

6  postal money orders?

7  A.  Yes.

8       MR. FERGENSON:  OK.  Let's scroll down.  Zoom on this

9  photo.

10  Q.  How many $1,000 postal money orders are if this photo,

11  Ms. Gutierrez?

12  A.  Six.

13  Q.  And are the serial numbers on the left all different?

14  A.  Yes.

15  Q.  Different from the earlier photos of the $1,000 postal

16  money orders?

17  A.  Yes.

18       MR. FERGENSON:  Let's scroll down.  Let's actually,

19  Ms. Foote, let's keep scrolling.  Let's zoom on that.

20  Q.  Now, Ms. Gutierrez, how many $50 bills are shown in this

21  photo?

22  A.  Nine.

23  Q.  And do you see -- just maybe focus on the top two bills.

24       Do you see the series of letters and numbers printed

25  in the bottom right?

1    A.  Yes.

2    Q.  And are you able to see it on the first one and the second

3    one?

4    A.  Yes.

5    Q.  At least partially?

6    A.  Yes.

7    Q.  OK.  Now, let's continue going and we can zoom back out.

8            Do you see the incoming message after that, let me

9    know if you got nine photo?

10   A.  Yes.

11   Q.  And you said there were nine $50 bills?

12   A.  Yes.

13   Q.  OK.  And not to make you do math, how much in total was

14   that cash?

15   A.  It's $450.

16   Q.  Thank you, Ms. Gutierrez.

17           All right.  Now let's zoom on this second photo of

18   cash.

19           How many $50 bills are shown in this photo,

20   Ms. Gutierrez?

21   A.  Eight.

22   Q.  So is that $400?

23   A.  Yes.

24   Q.  And to the extent they are visible, did you compare the

25   numbers and letters in the lower right of these dollar bills

1    with the ones that were visible in the first photo?

2    A.  Yes, I did.

3    Q.  Are they the same or different?

4    A.  They are different.

5    Q.  So we're at $850 in cash total?

6    A.  Yes.

7           MR. FERGENSON:  All right.  Let's keep scrolling.  All

8    right.  Let's zoom on this photo.

9    Q.  How many $50 bills are in this photo, Ms. Gutierrez?

10   A.  Four -- not four, I'm sorry.  Eight.

11   Q.  And now, kind of focusing you on portions of those letters

12   and numbers, are those visible here?

13   A.  Yes, some of them.

14   Q.  And did you compare those with the ones in the earlier

15   photos, to the extent they are visible?

16   A.  I did.

17   Q.  And are they the same or different?

18   A.  They are different.

19   Q.  All right.  So are we at -- we got another $400, right?

20   A.  1250.

21   Q.  We're at $1,250, Ms. Gutierrez?

22   A.  Yes.

23   Q.  All right.  Let's keep going.

24          How many $50 bills are shown in this photo,

25   Ms. Gutierrez?

NC5sWAD6                          Gutierrez – Direct

1    A.  Another eight.

2    Q.  It's another $400?

3    A.  Yes.

4    Q.  To the extent they are visible, did you compare the serial

5    numbers on these dollar bills with the ones in the earlier

6    photos?

7    A.  Yes.

8    Q.  Are they the same or different?

9    A.  They are different.

10   Q.  OK.  So are we at now $1,650 total?

11   A.  Yes.

12             MR. FERGENSON:  All right.  Let's keep going,

13   Ms. Foote.  Let's zoom on that last one.

14   Q.  How many $50 bills are shown in this fifth photo of cash,

15   Ms. Gutierrez?

16   A.  There is seven.

17   Q.  So how many in this batch?

18             THE COURT:  She just said seven.

19   Q.  How much?

20   A.  I've been doing this for a while.

21   Q.  Is it $350 in this batch, Ms. Gutierrez?

22   A.  Yes.

23   Q.  All right.  So we had 1,650 earlier, now are we at an even

24   2,000?

25   A.  Yes.

1          MR. FERGENSON:  All right.  Now, Ms. Foote, if we can

2    scroll back up a few pages.

3          THE COURT:  Counsel, may I have a sense of how much

4    more?

5          MR. FERGENSON:  I am wrapping up, your Honor.  I have

6    about two more pages.

7          THE COURT:  OK.  That's fine.  If you'll just excuse

8    me, I'm having a little bit of a back issue.  I want to stand

9    up.

10         Anybody else has a back issue, you can join me.  I'm

11   sorry.  I need to walk around a minute.  So thank you.

12         All right.  Anybody who wants to get up as well can

13   do.  I'm not demanding that you do so, just offering you the

14   opportunity.

15         All right.  Thank you so much.

16         Counsel, you may continue.

17         MR. FERGENSON:  Thank you, your Honor.

18         All right.  Mrs. Foote, let's zoom on the FedEx

19   envelope.

20   BY MR. FERGENSON:

21   Q.  OK.  Who is this FedEx envelope addressed to,

22   Ms. Gutierrez?

23   A.  Nadine Wade.

24   Q.  That same Bronx Walgreens?

25   A.  Yes.

NC5sWAD6                        Gutierrez – Direct

1    Q.  And, you know, beneath that after the bar code, could you

2    read the last four of the tracking number?

3    A.  2456.

4           MR. FERGENSON:  Let's scroll all the way down,

5    Ms. Foote.

6    Q.  And, Ms. Gutierrez, what's the last four of the tracking

7    number on this record?

8    A.  2456.

9    Q.  Same as on the envelope to Nadine Wade?

10   A.  Yes.

11   Q.  Ms. Gutierrez, who signed for this FedEx envelope filled

12   with money orders and cash?

13   A.  N. Wade.

14          MR. FERGENSON:  Ms. Foote, let's go to Government

15   Exhibit 977.

16   Q.  Is this still Rose Martin, Ms. Gutierrez?

17   A.  Yes.

18   Q.  What's the date?

19   A.  January 10, 2020.

20          MR. FERGENSON:  OK.  Let's just -- we don't even need

21   to read the text, Ms. Foote.  Let's just scroll down.

22          Let's just zoom on that check.

23   Q.  Ms. Gutierrez, how much is this check for?

24   A.  $37,000.

25   Q.  What's the date?

1    A.  January 10, 2020.

2    Q.  Is there a remitter listed?

3    A.  Yes.

4    Q.  Who is the remitter?

5    A.  Rose Lee Martin.

6    Q.  And who is this $37,000 cashier's check from Rose Martin

7    payable to?

8    A.  Royal Treasure Chest, LLC.

9          MR. FERGENSON:  Let's zoom back out.  Let's scroll

10    down.  Let's zoom on the FedEx envelope.

11    Q.  All right.  Where was this $37,000 check sent,

12    Ms. Gutierrez?

13    A.  The Bronx Walgreens, 244 East 161st Street.

14    Q.  And to which individual?

15    A.  Nadine Wade.

16          MR. FERGENSON:  All right.  Let's zoom out.  Let's

17    keep scrolling down.

18    Q.  And does the tracking number on this record match the

19    tracking number on the envelope?

20    A.  Yes.

21    Q.  Who signed for the $37,000 cashier's check from Rose Lee

22    Martin?

23    A.  N. Wade.

24          MR. FERGENSON:  OK.  Ms. Foote, let's go to Government

25    Exhibit 978.

NC5sWAD6                          Gutierrez - Direct

1   Q.  Let's just, again, let's just -- this is still Rose Martin,

2   right, Ms. Gutierrez?

3   A.  Yes.

4   Q.  What's the date?

5   A.  January 24, 2020.

6           MR. FERGENSON:  All right.  Ms. Foote, let's go to the

7   second page, please.  I'm sorry.  Keep ...

8           Let's zoom on the photo of the cash.

9   Q.  Ms. Gutierrez, how many $100 bills are shown in this photo?

10  A.  Ten.

11          MR. FERGENSON:  OK.  Let's zoom out.  Let's scroll

12  down.

13          We'll come back to that.  Let's zoom on the next

14  photo.

15  Q.  Do you see in the top right of one of these pieces of paper

16  what it says, Ms. Gutierrez?

17  A.  Yeah, money order.

18  Q.  And what's the dollar amount on each of these?

19  A.  $500.

20  Q.  How many $500 money orders are in this photo?

21  A.  Five.

22          MR. FERGENSON:  Zoom out, please.  Let's keep

23  scrolling.  Let's zoom on that photo.

24  Q.  And do you see what it says on these pieces of paper

25  towards the top center, Ms. Gutierrez?

NC5sWAD6                    Gutierrez - Direct

1  A.  Um, international money order.

2  Q.  And do you see the dollar amount after pay only?

3  A.  It's $500.

4  Q.  How many $500 international money orders are in this photo?

5  A.  Three.

6          MR. FERGENSON:  Zoom out.  Scroll down.

7          Let's go back up to page three, Ms. Foote, or to the

8  FedEx.  Page four, excuse me.  Let's zoom on that.

9  Q.  Ms. Gutierrez, who is this sent to?

10 A.  Jazmine Wad.

11 Q.  At what address?

12 A.  32 Holland Street, Newark, New Jersey.

13         MR. FERGENSON:  OK.  And let's scroll to the bottom,

14 Ms. Foote.

15 Q.  Is this the FedEx record matching the tracking number on

16 that photo?

17 A.  Yes.

18 Q.  And is there a signature for this package?

19 A.  No.

20         MR. FERGENSON:  All right.  Ms. Foote, let's pull up

21 Government Exhibit 979.

22 Q.  Still Rose Martin?

23 A.  Yes.

24 Q.  What's the date?

25 A.  January 28, 2020.

NC5sWAD6                        Gutierrez - Direct

1   Q.  That's four days after the one we just looked at?

2   A.  Yes.

3   Q.  OK.  Let's just zoom on the FedEx package.

4        Who is this going to?

5   A.  Jazmine Wad.

6   Q.  At what address?

7   A.  32 Holland Street in Newark.

8   Q.  Zoom out.  Let's scroll down and zoom on the photo.

9        Ms. Gutierrez, how many $500 money orders are shown in

10  this photo?

11  A.  Six.

12        MR. FERGENSON:  And, Ms. Foote, we can scroll all the

13  way down.

14  Q.  Is this the tracking number that matches the FedEx

15  envelope?

16  A.  Yes.

17  Q.  Was there a signature for this FedEx delivery?

18  A.  No, there was not.

19  Q.  All right.  Let's go to one last individual, Ms. Gutierrez.

20        MR. FERGENSON:  Ms. Foote, can you please pull up

21  Government Exhibit 931.  Scroll down.  Excuse me.

22  Q.  Ms. Gutierrez, what is the name in the top left here?

23  A.  Rhonda Dillon.

24  Q.  What's the date?

25  A.  October 10, 2019.

1    Q.  I'm not going to read the text.  Let's just scroll down.

2    Let's zoom on the second photo of the check.

3            Now, Ms. Gutierrez, I'm going to ask you to read this,

4    to the extent you can.

5            Is this a cashier's check?

6    A.  Yes.

7    Q.  For how much?

8    A.  $11,000.

9    Q.  What's the date?

10   A.  October 10, 2019.

11   Q.  And now what's the financial institution that sent this?

12   A.  Greater Nevada Credit Union.

13   Q.  OK.  And were you able to read the city and state printed

14   on the check?

15   A.  Yes.  Carson city, Nevada.

16   Q.  OK.  Now, I want to focus you, if you were looking at the

17   check properly, in its bottom left.

18           Do you see at the very bottom it says memo?  Do you

19   see that?

20   A.  Yes.

21   Q.  What is written in the memo line for this $11,000 cashier

22   check?

23   A.  Richard B. Francisco.

24   Q.  And who is this -- to whom is this $11,000 cashier's check

25   with a memo line of Richard B. Francisco payable to?

1   A.  Royal Treasure Chest, LLC.

2            MR. FERGENSON:  Let's zoom out.  Let's scroll down.

3   And let's zoom on the first picture of the FedEx envelope.

4   Q.  Ms. Gutierrez, on the left do you see, you know, a FedEx

5   sticker?

6   A.  Yes.

7   Q.  And who are those FedEx stickers addressed to?

8   A.  Nadine Wade.

9   Q.  At that same Bronx Walgreens address we've been looking at?

10  A.  Yes.

11  Q.  Now, I want to focus you on what you see on the right.

12            Could you describe what is shown in the photograph on

13  the right?

14  A.  It's an envelope.

15  Q.  And in the top left, is that the same credit union that was

16  on the check?

17  A.  Yes.

18  Q.  OK.  What's the name in the center of the envelope?

19  A.  Nadine J. Wade.

20  Q.  And then what does it say in the bottom left of this

21  envelope?

22  A.  Re Richard Francisco.

23            MR. FERGENSON:  Let's zoom out.  Can you scroll down

24  quickly, Ms. Foote.  Let's just zoom quickly on the package

25  FedEx envelope.  It's a little blurry.

1          Ms. Foote, if you don't mind, if we can go back to the

2     original FedEx picture and zoom on that.  Yes, please.

3     Q.  What are the last three of the tracking number here,

4     Ms. Gutierrez?  Last four, excuse me?

5     A.  3037.

6     Q.  Let's zoom out.

7          And what are the last four of the tracking number in

8     this FedEx record, Ms. Gutierrez?

9     A.  3037.

10    Q.  And who signed for this package with a letter and a check

11    for Richard Francisco?

12    A.  N. Wade, spelled incorrectly.

13          MR. FERGENSON:  All right, Ms. Foote.  We can take

14    that down.

15    Q.  Now, Ms. Gutierrez, we looked at FedEx records for

16    envelopes sent to three addresses, right?

17    A.  Right.

18    Q.  Those addresses were in the Bronx, in New Jersey, and in

19    Florida, correct?

20    A.  Yes.

21    Q.  All right.  Now, for the Bronx and the New Jersey

22    addresses, have we looked at all the FedEx records you reviewed

23    or only some?

24    A.  Only some.

25    Q.  Did you make summary charts for certain FedEx packages sent

NC5sWAD6                    Gutierrez – Direct

1   to those addresses?

2   A.  Yes.

3          MR. FERGENSON:  Ms. Foote, please show the witness

4   what's marked for identification as Government Exhibit 405-S.

5   Q.  Do you recognize this document?

6   A.  Yes.

7   Q.  And what does this document show?

8   A.  It's just summarizes some FedEx information.

9   Q.  And what's the address, you know, the mailing address in

10  the recipient name column?

11  A.  32 Holland Street.

12  Q.  And are these all the FedEx records in evidence, does this

13  summarize all the FedEx records in evidence for shipments sent

14  to this address or just some?

15  A.  Just some.

16  Q.  Which ones?

17  A.  Ones in which the recipient name was Jazmine Wade or Nadine

18  Wade or some variation of that name.

19  Q.  Is this chart accurate?

20  A.  Yes.

21          MR. FERGENSON:  Government offers Government Exhibit

22  405-S.

23          MR. SOLOWAY:  No objection.

24          THE COURT:  Government Exhibit 405-S is admitted into

25  evidence and may be shown to the jury.

NC5sWAD6                        Gutierrez – Direct

1           (Government's Exhibit GX 405-S received in evidence)

2           MR. FERGENSON:  Publish, please.

3   BY MR. FERGENSON:

4   Q.  Now, Ms. Gutierrez, let's just quickly walk through some of

5   these columns.

6           What's in the first column on the left?

7   A.  It's just a counter.

8   Q.  And the column to the right of that?

9   A.  Tracking number.

10  Q.  And to the right of that?

11  A.  The ship date.

12  Q.  And then what comes after ship date?

13  A.  The shipper's name.

14  Q.  And then after the shipper's name?

15  A.  The recipient's name.

16  Q.  Then there is a delivery received by column.

17          What's there?

18  A.  That's would be who the delivery was received by.

19  Q.  And delivery time, what's that?

20  A.  The time of the delivery.

21  Q.  OK.  Now, what's the date of the --

22          Just looking at the first one, what's the date on the

23  top delivery?

24  A.  March 18, 2019.

25  Q.  And who was the recipient name?

NC5sWAD6                          Gutierrez - Direct

1   A.  Jazmine Wad.

2   Q.  And these are all 32 Holland Street, right?

3   A.  Yes.

4            MR. FERGENSON:  Let's scroll, Ms. Foote.  Keep

5   scrolling, please.

6   Q.  You know, row 48, what's the date of the last shipment?

7   A.  March 3, 2020.

8   Q.  And who signed for that one?

9   A.  M. Felix.

10  Q.  Who is the sender of that package?

11  A.  Patsy Kwitkin.

12           MR. FERGENSON:  Ms. Foote, let's take that down.

13           Let's show the witness, please, what's marked as

14  Government Exhibit 403-S.

15  Q.  All right.  Ms. Gutierrez, do you recognize this document?

16  A.  I do.

17  Q.  Is this the same kind of summary chart for the 244 East

18  161st Street address as the one we just looked at for 32

19  Holland?

20  A.  Yes.

21  Q.  Is this chart accurate?

22  A.  Yes.

23           MR. FERGENSON:  Government offers Government Exhibit

24  403-S.

25           MR. SOLOWAY:  No objection.

NC5sWAD6                          Gutierrez - Direct

1          THE COURT:  Government Exhibit 403-S is admitted into

2     evidence and may be published to the jury.

3          (Government's Exhibit GX 403-S received in evidence)

4          MR. FERGENSON:  Thank you, Ms. Foote.

5     Q.  So this is the same type of summary chart we were just

6     looking at?

7     A.  Yes.

8     Q.  And what's the address for this one?

9     A.  244 East 161st Street.

10    Q.  Like the delivery address, that is?

11          That's the recipient address?

12    A.  Yes.

13    Q.  And that's the Bronx Walgreens we've been looking at,

14    right, Ms. Gutierrez?

15    A.  Yes.

16    Q.  OK.  What's the date of the first shipment listed here?

17    A.  The first delivery date is August 30, 2019.

18          MR. FERGENSON:  And let's just scroll, Ms. Foote.

19    Q.  Focusing you on row 42, what's the date of the last

20    delivery?

21    A.  July 2, 2020.

22    Q.  And the recipient name of that delivery was whom?

23    A.  Nadine J. Wade.

24    Q.  And who signed for that?

25    A.  J. Wade.

NC5sWAD6                         Gutierrez - Direct

1          MR. FERGENSON:  No further questions.  Thank you,

2     Ms. Gutierrez.

3          THE COURT:  All right.  I imagine there is

4     cross-examination.  Correct, sir?

5          MR. SOLOWAY:  Very brief.  Under ten minutes.

6          THE COURT:  If it's all right with you, I think we

7     should, nonetheless, take the break.  I appreciate what you're

8     saying.

9          Let's take a brief afternoon break just so we can all

10    get up and stretch our legs, and I'll see you within ten

11    minutes.

12         I'll ask you, please, not to discuss this case with

13    each other or with anyone else.  Keep an open mind until all of

14    the evidence is in.  And we'll see you in a few minutes.

15         Thank you very much.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  If I can ask the parties to be seated for

3   a moment, please.

4          Ms. Gutierrez, I would like to remind you, you remain

5   under oath, and I'd like to let you know, now that you're under

6   cross-examination, you may not discuss the substance of your

7   testimony with the government.  Do you understand?

8          THE WITNESS:  Yes.

9          THE COURT:  I understand there is approximately ten

10  minutes.  We'll see about redirect.

11         Mr. Fergenson, I say this with all the esteem I have

12  for you.  You're underestimating your times by a fair amount,

13  so I think you have to overstate what you think it is so that

14  my expectations will be better managed.

15         Is it the contemplation of the parties that there will

16  be another witness that we will be starting with today?

17         MR. KING:  Our Honor, we have another witness who is

18  about 20 minutes.  I think that is realistic assessment.

19         THE COURT:  Oh, OK.  Not a Mr. Fergenson assessment.

20         MR. KING:  Got you.

21         THE COURT:  No, that's fine.  Let's hope for that

22  then.

23         OK.  There was a snack for the jury, so I wanted them

24  to be fed.  We'll come back.

25         Let's hope we at least get through that witness.  Of

NC5sWAD6                    Gutierrez - Direct

```
 1   course, counsel wouldn't know what the anticipated cross is
 2   without hearing the direct testimony.  We'll see where we go
 3   for today.
 4            MR. SOLOWAY:  The next witness?
 5            THE COURT:  Yes, please.
 6            MR. SOLOWAY:  I don't think we expect very much cross.
 7            THE COURT:  Oh, then God willing we will get through
 8   that witness as well.  I'll cross my fingers and toes for this.
 9            I'll see you in a few minutes.  Thank you very much.
10            (Recess)
11            Mr. Stern, as the jury is walking in, if you want to
12   go to the podium, sir, you can.  Thank you.
13            MR. STERN:  OK.
14            (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

NC5sWAD6                          Gutierrez - Cross

1          (Jury present)

2          THE COURT:  Please be seated.  We're just waiting for

3    Ms. Wade.

4          Thank you, Mr. Stern.

5    CROSS-EXAMINATION

6    BY MR. STERN:

7    Q.  Hi, Ms. Gutierrez.

8    A.  Hi.

9    Q.  Ms. Gutierrez, what we've been going over for the last

10   several hours were not the entirety of the conversations had

11   between whoever the person is, Francisco and the women he was

12   talking to, are they?

13   A.  I couldn't answer that.  I don't -- I assume not.

14   Q.  Well, did you read the entire conversations at any point?

15          THE COURT:  Do you mean into the record, sir, or in

16   her life working on this case?

17          MR. STERN:  In her life as a paralegal.

18   A.  Wait.  Can you ask the question again?

19   Q.  Yes.

20          There were conversations between the various women and

21   Francisco, whatever his name is, right?

22   A.  Yes.

23   Q.  Did you read those in their entirety?

24   A.  In the record?

25          THE COURT:  No.  No, he means --

1    A.  In my life?  No.

2    Q.  Who prepared the excerpts that you were working from today?

3    A.  I did.

4    Q.  But you didn't excerpt them from the conversations?

5    A.  Are you asking if I chose what to include?

6    Q.  Yes.

7    A.  Which message to include?

8    Q.  Yes.

9    A.  The attorneys did.

10    Q.  OK.  And that was done before you ever saw the

11    conversations?

12    A.  Yes.

13    Q.  So you don't know, for example, if there is certain

14    patterns in those conversations in parts that weren't included

15    here?

16    A.  I don't know if there is any pattern.

17    Q.  You don't know if in every one of those conversations the

18    women are sent a record of how much money this Francisco has?

19    A.  I didn't see anything like that.

20    Q.  You don't know if they have conversations about their

21    families, he tells them about his family, and they tell him

22    about theirs?

23    A.  Besides what the -- there was some discussion.  But besides

24    that, no.

25    Q.  There were some sections in what you were dealing with?

1    A.  Yes.

2    Q.  But all the rest of these conversations you know nothing

3    about, is that right?

4    A.  That's right.

5             MR. STERN:  Thank you.

6             MR. FERGENSON:  No redirect, your Honor.

7             THE COURT:  All right.  Ms. Gutierrez, I think very

8    much.  You may step down.

9             (Witness excused)

10            Would the government please call its next witness.

11            MR. FERGENSON:  Government calls T.R. Pescod.

12            THE DEPUTY CLERK:  Mr. Pescod, I'll ask you to step up

13   into the witness stand and remain standing.

14    T.R. PESCOD,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17            You can be seated, and into the microphone, please

18   state and spell your full name for the record.

19            THE DEPUTY CLERK:  My name is Thomas R. Pescod Junior,

20   P-e-s-c-o-d.

21            THE COURT:  Thank you very much.

22            Counsel, you may inquire.

23            Ms. Noriega, you'll find out where the alarm is coming

24   from.  Thank you.

25   DIRECT EXAMINATION

1    BY MR. FERGENSON:

2    Q.  Good afternoon.

3    A.  Good afternoon.

4    Q.  What's your name?

5    A.  Thomas R. Pescod Junior.  I'm also known as T.R. Pescod.

6    Q.  Mr. Pescod, where do you live?

7    A.  Amagansett, New York.

8    Q.  Where did you grow up?

9    A.  I grew up in West Hampton Beach, New York.

10   Q.  What do you do for work?

11   A.  I'm a designer.  But for 25 plus years, I've also been

12   modeling and acting.

13   Q.  And, just generally, what kind of modeling and acting?

14   A.  I've done a number of things.  I've done TV commercials for

15   cars, for perfumes, a lot of fashion campaigns.  Um, everything

16   from Macy's to L.L. Bean to foreign companies.  In particular,

17   a brand called Cesare Attolini which is all bespoke menswear.

18   Q.  Where is Cesare Attolini based?

19   A.  In Italy.

20   Q.  Now, Mr. Pescod, have pictures from your acting or modeling

21   career been made available online?

22   A.  Yes.

23   Q.  What social media accounts, if any, do you use?

24   A.  Primarily Instagram.  But to have Instagram, you have to

25   have a Facebook account.  I have Facebook as well, but I

1    haven't really been active on there in a number of years.

2    Q.  Focusing on your Instagram account, is it public?

3    A.  Yes.

4    Q.  What sorts of things do you post on Instagram?

5    A.  Lifestyle, family events, holidays, also photographs from

6    my modeling career.  It's kind of a part of our business, that

7    you're shown online and you have a certain amount of followers.

8    Q.  What about photos of yourself?

9    A.  Photos of myself, photos of myself at photo shoots, videos

10   of days at the beach.  Sometimes when I'm on location shooting

11   modeling work.  There was a period that I was sort of speaking

12   into the camera and producing little stories to garner

13   interest.

14           MR. FERGENSON:  Ms. Foote, could you please show just

15   for the witness what's marked as Government Exhibit 503-A.

16           THE COURT:  Any objection from defense counsel?

17           I'm not sure --

18           MR. SOLOWAY:  Is he offering?

19           THE COURT:  There will be at some point.  I'm trying

20   to streamline.

21           MR. SOLOWAY:  No objection.

22           THE COURT:  Assuming it will be offered by the

23   government, Government Exhibit 503-A is admitted into evidence

24   and may be published to the jury.  Thank you.

25           (Government's Exhibit GX 503-A received in evidence)

NC5sWAD6                          Pescod - Direct

1                  MR. FERGENSON:  Thank you, your Honor.

2                  Please publish.

3     BY MR. FERGENSON:

4     Q.  All right.  Mr. Pescod , what are we looking at here?

5     A.  This is my Instagram account.

6     Q.  And what does the blue checkmark next to T.R. Pescod mean?

7     A.  That means that I'm verified.

8     Q.  Has the account always been verified?

9     A.  No.  It's only been verified, um, I would say since

10    February of this year.

11    Q.  And the circles towards the bottom of the page, what are

12    those?

13    A.  Those are highlights, and certain videos and pictures that

14    I wanted to keep, and they stay on your account.  Some of the

15    stories only last for 24 hours.  If you put them in these

16    highlights, they will stay there --

17    Q.  And are these --

18    A.  -- for eternity.

19    Q.  Are these some of the sorts of videos that you mentioned

20    earlier on your Instagram?

21    A.  Yes.

22                  MR. FERGENSON:  Ms. Foote, we can go ahead and take

23    that down.

24    Q.  Mr. Pescod, has it ever come to your attention that people

25    were using photos of you without your consent?

1    A.  Yes.

2    Q.  How did you learn about it?

3    A.  Mainly through direct messages on Instagram where people

4    can send you a message directly.  And there was a number of

5    people that had reached out, relatives or actually people who

6    were scammed themselves, and that's -- it's just been over the

7    past, like, six or seven years that I've been getting all kinds

8    of messages from people.

9    Q.  How often were you contacted by people?

10   A.  Often.  There was a period of time where every week I would

11   be getting direct messages from relatives of people that were

12   scammed or people themselves, and I would try to explain I've

13   been complaining to Instagram, but nothing was really ever

14   done.

15   Q.  Were you ever contacted by individuals who had thought they

16   were in a relationship with you?

17   A.  Yes.

18   Q.  To your recollection, would the people contacting you say

19   what name they knew you as?

20   A.  Not always, no.  But there were a couple of instances --

21   there were all different iterations of my name itself.  Thomas

22   Pescod, Richard Pescod, Thomas_Pescod.  There were a number of

23   false accounts on Instagram I would always report.

24          Then it came to my knowledge over the past, I would

25   say, about two years ago or so, that there was a Francisco and

NC5sWAD6                        Pescod - Direct

1    then there was a Diego Francisco.  There were a number of

2    iterations of that.

3    Q.  Mr. Pescod, have you ever been on the online site Marriage

4    Minded?

5    A.  No.

6    Q.  What about the online site Our Time?

7    A.  No.

8    Q.  LoveAndSeek?

9    A.  No.

10   Q.  Have you ever been in a relationship with Joy Birch?

11   A.  No.

12   Q.  Clemi Carter Arbaugh?

13   A.  No.

14   Q.  Patsy Kwitkin?

15   A.  No.

16   Q.  Judy Crain?

17   A.  No.

18   Q.  Patsy Stanley?

19   A.  No.

20   Q.  What about Rhonda Dillon?

21   A.  No.

22   Q.  All right.  Mr. Pescod, I would like to show you some

23   images now.

24           MR. FERGENSON:  Ms. Foote, could you please pull up

25   what's in evidence as Government Exhibit 1401 at page two.

NC5sWAD6                          Pescod - Direct

1    Q.  Is it up on your screen Mr. Pescod?

2    A.  Yes.

3    Q.  Do you recognize this image?

4    A.  Yes.

5    Q.  What is it?

6    A.  This is one of the modeling shoots I did for Cesare

7    Attolini.

8    Q.  Is that the brand you mentioned earlier?

9    A.  Yes.

10   Q.  And you said, I believe you said it was a bespoke men's

11   attire company?

12   A.  Yes.

13   Q.  And what was your relationship with that company?

14   A.  Um, I was the face of the brand for about ten years, and we

15   would shoot twice a year in Italy.  In fact, that's one of

16   their suits that I'm wearing.

17            THE COURT:  Right now?

18            THE WITNESS:  No.  In the photo.

19            THE COURT:  OK.  I just wondered.

20            THE WITNESS:  No, I didn't break out the three-piece

21   suit today.

22            THE COURT:  OK.

23   Q.  And around what year did you start to be the face of the

24   brand?

25   A.  Um, around 2012.

NC5sWAD6                         Pescod - Direct

 1              MR. FERGENSON:  Ms. Foote, let's go to Government

 2    Exhibit 1401 at page three, please.

 3    Q.  Do you recognize this photo?

 4    A.  Yes.  Again, an image from one of the photo shoots for

 5    Cesare Attolini.

 6    Q.  Same brand?

 7    A.  Same brand.

 8              MR. FERGENSON:  All right.  Ms. Foote, let's now pull

 9    up what's in evidence as Government Exhibit 1402 at page two.

10              Scroll down.  OK.

11    Q.  Mr. Pescod, is this a photograph from one of your modeling

12    campaigns?

13    A.  No.

14    Q.  Is this a photograph you recognize?

15    A.  I recognize.

16    Q.  Is this a real photograph?

17    A.  No.

18    Q.  Have you ever taken a selfie on a ship like that?

19    A.  No.

20    Q.  Have you ever worked on a rig?

21    A.  No.

22              MR. FERGENSON:  All right.  Ms. Foote, let's go to

23    Government Exhibit 501M.

24    Q.  Do you recognize this photograph?

25    A.  Yes.

NC5sWAD6                        Pescod - Direct

1   Q.  How do you recognize it?

2   A.  Um, it's a photograph of me in my home, while my home South

3   Hampton, New York, that was taken by a friend of mine, Valerie,

4   and her dog Largo.

5   Q.  Would this photo have been available online?

6   A.  Yes.

7            MR. FERGENSON:  Ms. Foote, let's go to Government

8   Exhibit 501N.

9   Q.  Is this a real photograph?

10  A.  Yes.

11  Q.  And what's shown in this photograph?

12  A.  This was actually at the headquarters of the Cesare

13  Attolini in Naples, Italy.  And I had visited the headquarters

14  previous to one of the shoots we were doing.

15           MR. FERGENSON:  Ms. Foote, let's go to Government

16  Exhibit 501O.

17  Q.  What about this photograph, is this a real photograph?

18  A.  No.

19           MR. FERGENSON:  Ms. Foote, let's go to Government

20  Exhibit 501K?

21           THE COURT:  Counsel, may I inquire of something?

22           MR. FERGENSON:  Yes.

23           THE COURT:  Thank you.

24           Sir, I understand that it may not be a real

25  photograph.  Is it possible that you took the picture of

1    yourself or someone took the picture of yourself that's at the

2    front and superimposed it?

3            THE WITNESS:  Yes.

4            THE COURT:  When you said earlier that the photograph

5    on the rig, I believe, was fake, is it the case that the

6    photograph, the picture of you is real?

7            THE WITNESS:  The picture of me is real.

8            THE COURT:  The setting is not real.

9            THE WITNESS:  The setting is not real.  The picture,

10   it's, like a, selfie that I had taken, but the --

11           THE COURT:  The background.

12           THE WITNESS:  -- the setting behind it was not real.

13           THE COURT:  Thank you for clarification, sir.

14           Thank you, Counsel.

15           THE WITNESS:  Thank you.

16           MR. FERGENSON:  Thank you.

17           Ms. Foote, let's go to Government Exhibit 501K.

18           Ms. Foote, if we can zoom on the lower portion of the

19   passport.

20   BY MR. FERGENSON:

21   Q.  Now, Mr. Pescod, who is shown in this photograph?

22   A.  That's a photograph of me.

23   Q.  What's the name on this passport?

24   A.  Francisco Diego.

25   Q.  What's the place of birth?

1    A.  Rome, Italy.

2    Q.  Is this your passport?

3    A.  No.

4    Q.  Have you ever used the name Diego Francisco?

5    A.  No.

6    Q.  Richard Francisco?

7    A.  No.

8    Q.  Tom Francisco?

9    A.  No.

10   Q.  Besides T.R., have you used any other names?

11   A.  No.

12             MR. FERGENSON:  No further questions.

13             Thank you, Mr. Pescod.

14             THE COURT:  Thank you.

15             Cross-examination.

16             MR. SOLOWAY:  We have no questions for Mr. Pescod.

17             THE COURT:  OK.  Well, perhaps we can let this witness

18   go then.

19             All right.  Mr. Pescod, we thank you very much.

20             THE WITNESS:  Thank you.

21             THE COURT:  You're released, sir.  Thank you.

22             (Witness excused)

23             Asking for a friend.  Is there another short witness

24   or are the parties together asking me to break for the day?

25             I'll let you speak to each other, if you want to.

1          MR. KING:  The next witness is a longer witness, your

2     Honor.

3          THE COURT:  All right.  Given that, does it make

4     sense, Mr. Soloway, to break for the day?

5          MR. SOLOWAY:  It does, your Honor.  I believe so.

6          THE COURT:  OK.  Then that's what we'll do.

7          We have made progress today.  I thank you very much.

8     I appreciate, in particular, the fact that you have all been

9     very timely.  I've got some folks here less timely.  I'll speak

10    to them later.  I know you are, and I'll ask you to continue to

11    do so.

12         I'm going to release you for the day and ask you to

13    come back tomorrow at 8:45 so we that we can begin at close to

14    nine as possible.  See, I'm managing everyone's expectations.

15         I'm going to ask you, please, not to discuss this case

16    with each other or anyone else.  Keep an open mind until all of

17    the evidence is in.  I thank you very much for your attendance

18    and patience today.

19         All rise for the jury, please.

20         (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Counsel, can I ask you to be seated for a

3     moment.

4          Thank you very much.  I want to raise an issue with

5     the parties.  I want to make sure I'm raising it correctly.  I

6     want to be very clear and very measured, so you'll excuse me if

7     I take a little bit of time to get this out.

8          This morning there was an ex parte conference that I

9     had in my robing room with defense counsel and Ms. Wade.  What

10    I mentioned to the parties and to the public when I came out

11    into court was that there was a request for certain types of

12    information, and I produced some of that information.  For

13    example, I produced the indictment.

14         There was also a request for certain information that

15    I thought was better served by a FOIA request, and if one is

16    made, it will be addressed in due course.

17         There was a request, the last request I had was a

18    request for a type of statement.  As I can describe, if defense

19    counsel is not recalling the statement in question, I'm just

20    going to use that name.  You can tell me if you need further

21    clarification as to the time of statement.

22         MR. SOLOWAY:  I know what you mean, your Honor.

23         Thank you.

24         THE COURT:  OK.  Thank you.

25         All right.  Well, in connection with those, that

1    request for that type of statement, Ms. Wade gave to me several

2    statutes that she indicated supported her entitlement to

3    statements of that type from individuals involved in the trial

4    team.

5          I committed this morning that I would look into the

6    matter, and during the morning proceedings and a little bit

7    into the afternoon, Mr. Mendes, my thoughtful law clerk, was

8    looking into these statutes.

9          I think I hinted to defense counsel and to Ms. Wade at

10   the time that I didn't think these statutes were relevant, and

11   my law clerk's research, which I have checked during the lunch

12   break, confirms that they are not relevant.

13         But what is troubling to me is that, in my law clerk's

14   travels, it appears that the information or the statements or

15   the arguments that Ms. Wade were making were found and gathered

16   in a series of websites that are put forth by people who have,

17   what I'll call, a fundamentally incorrect view of the United

18   States Government and how it operates and how the United States

19   is to be considered.

20         And so it's one thing if Ms. Wade is asking me this

21   because she genuinely cares and wants this information.  If

22   she's using some sort of turnkey -- I don't want to say

23   obstruction, that's not the word -- but these arguments that

24   are absolutely wrong.  They are wrong when they're crafted.

25   I'm not interested in having to dispel the views of people who

1  subscribe to these beliefs about the United States Government.

2          So what I'm saying is, we -- my law clerk and I --

3  wasted several hours this morning looking into it.  If I had

4  known that these were not her your actual thoughts, but

5  actually something she found in some weird online website, I

6  might not have given them the care I have.  I now know this is

7  where they are coming from.

8          We are not going to do this again.  And I'll ask

9  defense counsel to, perhaps, preview their client's requests

10  before sending me on the rabbit hole expedition that I went

11  through this morning.  That's all I'm going to say on the

12  issue.

13          If counsel want me on this record to go through each

14  of the statutes and explain why it's irrelevant, I'll do that.

15  I think you would probably do better looking at them yourselves

16  and explaining to your client why they are not.

17          I'll do whatever you want, Mr. Soloway.

18          MR. SOLOWAY:  Judge, we'll do our best.  We hear you.

19  We will do our best to manage our client's expectations.

20          THE COURT:  There you go.  Now it's on.  There you go.

21          MR. SOLOWAY:  I think that we said, when we came in

22  and we began the proceedings this morning, that we had no

23  expectation that there was going to be any ex parte.  Your

24  deputy came out this morning and said, Does anybody have

25  anything they want --

1        THE COURT:  Yes.

2        MR. SOLOWAY:  -- to alert the court.  Everyone, except

3   Ms. Wade, said no, we do not.  And then Ms. Wade -- so at that

4   point, that was the entirety of our notice, is the word I'll

5   use.

6        THE COURT:  OK.

7        MR. SOLOWAY:  And the specific statutes, we didn't get

8   into the granular details.  We were not aware of.

9        THE COURT:  OK.

10        MR. SOLOWAY:  The sites that she gave to your Honor I

11   heard for the first time in the robing room.  If we had, you

12   know, time to --

13        We have a lot to do.

14        THE COURT:  Yes.  Same here.

15        MR. SOLOWAY:  I know, your Honor.  I know.  I know.

16   And that's the way it happened today.

17        We will try our best to address these things and to

18   have meaningful discussions with our client about what is going

19   on before we come into court, and we will try to avoid having

20   anything like that happen again.  We'll do our best, and that's

21   all I think I can say.

22        THE COURT:  While we were in the ex parte

23   discussion -- no, government, you're not getting any more

24   details of them -- I made mention of the type of argument I

25   thought this was.

1          MR. SOLOWAY:  Yes.

2          THE COURT:  You heard me.  Yes.

3          It is.  It is.

4          MR. SOLOWAY:  Yes, your Honor.

5          THE COURT:  And that's not something, I'm not going to

6     have a trial about that.

7          So going forward, I hope there -- well, I hope there

8     will be no further requests for ex parte communications.  I

9     doubt I'll indulge them.  but I wanted you know to know, this

10    was what I feared it was, and I won't do it again.

11         MR. SOLOWAY:  Yes, your Honor.

12         THE COURT:  So I appreciate that you will talk to your

13    client and, perhaps, explain to her why these particular

14    theories are not going to be countenanced in this courtroom.

15         MR. SOLOWAY:  Yes, your Honor.

16         THE COURT:  All right.  I thank you all very much.

17         We'll see everyone tomorrow at 8:45, unless there is

18    anything --

19         Mr. King, I was so close to getting out of here.

20         MR. KING:  Sorry, your Honor.  We'll be very brief.

21    One thing we wanted to put on the record today.

22         THE COURT:  Everybody seems to put something on the

23    record today.

24         Sir, yes.

25         MR. KING:  Yes, your Honor.

1          Yesterday during jury selection when we did portions
2     of the selection in the robing room, as opposed to at sidebar
3     with the white noise machine, the government just wanted to put
4     on the record that our view is that those were not akin to a
5     courtroom closure, that that was a mechanism your Honor used
6     essentially in lieu of a sidebar, but wasn't closed off to the
7     public.
8          And so the government just wanted to put its view of
9     what that mechanism was on the record, because there was some
10    discussion about what it was, and we just wanted to put on the
11    record our view that it was not a courtroom closure or akin to
12    a courtroom closure.
13         THE COURT:  Fair enough.  I'm not interested in having
14    Alcantara revisited years later.
15         I did also obtain from the parties their consent to
16    have the proceedings in the robing room so we could have
17    discussions without the white noise or the jurors.
18         so I appreciate you have put on the record the
19    government's perspective, sir.
20         Thank you.
21         MR. KING:  Thank you, your Honor.
22         THE COURT:  All right.  Anything from the defense this
23    afternoon?
24         MR. SOLOWAY:  Dave?
25         MR. STERN:  No.

NC5sWAD6                      Pescod - Direct

1              THE COURT:  All right.  Go forth, everyone.

2              Thank you very much.  We'll do this again tomorrow.

3    Have a great day.

4              (Adjourned to December 6, 2023, at 8:45 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3    JOY BIRCH

 4   Direct By Mr. King . . . . . . . . . . . . .79

 5   Cross By Mr. Soloway . . . . . . . . . . . . .99

 6   Redirect By Mr. King . . . . . . . . . . . 105

 7   JULIA GUTIERREZ

 8   Direct By Mr. Fergenson  . . . . . . . . . . 111

 9   Cross By Mr. Stern . . . . . . . . . . . . 216

10    T.R. PESCOD

11   Direct By Mr. Fergenson  . . . . . . . . . . 219

12                       GOVERNMENT EXHIBITS

13   Exhibit No.                              Received

14    GX 501L  . . . . . . . . . . . . . . . . .79

15    GX 501K  . . . . . . . . . . . . . . . . .82

16    GX 501M, N, O, P, and Q  . . . . . . . . . .83

17    GX 501A, B, C, D, E, F, G,  . . . . . . . . .90

18          H, I, and J

19   S1  . . . . . . . . . . . . . . . . . . . 107

20    101A through 101B, 111A . . . . . . . . . 110

21              through 111D, 112A through

22              112E, 113A through 113E, 114A

23              through 114D, 115A through

24              115S, 121A through 121C, 122A

25              through 122C, 123A through
```

123C, 124A through 124C, 125A

through 125G, 126A through

126M, 131A through 131M, 132A

through 132E, 140A through

140K, 141A through 141E, 142A

through 142I, 143A through

143E, 144A through 144E, 145A

through 145F, 146A through

146H, 147A through 147G, 148A

through 148F, 149A through

149E, 151A through 151B, 152A

through 152C, 161A through

161H, 162A through 162E, 163A

through 163C, 171A through

171B, 172A through 172B, 173A

through 173B, 174A through

174B, 181A through 181E, 182A

through 182D, 183A through

183D, 191A through E, 201A

through 201B, 202A through

202C, 203A through 203B, 401

through 407, 71 through 74,

61A and 62A through 62F

S4     . . . . . . . . . . . . . . . . . . 113

  1001 to 1018, 1101 to  . . . . . . . . . . 116

1109, 1201, 1301 to 1305, 1401

to 1405, 1501, 1502, 1601 to

1647, 1701 to 1731, 1801 to

1831 and 1901 to 1906

900S  . . . . . . . . . . . . . . . . . 120

911 to 915, 921, 931, 941 . . . . . . . . . 122

to 944, 951 to 965, 971 to

979, 981 to 986, 991

S2  . . . . . . . . . . . . . . . . . . 127

11 through 15  . . . . . . . . . . . . . 128

S6  . . . . . . . . . . . . . . . . . . 130

51 through 55  . . . . . . . . . . . . . 131

GX 405-S  . . . . . . . . . . . . . . . 210

GX 403-S  . . . . . . . . . . . . . . . 212

GX 503-A  . . . . . . . . . . . . . . . 220